# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>ABENGOA BIOENERGY US HOLDING, LLC, *et al.*,<br><br>            Debtors.[1] | Chapter 11<br><br>Case No. 16- 41161-659<br><br>(Joint Administration Requested)<br><br>**Hearing Date and Time:**<br>March 2, 2016 at 10:00 a.m.<br>(Prevailing Central Time)<br><br>**Hearing Location:**<br>Courtroom 7 North |

## MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507, BANKRUPTCY RULES 2002, 4001, 6004, AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING <u>RELATED RELIEF</u>

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), by and through their proposed undersigned attorneys, hereby file this motion (the "<u>Motion</u>"), pursuant to sections 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of an interim order on an expedited basis, substantially in the form annexed hereto as <u>Exhibit A</u> (the "<u>DIP Interim Order</u>"), and a final order (the "<u>DIP Final Order</u>" and, together with the Interim Order, the "<u>DIP Orders</u>"), (i) authorizing the Debtors to

---

[1] The Debtors in these bankruptcy cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Abengoa Bioenergy US Holding, LLC (2217), Abengoa Bioenergy Company, LLC (1658); Abengoa Bioenergy of Nebraska, LLC (1343); Abengoa Bioenergy Engineering & Construction, LLC (2441); Abengoa Bioenergy Trading US, LLC (2469); Abengoa Bioenergy Outsourcing, LLC (9794).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  16150 Main Circle Drive #300, Chesterfield, MO 63017.

(a) enter into a postpetition financing arrangement (the "DIP Loan") on an interim basis on the terms set forth in the debtor in possession credit and security agreement, dated as of February 24, 2016 substantially in the form attached hereto as Exhibit B (the "DIP Credit Agreement," and together with the security agreement, the "DIP Agreements") and on a final basis under a debtor in possession credit and security agreement containing terms and conditions substantially similar to those set forth in the DIP Credit Agreement, and (b) use Cash Collateral (as defined below), (c) granting liens and providing super-priority administrative expense status, (d) granting adequate protection to the Debtors' prepetition secured lender, (e) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (f) granting related relief (the "Motion").[2]  In support of this Motion, the Debtors respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED

1.      In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their liquidity needs and resume operations of the ethanol facilities located in Ravenna, Nebraska and York, Nebraska (together, the "Plants").  In addition, the Debtors require access to sufficient liquidity to fund these Chapter 11 cases while working towards a successful sale transaction with respect to substantially all of the Debtors' assets. Postpetition financing, in addition to the use of cash collateral, is necessary in order for the Debtors to have access to sufficient liquidity to maintain ongoing day-to-day operations and fund their working capital needs, including but not limited to, paying and retaining employees, maintaining insurance and maintaining good working order and conditions of the Plants.  Absent postpetition financing and the use of cash collateral, the Debtors will be forced to wind-down their operations due to a lack of funds.  It is therefore imperative that the Debtors have access to

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Interim Order or the DIP Credit Agreement.  To the extent that there is any conflict between this Motion and the DIP Interim Order, the DIP Interim Order shall control.

sufficient liquidity to avoid imminent irreparable harm and successfully consummate a sale transaction as quickly as possible.

2.       Accordingly, by this Motion, the Debtors are seeking, *inter alia*:

(a)       authorization for the Debtors to obtain senior secured postpetition financing consisting of a credit facility in an amount not to exceed $41,000,000 at any one time outstanding (the "DIP Loan") in accordance with, (i) prior to entry of the DIP Final Order, and the DIP Credit Agreement  entered into among Abengoa Bioenergy Company, LLC, Abengoa Bioenergy US Holding, LLC, Abengoa Bioenergy of Nebraska, LLC, Abengoa Bioenergy Engineering and Construction, LLC, Abengoa Bioenergy Trading US, LLC and Abengoa Bioenergy Outsourcing, LLC, as borrowers (the "Borrowers"), and The Kimberley Fund, LP, an affiliate of Sandton Capital Partners, L.P. (the "DIP Lender"), and (ii) following entry of the DIP Final Order, the DIP Credit Agreement and, together with such other documents and agreements required by the DIP Lender, the "DIP Credit Documents");

(b)       following the entry of the DIP Interim Order, authorization for the Debtors to obtain from the DIP Lender an interim advance in an amount not to exceed a maximum outstanding principal amount of $8,000,000 (the "Interim Amount") in accordance with the DIP Credit Agreement and the DIP Interim Order, which Interim Amount will include the amount of Existing Debt (as defined below) assumed by the Debtors in accordance with the DIP Credit Agreement and which will constitute part of the DIP Loan;

(c)       authorization for the Debtors to assume the Existing Debt as an obligation under the DIP Loan and to deem all outstanding Existing Debt, including, without limitation, all principal, interest, fees and other expenses, to constitute obligations under the DIP Loan that are valid, binding, and enforceable against the Debtors without further action by the Debtors or the DIP Lender;

(d)       upon entry of the DIP Final Order, authorization for the Debtors to obtain from the DIP Lender an amount not to exceed a maximum outstanding principal amount of $41,000,000 (the "Total Commitment") in accordance with the DIP Agreements and the DIP Final Order, which Total Commitment includes the amount of Existing Debt assumed by the Debtors in accordance with the DIP Agreements;

(e)       authorization for the Debtors to execute and deliver the DIP Agreements and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(f)       authorization for the Debtors to grant, subject only to valid, perfected and non-avoidable liens that existed on or as of the Petition Date (as defined herein) or the date acquired (if acquired after the Petition Date), pursuant to section

3

364(c)(2) of the Bankruptcy Code, the DIP Lender is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, including, without limitation, all cash and cash collateral of the Debtors (whether maintained with the DIP Lender or otherwise) and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, post-petition intercompany claims against Debtors), contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries and the proceeds, product, offspring or profits of all the foregoing (collectively, "Unencumbered Property");

(g)     authorization for the Debtors to grant to the DIP Lender assurances for the full and timely payment of the Debtors' obligations under the DIP Loan by granting to the DIP Lender (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim (a "Superpriority Administrative Expense Claim") having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carveout (as defined below), and (ii) pursuant to section 364(c)(2), (3) and (d) of the Bankruptcy Code, liens on, and security interests in, any and all of the DIP Collateral (as defined in the DIP Credit Agreement), subject only to the Carveout;

(h)     authorization to use cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral"), and authorization to use the proceeds of the DIP Loan in accordance with a certain budget in form and substance satisfactory to the DIP Lender, including to fund the costs associated with the Debtors' Chapter 11 cases and to fund postpetition operating expenses of the Debtors during the Chapter 11 cases;

(i)     pursuant to Bankruptcy Rule 4001, to schedule a preliminary hearing on this Motion and obtain authorization, from the entry of the DIP Interim Order until the final hearing (the "Final Hearing"), to obtain credit under the terms contained in the DIP Agreements and to utilize Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates; and

(j)     pursuant to Bankruptcy Rule 4001, to schedule a Final Hearing on this Motion to consider entry of the DIP Final Order authorizing the Debtors to borrow the balance of the DIP Loan on a final basis on the terms and conditions set forth in the DIP Agreements.

4

## JURISDICTION

3.      This Court has jurisdiction over the Debtors, their estates, and this matter pursuant to 28 U.S.C. §§ 157 and 1334.   This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.   The statutory predicates for the relief requested in this Motion are sections 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014.

## BACKGROUND

**A.      General Background.**

4.      The Debtors are bioenergy companies and indirect subsidiaries of Abengoa, S.A. ("Abengoa"), a leading engineering and clean technology company founded in Spain in 1941. For months, Abengoa and its affiliates and subsidiaries throughout the world have been working toward a global restructuring of their debt obligations.

5.      On February 1, 2016, Gavilon Grain, LLC, Farmers Cooperative Association, and The Andersons, Inc. commenced a case in the United States Bankruptcy Court for the District of Nebraska against Abengoa Bioenergy of Nebraska, LLC by filing an involuntary petition for relief under Chapter 7 of the Bankruptcy Code (the "Nebraska Proceeding").   Subsequently, on February 11, 2016, Gavilon Grain, LLC, Farmers Cooperative, and Central Valley Ag Cooperative commenced a case in the United States Bankruptcy Court for the District of Kansas (Kansas City) against Abengoa Bioenergy Company, LLC by filing an involuntary petition for relief under Chapter 7 of the Bankruptcy Code (the "Kansas Proceeding," and together with the Nebraska Proceeding, the "Involuntary Cases").   An order for relief has not been entered, and no interim Chapter 7 trustee has been appointed in the Involuntary Cases.

6.      On February 24, 2016, Debtors Abengoa Bioenergy of Nebraska, LLC and Abengoa Bioenergy Company, LLC filed motions to convert the Involuntary Cases to cases under Chapter 11 in the United States Bankruptcy Court for the District of Nebraska and the United States Bankruptcy Court for the District of Kansas (Kansas City), respectively. Contemporaneously, Debtors Abengoa Bioenergy of Nebraska, LLC and Abengoa Bioenergy Company, LLC filed motions to transfer venue from the United States Bankruptcy Court for the District of Nebraska and the United States Bankruptcy Court for the District of Kansas (Kansas City), respectively, to the United States Bankruptcy Court for the Eastern District of Missouri (the "Court").

7.      On February 24, 2016 (the "Petition Date"), the Debtors commenced these Chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.      No trustee, examiner or official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

9.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Sandra Porras Serrano, Chief Financial Officer, in Support of Chapter 11 Petitions and First Day Pleadings*, filed concurrently herewith and fully incorporated herein by reference.

**B.      The DIP Loan**

10.      In connection with the Debtors' restructuring efforts and in the interest of resuming operations at the Plants, the Debtors solicited offers for debtor-in-possession financing

and engaged in extensive negotiations with a number of potential lenders.  In the end, after careful consideration, the Debtors ultimately decided that the proposal for debtor in possession financing advanced by the DIP Lender was the best available under the circumstances and adequately addressed the Debtors' reasonably foreseeable working capital needs in the near term. Under the DIP Credit Agreement, the DIP Lender agreed to provide DIP financing to the Debtors subject to the terms and conditions set forth therein and in the DIP Agreements.

11.    Immediate access to postpetition financing and the use of Cash Collateral is necessary to enhance the Debtors' liquidity, resume and maintain operations of the Plants, provide necessary working capital during the pendency of these Chapter 11 Cases, and work towards an eventual sale transaction.  The Debtors determined that the use of Cash Collateral alone, without the DIP Loan, would not provide sufficient liquidity for the Debtors to achieve these goals.  For the foregoing reasons, obtaining the DIP Loan is in the best interest of the Debtors' estates, creditors, and other parties in interest.

**THE DIP FINANCING**

12.    Consistent with Bankruptcy Rule 4001(c)(1), the principal terms of the DIP Loan and DIP Interim Order are as follows:[3]

| Lender: | The Kimberley Fund, LP, an affiliate of Sandton Capital Partners, L.P. (the "DIP Lender") |
| --- | --- |

---

[3]    The terms and conditions of the DIP Loan set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such.  This summary is qualified in its entirety by the provisions of the DIP Credit Agreement and the DIP Interim Order.  The Debtors reserve all rights in connection with the DIP Interim Order.  Unless otherwise specified, terms used in this section have the same definitions as those in the DIP Term Sheet.

| | |
|---|---|
| **Borrowers:** | Abengoa Bioenergy Company, LLC, Abengoa Bioenergy Engineering & Construction, LLC, Abengoa Bioenergy of Nebraska, LLC, Abengoa Bioenergy Outsourcing, LLC, Abengoa Bioenergy Trading US, LLC, and Abengoa Bioenergy US Holding, LLC (collectively and individually, jointly and severally, each, a "<u>Borrower</u>") |
| **DIP Loan Amount:** | Principal Amount Not In Excess of:  $41 million (<u>see</u> proviso in Funded Amount below).<br><br>Subject to the entry of a final order (the "<u>Final DIP Order</u>") approving the DIP Loan by a United States Bankruptcy Court having jurisdiction over the Borrowers' bankruptcy cases (the "<u>Bankruptcy Court</u>"). |
| **Use of Proceeds:** | The DIP Loan will be available to the Borrowers to fund each Borrower's expenses in accordance with the budget attached to the <u>Annex A</u> (the "<u>Budget</u>").  The Budget will be agreed to by the Borrowers and the DIP Lender and will include, without limitation, budgeted professional fees.<br><br>An amount not in excess of $3.8 million of the DIP Loan proceeds may be used for the purpose of restarting the York facility.  In addition, excess cash generated by the Ravenna facility's operations (the "<u>Excess Cash</u>") may also be used for the restart of the York facility. |
| **Funded Amount:** | • **<u>Interim Amount:  $8 million</u>**.  This amount will be immediately available for draws in accordance with the DIP Credit Agreement upon the approval and entering of the DIP Interim Order by the Bankruptcy Court; no diligence contingency.<br><br>• **<u>Maximum Additional Draws upon DIP Final Order $33 million</u>**.  The maximum Additional Draws will be $33 million.<br><br>• The Funded Amount is not subject to further diligence, but only the conditions as set forth above (<u>e.g.</u>, entry of the Initial DIP Order, the Final DIP Order, and the signing of the DIP Agreements). |

| | |
|---|---|
| **Funding Dates:** | • **Interim Draw of $8 million**, available upon the entry of the DIP Interim Order approving the DIP Loan on an interim basis. |
| | • **Additional Draw of up to an Additional $33 million**. Available upon the entry of the DIP Final Order. |
| | • The draws can be used to permit the reopening of the Ravenna Plant, the York Plant, and other expenditures in accordance with the Budget. |
| **Maturity:** | The Lender will be entitled to immediate repayment of all outstanding obligations under the DIP Loan on the earliest of (the "Repayment Date"): |
| | (a) the effective date of the plan of reorganization or closing on a sale of substantially all of the Borrowers' assets; |
| | (b) the effective date of the closing of the sale of the Ravenna plant; and |
| | (c) through and including 180 days following the entry of the DIP Interim Order (time being of the essence), subject to extension as set forth below. |
| **Amortization:** | None. |
| **Prepayment:** | The DIP Loan will be prepayable in full or in part by the Borrowers on one or more occasions. |
| | There will be a mandatory repayment of the DIP Loan upon the sale of any assets outside of the ordinary course of business. |

| | |
|---|---|
| **Loan Interest Rates and Fees:** | The DIP Loan interest rates and fees will be as follows: |
| | (i)    <u>Initial Fee</u>: The Borrowers will pay the Lender an initial fee of $1 million, which fee will be fully earned as, and payable on the date of the payment, of the Initial Draw (the Initial Fee will be payable as a draw under the DIP Loan). |
| | (ii)    <u>Cash Interest</u>: The Borrowers will pay the Lender cash interest at 14% <u>per annum</u> on the outstanding Principal Amount. This interest will be payable monthly. The Borrowers, at their option, may PIK[4] the Cash Interest on a monthly basis. Cash interest that is PIK'ed will not be counted towards to draw limits (<u>e.g.</u>, $5 million, $25 million, or the Accordion Facility). |
| | (iii)    <u>Exit Fee</u>: The Borrowers will pay the Lender an exit fee of $1.5 million which will be earned on the date of the Initial Draw, but will be payable on the earlier to occur of the date: (a) the DIP Loan is required repaid in full; and (b) the DIP Loan is paid in full or in part prior (on a <u>pro rata</u> basis) to the Repayment Date. |
| | (iv)    <u>Default Interest Rate</u>: During the occurrence and continuance of an Event of Default, the Cash Interest rate will increase by 700 basis points. |
| | (v)    <u>Renewal Fee</u>. If the DIP Loan is not repaid on or before the Repayment Date, time being of the essence, the Borrowers will pay to the Lender, in addition to all other amounts as set forth in this Term Sheet, an additional renewal fee of $1.5 million, which shall extend the Repayment Date by an additional 180 days. |

---

[4] The PIK feature, along with the increase in the facility to cover the Initial Fee, permits the Borrowers to conserve cash in an amount that could exceed $6 million.

| | |
|---|---|
| **Collateral Security and Priority:** | The collateral for the DIP Loan (the "<u>Collateral</u>") will include pursuant, to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, a fully perfected security interest in substantially all of the existing and after-acquired real property and personal, tangible and intangible, assets of the Borrowers including, without limitation, all cash, cash equivalents, bank deposit and securities accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, general intangibles, avoidance actions to the extent provided in the Interim DIP Order and Final DIP Order, investment property, supporting obligations, tax refunds, securities, franchise rights, letter of credit rights, commercial tort claims, causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, patents, tradenames, trademarks, copyrights, intellectual property and all substitutions, accessions and proceeds of such intellectual property, wherever located, including insurance or other proceeds. |
| **Covenants:** | Affirmative, negative, and other financial and operational covenants customary for transactions of this type, including:<br><br>• Maximum capital expenditures.<br>• No dividends or any other upstream payments.<br>• No change of control, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not limited to Sections 363 or 1129 of the Bankruptcy Code.<br>• Maintenance of appropriate insurances and having the Lender as a beneficiary of such insurance policies.<br>• Limitations on additional debt, guarantees, and hedging arrangements, including the subordination of all intercompany indebtedness.<br>• Limitations on liens and further negative pledges.<br>• Limitations on sales, transfers, and other dispositions of assets, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not limited to Sections 363 or 1129 of the Bankruptcy Code.<br>• Limitations on loans and investments.<br>• Limitations on creating new subsidiaries or becoming a general partner in any partnership.<br>• Limitations on transactions with affiliates except as permitted. |

| | |
|---|---|
| **Representations and Warranties:** | Usual and customary representations and warranties, including organization in good standing, validity of agreements, tax status, compliance with law, and operational and financial disclosures. |
| **Events of Default:** | Events of Default will include, in addition to other such events customarily found in transactions similar to the DIP Loan:<br>• Payment defaults.<br>• Covenant defaults.<br>• Representation or warranty breaches.<br>Among other remedies, upon the occurrence of an Event of Default, the DIP Lender may accelerate all of the DIP Loan obligations. |
| **Expenses:** | The Borrowers will be responsible for the DIP Lender's out of pocket fees and expenses incurred by the DIP Lender to put the DIP Loan in place, to manage the DIP Loan, and to enforce the terms of the DIP Loan (absent an event of default) up to an amount not to exceed $150,000. |
| **Governing Law, Waiver of Jury Trial, Jurisdiction:** | In connection with the transaction outlined in this Term Sheet, all parties agree: (i) that the law of the State of New York governs without regard to any conflict of law principals; (ii) to the waiver of a trial by jury; and (iii) to the jurisdiction of the state and federal courts located in New York County, New York.<br><br>The DIP Credit Documents will be governed by New York law. |
| **Definitive Documents:** | The DIP Loan will be documented by, among other things, a promissory note, security agreement, and credit agreement, all of which will be subject to Bankruptcy Court approval. |
| **Brokers:** | Each of the parties represent to each other that no broker or other intermediary is entitled to any payments or compensation with respect to the transactions as set forth in this Term Sheet. |

## BASIS FOR RELIEF

**A.    THE REQUESTED RELIEF SHOULD BE GRANTED PURSUANT TO SECTIONS 364(c) AND 364(d)(1) OF THE BANKRUPTCY CODE**

13.    As set forth above, the Debtors' ability to maximize the value of their estates and successfully sell their business operations hinges upon their being able to access postpetition

financing.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  See 11 U.S.C. § 364(c).

14.     Under section 364 of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

## B.    THE DEBTORS HAVE EXERCISED THEIR BUSINESS JUDGMENT IN ENTERING INTO THE DIP LOAN

15.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  See In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment."); see

also In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors.").

16.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money.  See, e.g., In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court").  Further, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

17.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  See In re Curlew Valley Assocs., 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); see also In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor).  Moreover, bankruptcy courts generally will not second-guess a debtor in

possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R. at 513–14.

18.     The Debtors have exercised sound business judgment in determining the appropriateness of the DIP Loan and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Credit Agreement.  The use of Cash Collateral alone is insufficient to meet the Debtors' working capital needs to resume and maintain the operations of their businesses in the ordinary course.  The DIP Credit Agreement contains terms and conditions that are the best available under the circumstances and provides the Debtors with sufficient liquidity during the period of the Budget.

19.     The funds provided by the DIP Loan are essential to enable the Debtors to begin to operate during the course of these Chapter 11 Cases while working towards a sale transaction that is in the best interest of the Debtors' estates.  Indeed, failure to obtain approval of the DIP Loan will lead to a wind-down of the Debtors' business operations which, in turn, will preclude any sale of the Debtors' assets and adversely affect the value ultimately received by stakeholders.

20.     Accordingly, pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors respectfully submit that they should be granted authority to obtain financing from the DIP Lenders on the terms set forth in the DIP Credit Agreement.

**I.      The DIP Loan Represents the Best Financing Available.**

21.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source.  See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr.

15

S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders; Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

22.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); In re Ames Dep't Stores, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

23.     The Debtors and their advisors have solicited proposals from and negotiated with several institutions in an effort to secure debtor in possession financing on the best terms available.  The Debtors have determined that the terms and conditions of the DIP Loan are the best available under the circumstances and address the Debtors' working capital needs. Postpetition financing is not otherwise available without granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the

kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the DIP Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code. The Debtors are unable to obtain the necessary postpetition financing that they need on terms more favorable than those provided by the DIP Loan. Accordingly, the Debtors' efforts to obtain postpetition financing satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.

II.     **The DIP Loan Is Necessary to Resume and Maintain the Debtors' Business Operations and to Successfully Consummate a Sale of the Debtors' Assets in These Chapter 11 Cases.**

24.     The DIP Loan, if approved, will provide essential working capital, allowing the Debtors to maximize the value of their assets and their business operations while working towards a sale of the Debtors' assets in these Chapter 11 Cases. In addition, the DIP Loan will provide the Debtors' various constituencies, employees, vendors, service providers, and other creditors with confidence in the Debtors' ability to maintain operations while working towards a sale transaction.

25.     If the relief sought in this Motion is denied or delayed, the Debtors likely will experience business disruptions, the Debtors' ability to resume normal business operations will be hindered, and the Debtors' ability to consummate a sale transaction and maximize value for the estates will be irreparably damaged. Accordingly, the DIP Loan is necessary to maximize value for the Debtors' estates and inures to the benefit of creditors and all parties in interest.

III.    **The Terms of the DIP Loan Are Fair, Reasonable, and Adequate Under the Circumstances.**

26.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. See In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003);

see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. See Transcript of Record at 740:4–6, In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now.").

27.    The terms and conditions of the DIP Loan were negotiated in good faith and at arm's length among the parties, culminating in the DIP Credit Agreement that is designed to provide the Debtors with essential working capital and provide an opportunity to restart the Plants while working towards a sale of the Debtors' assets. Indeed, when viewed in its totality, the DIP Loan reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and is supported by fair consideration.

### IV.    Section 364(e) Protections Should Apply to the DIP Loan.

28.    The terms and conditions of the DIP Loan are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of Bankruptcy Code section 364(e), and are entitled to all of the protections afforded by that section.

### C.    THE DEBTORS' REQUEST FOR USE OF CASH COLLATERAL AND THE PROPOSED ADEQUATE PROTECTION IS APPROPRIATE.

29.    The Debtors' use of property of the estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into

transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

30.     Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtors to use cash collateral as long as the applicable secured creditors consent or are adequately protected.  See In re McCormick, 354 B.R. 246, 251 (Bankr. C D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to the Court that the secured creditor's interest in the cash collateral is adequately protected).  "Cash Collateral" is defined as, "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest."  11 U.S.C. § 363(a).

31.     The Debtors have an urgent need for the immediate use of the Cash Collateral pending the final hearing on this Motion and seek to use all Cash Collateral existing on or after the Petition Date.  The Debtors require the use of the Cash Collateral to, among other things, resume and maintain their business operations and to pay the costs and expenses associated with the administration of these Chapter 11 Cases.  Absent the use of Cash Collateral, the Debtors' ability to continue normal operations would be diminished and the value of the Debtors' business as a going concern would be irreparably impaired.

32.     Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.  See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985).  The focus of the requirement is to protect a secured creditor from the diminution in value of its interest in the particular collateral during the period of use.  See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection

19

for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

33.    Courts have also held that adequate protection may be demonstrated by showing that the secured creditor's interest in the collateral is preserved by the debtor's use of the cash collateral in a manner that maintains or enhances the collateral's value.  See In re Salem Plaza Assocs., 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used to pay necessary operating expenses); In re Constable Plaza Assocs., L.P., 125 B.R. 98, 105–06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); accord in re Atrium Dev. Co., 159 B.R. 464, 471 (Bankr. E.D. Va. 1993) ("Adequate protection is typically established by the fact that cash is being used to maintain and enhance the value of the underlying income producing real property in which the creditor also usually holds a security interest."); McCombs Props. VI, Ltd. V. First Tex. Sav. Ass'n (In re McCombs Props. VI, Ltd.), 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that committing to use cash collateral for operating expenses substantially eliminated the risk of diminution in the secured creditor's interest in the collateral).

34.    The proposed adequate protection is typical and appropriate under the circumstances.  Specifically, as adequate protection for the Debtors' current secured lenders with respect to, and solely to the extent of, any diminution of value of their collateral, the lenders, if any, shall receive replacement liens in and to the DIP Collateral, subject to the Carve Out (as defined in the DIP Credit Agreement), the liens and security interests of the DIP Lender in and to such DIP Collateral.

35.     In addition, the Debtors will use Cash Collateral to operate their business, which will maintain and enhance the value of the prepetition collateral.  Accordingly, the Debtors should be authorized to use Cash Collateral as set forth herein.

## D.     MODIFICATION OF THE AUTOMATIC STAY ON A LIMITED BASIS IS WARRANTED.

36.     The relief requested herein contemplates a modification of the automatic stay pursuant to Bankruptcy Code section 362 to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Agreements, the DIP Interim Order, and the DIP Final Order, as set forth therein, and to take various actions without further order of or application to the Court.

37.     Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Agreements and DIP Credit Documents, the proposed DIP Interim Order, and the proposed DIP Final Order.

## D.     INTERIM APPROVAL AND SCHEDULING OF FINAL HEARING.

38.     As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

39.     Absent relief on an interim basis pursuant to the DIP Interim Order, the Debtors will be unable to satisfy their immediate and projected payment obligations, including payroll and other operating expenses.  Given the immediate and irreparable harm to be suffered by the Debtors absent interim relief, the Debtors respectfully request that the Court schedule and conduct a preliminary hearing on the Motion and (a) authorize the Debtors, from the entry of the DIP Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Credit Agreement and to utilize Cash Collateral, and (b) schedule the Final Hearing.

**E.     WAIVER OF BANKRUPTCY RULES 6004(a) AND (h).**

40.     The Debtors believe an efficient and expeditious approval and implementation of the DIP Loan is in the best interests of their creditors and other parties in interest.  Accordingly, the Debtors seek waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

<u>**NOTICE**</u>

41.     No trustee, examiner or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.  Notice of this Motion has been given to:  (i) the Office of the United States Trustee for the Eastern District of Missouri, (ii) counsel to the petitioning creditors, Farmers Cooperative Association, The Andersons, Inc., Gavilon Grain, LLC, and Central Valley Ag Cooperative; (iii) the parties included on the Debtors' consolidated list of fifty (50) largest unsecured creditors, (iv) counsel for the DIP Lender, Lowenstein Sandler, LLP, 65 Livingston Avenue, Roseland, New Jersey 07068 (Attention: Sharon Levine, Esq.) and Bryan Cave LLP, One Metropolitan Square, 211 North Broadway, Suite 3600, St. Louis, MO 63102-2750 (Attention: Laura Uberti Hughes, Esq.); (v) counsel for the Debtors' primary secured lenders, (vi) the Internal Revenue Service, and (vii) the United States Attorneys' Office for the

Eastern District of Missouri.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-3.  In light of the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

### **NO PRIOR REQUEST**

42.    No prior request for the relief sought herein has been made to this or any other court.

*[REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the proposed Interim Order attached hereto as Exhibit A, (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court, and (iii) grant such other and further relief as this Court deems just and proper.

Dated:  February 24, 2016
        St. Louis, Missouri

Respectfully submitted,

**ARMSTRONG TEASDALE LLP**

 /s/ Richard W. Engel, Jr.
Richard W. Engel, Jr. #34641MO
David L. Going #33435MO
Susan K. Ehlers #49855MO
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
Telephone:  (314) 621-5070
Facsimile:  (314) 621-5065
rengel@armstrongteasdale.com
dgoing@armstrongteasdale.com
sehlers@armstrongteasdale.com

-and-

**DLA PIPER LLP (US)**
Richard A. Chesley #6240877IL (*pro hac vice* admission pending)
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516
richard.chesley@dlapiper.com

R. Craig Martin #005032DE (*pro hac vice* admission pending)
1201 North Market Street, Suite 2100
Wilmington, Delaware  19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
craig.martin@dlapiper.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>ABENGOA BIOENERGY US HOLDING, LLC, *et al.*,<br><br>                    Debtors.[1] | Chapter 11<br><br><br>Case No. 16- 41161-659<br><br>Joint Administration Pending |

**INTERIM ORDER (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507, BANKRUPTCY RULES 2002, 4001, 6004, AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING  ADEQUATE PROTECTION, (V) SCHEDULING A FINAL <u>HEARING, AND (VI) GRANTING RELATED RELIEF</u>**

Upon the motion (the "<u>Motion</u>"),[2] dated February 24, 2016, of Abengoa Bioenergy Company, LLC, Abengoa Bioenergy Engineering & Construction, LLC, Abengoa Bioenergy of Nebraska, LLC, Abengoa Bioenergy Outsourcing, LLC, Abengoa Bioenergy Trading US, LLC, and Abengoa Bioenergy US Holding, LLC (each, a "<u>Borrower</u>") and as affiliated debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") in the above-captioned cases (the "<u>Chapter 11 Cases</u>") pursuant to sections

---

[1]  The Debtors in these bankruptcy cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Abengoa Bioenergy Company, LLC (1658); Abengoa Bioenergy US Holding, LLC (2217); Abengoa Bioenergy of Nebraska, LLC (1343); Abengoa Bioenergy Engineering and Construction, LLC (2441); Abengoa Bioenergy Trading US, LLC (2469); Abengoa Bioenergy Outsourcing, LLC (9794). The mailing address for the Debtors, solely for purposes of notices and communications, is: 16150 Main Circle Drive #300, Chesterfield, MO 63017.

[2] All terms used but not defined herein shall have the meanings ascribed to them in the Motion.

105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") and rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking, among other things:

(1)    authorization for the Debtors to obtain post-petition financing (the "DIP Loan"), up to the aggregate principal amount not in excess of $41,000,000 (the actual available principal amount at any time being subject to those conditions set forth in the DIP Credit Documents (as defined in the credit agreement substantially in the form attached as Exhibit A to the Motion (the "DIP Credit Agreement")), from The Kimberley Fund, LP, an affiliate of Sandton Capital Partners, L.P.  (the "DIP Lender");

(2)    authorization for the Debtors to execute and enter into the DIP Credit Agreement and the other DIP Credit Documents and to perform such other and further acts as may be required in connection with the DIP Credit Agreement and the other DIP Credit Documents;

(3)    authorization for the Debtors to use Cash Collateral (as defined below) and all other collateral (together, with Cash Collateral, the "Pre-Petition Collateral") in which the Debtors' pre-petition lenders (the "Pre-Petition Lenders"), if any, having an interest, and the granting of adequate protection with respect to, *inter alia*, such use of their Cash

-2-

Collateral solely to the extent of any diminution in the value of the Pre-Petition Collateral;

(4)     the granting of superpriority claims to the DIP Lender payable from, and having recourse to, all pre-petition and post-petition property of the Debtors' estates and all proceeds thereof, subject to the Carve Out (as defined below);

(5) subject only to and effective upon entry of the DIP Final Order (as defined below), the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code;

(6)     pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "DIP Interim Order") (a) authorizing the Borrower, on an interim basis, to borrow up to an aggregate principal amount of $8,000,000 to pay amounts as set forth in the DIP Budget (as defined in the DIP Credit Agreement), (b) authorizing the Debtors' use of Cash Collateral and all other collateral, and (c) granting the adequate protection described herein; and

(7)  that this Court schedule a final hearing (the "Final Hearing") to be held within 20 days of the entry of this DIP Interim Order to consider entry of a final order authorizing the balance of the borrowings under the

-3-

DIP Credit Documents on a final basis, as set forth in the Motion and the

DIP Credit Documents filed with this Court (the "DIP Final Order");

and due and appropriate notice of the Motion, the relief requested therein and the Interim

Hearing having been served by the Debtors on the fifty largest unsecured creditors of the

Debtors, the DIP Lender, the Pre-Petition Lenders, the United States Trustee for this

District, all known holders of liens upon the Debtors' assets, and any parties that have

filed a notice of appearance in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002

and the Internal Revenue Service; and the Interim Hearing having been held by this Court

on March [__], 2016; and upon the record made by the Debtors at the Interim Hearing

and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Jurisdiction*.  This Court has core jurisdiction over the Chapter 11 Cases,

the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b)

and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice*.  Notice of the Motion, the relief requested therein and the Interim

Hearing was served by the Debtors on their consolidated fifty largest unsecured creditors,

the DIP Lender, the Office of the United States Trustee for this District, all known

holders of liens upon the Debtors' assets, any parties that have filed a notice of

appearance in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002, and the Internal

Revenue Service.  The interim relief granted herein is necessary to avoid immediate and

irreparable harm to the Debtors and their estates pending the Final Hearing.  Under the

-4-

circumstances, the notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b), and (c) and no further notice of the relief sought at the Interim Hearing is necessary or required.

       3.     *Findings Regarding the DIP Loan.*

      (a)     Good cause has been shown for the entry of this DIP Interim Order.

      (b)     The Debtors have an immediate need to obtain the DIP Loan and use Cash Collateral in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

      (c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Credit Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the

-5-

Bankruptcy Code without the Debtors granting to the DIP Lender, subject to the Carve Out as provided for herein, the DIP Liens and the Superpriority Claims (each as defined below) under the terms and conditions set forth in this DIP Interim Order and in the DIP Credit Documents.

(d)     The terms of the DIP Loan and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Loan has been negotiated in good faith and at arm's length among the Debtors and the DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Loan and the DIP Credit Documents, including without limitation, (i) all loans made to the Debtors pursuant to the DIP Credit Agreement and (ii) any DIP Obligations (as defined in the DIP Credit Agreement), including, but not limited to, credit extended in respect of overdrafts and related liabilities and other depository, treasury, and cash management services and other clearing services provided by the DIP Lender or any of their respective affiliates, in each case owing to the  DIP Lender or any of their respective banking affiliates, in accordance with the terms of the DIP Credit Documents (all of the foregoing in clauses (i) and (ii) collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Lender and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section

364(e) of the Bankruptcy Code, and the DIP Lender (and the successors and assigns of each) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this DIP Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)    The Debtors requested entry of this DIP Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the relief set forth in this DIP Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Loan and the use of Cash Collateral in accordance with this DIP Interim Order and the DIP Credit Documents are therefore in the best interests of the Debtors' estates.

4.    *Authorization of the DIP Loan and the DIP Credit Documents.*

(a)    The Debtors are hereby authorized on an interim basis to enter into the DIP Agreements.  The Debtors are hereby authorized to borrow money pursuant to the DIP Credit Agreement, up to an aggregate principal amount of $41,000,000 (plus interest, fees and other expenses and amounts provided for in the DIP Credit Documents), in accordance with the terms of this DIP Interim Order, any further or final order and the DIP Credit Documents, which borrowings shall be used for all purposes permitted under the DIP Credit Documents, including, without limitation, to provide working capital for each Debtor and to pay interest, fees and expenses as more fully set out in the DIP Budget (as defined in the DIP Credit Agreement) and to restart the York Facility (as defined in the DIP Credit Agreement) to the extent permitted under the DIP Credit

-7-

Documents.  In addition to such loans and obligations, the Debtors are authorized to incur overdrafts and related liabilities arising from treasury, depository and cash management services, including any automated clearinghouse fund transfers provided to or for the benefit of the Debtors by the DIP Lender or any affiliate; *provided*, *however*, that nothing herein shall require any party to incur overdrafts or to provide any such services or functions to the Debtors.

(b)     The Debtors are hereby authorized, pending approval of the Motion on a final basis, to immediately borrow, pursuant to the DIP Credit Agreement, an aggregate amount not to exceed the sum of (i) $8,000,000 (the "DIP Interim Loan Amount"), provided that disbursements of such amounts shall not exceed the amounts permitted under the DIP Budget for the period to and including the date set by the Court for the hearing on the entry of the Final Order (the "Interim Period").  The DIP Lender consents to the use of all Cash Collateral, including collections, and borrowings of the DIP Interim Loan Amount as necessary to fund all of the proposed disbursements under the DIP Budget.

(c)     From and after the Petition Date, the Debtors shall use advances of credit under the DIP Loan only for the purposes specifically set forth in this DIP Interim Order and the DIP Credit Agreement, and in compliance with the DIP Budget, including, without limitation, upon entry of this DIP Interim Order authorizing and directing the Debtor to pay the initial fee of $1 million.

-8-

(d)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Loan, including, without limitation:

(i)      the execution, delivery and performance of the DIP Credit Agreement and the other DIP Credit Documents, and the DIP Collateral Documents (as defined in the DIP Credit Agreement),

(ii)     the non-refundable payment to the DIP Lender of the fees and any amounts due in respect of indemnification obligations referred to in the DIP Credit Agreement and reasonable costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained as provided for in the DIP Credit Documents, without the need to file retention motions or fee applications, and

(iii)    the performance of all other acts required under or in connection with the DIP Credit Documents.

(e)     Upon execution and delivery of the DIP Credit Agreement and the other DIP Credit Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Credit Documents and this DIP Interim Order.  No obligation, payment, transfer or grant

-9-

of security under the DIP Credit Documents or this DIP Interim Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

5.    *DIP Liens*.

(a)    As security for the DIP Obligations, effective and perfected upon the date of this DIP Interim Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of, or over, any Collateral (as defined below), the following security interests and liens are hereby granted to the DIP Lender (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), subject, only in the event of the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement), to the payment of the Carve Out (all such liens and security interests granted to the DIP Lender, pursuant to this DIP Interim Order and the DIP Credit Documents, the "DIP Liens"):

(i)    First Lien on Cash Balances and Unencumbered Property. Subject only to valid, perfected and non-avoidable liens, if any, that existed on or as of the Petition Date or the date acquired (if acquired after the Petition Date), pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Lender is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in

-10-

and lien upon all pre- and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, including, without limitation, all cash and cash collateral of the Debtors (whether maintained with the DIP Lender or otherwise) and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, post-petition intercompany claims against Debtors), contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries and the proceeds, product, offspring or profits of all the foregoing (collectively, "<u>Unencumbered Property</u>").

(ii)    <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (b) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors.

6.    *Superpriority Claims.*

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors (without the need to file any proof of claim) with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any

-11-

kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve Out to the extent specifically provided for herein (collectively, the "Superpriority Claims").

     7.    *Carve Out.*

     For purposes hereof, the "Carve Out" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (ii) after the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement) and after the first business day following the delivery of notice thereof (the "Carve Out Notice") to (A) the United States Trustee for this District, (B) DLA Piper, 302 North la Salle Street, Suite 1900, Chicago Illinois 60601-1293  (Attention: Richard A. Chelsey, Esq.), counsel for the Debtors, and (C) counsel for the official committee of unsecured creditors (the "Committee"), if any, to the extent allowed by this Court at any time, whether before or after delivery of a Carve Out Notice, the payment of accrued and unpaid fees, costs and expenses of professionals retained by the Creditors' Committee

-12-

(but excluding fees, costs and expenses of third party professionals employed by such Creditors' Committee's members) (collectively, "Professional Fees") incurred prior to the first business day following the delivery of the Carve Out Notice and subject to the limitations in the DIP Budget and (iii) Professional Fees incurred on or after the first business day following the delivery of the Carve Out Notice in an aggregate amount not exceeding $25,000 (the "Carve Out Cap"), which amount may be used subject to the terms of this DIP Interim Order.  For the avoidance of doubt, the dollar limitation on Professional Fees in this clause 7(ii) shall neither be reduced nor increased by the amount of any compensation or reimbursement of Professional Fees incurred, awarded or paid prior to the delivery of a Carve Out Notice, and nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (i), (ii) and (iii) above.

8.     *Protection of DIP Lender's Rights.*

(a)     So long as there are any borrowings or other amounts outstanding, or the DIP Lender has any DIP Obligations under the DIP Credit Agreement, the  Pre-Petition Lenders shall (i) have no right to and take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the any existing agreements or this DIP Interim Order, or otherwise seek to exercise or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the Adequate Protection Liens except to the extent authorized by an order of this Court, (ii) be deemed to have consented to any release of DIP Collateral authorized under the DIP Credit Documents,

-13-

(iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Lender files financing statements or other documents to perfect the liens granted pursuant to this DIP Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date and (iv) deliver or cause to be delivered, at the Debtors' cost and expense, (for which the invoices have previously been provided to the Debtors), any termination statements, releases and/or assignments in favor of the DIP Lender or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or disposition.

(b)      The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lender to exercise, (i) after five days notice following the occurrence of an Event of Default (as defined in the DIP Credit Agreement), all rights and remedies under the DIP Credit Documents other than those rights and remedies against the DIP Collateral as provided in clause (ii) below; and (ii) upon the occurrence and during the continuance of such an Event of Default and after the giving of five days' prior written notice to the extent provided for under the DIP Credit Agreement (which shall run concurrently with any notice provided under the DIP Credit Agreement (the "Default Notice Period")) to the Debtors, all rights and remedies against the DIP Collateral provided for under the DIP

-14-

Credit Documents as requiring such notice (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the DIP Lender).  In any hearing regarding any exercise of rights or remedies (which hearing must take place within the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors and the Pre-Petition Lenders hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Lender set forth in this DIP Interim Order or the DIP Credit Documents.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to their respective liens and security interests upon and in the DIP Collateral.

(c)      No rights, protections or remedies of the DIP Lender granted by the provisions of this DIP Interim Order or the DIP Credit Documents shall be limited, modified or impaired in any way by (i) any actual or purported withdrawal of the consent of any party to the Debtors' use of Cash Collateral, (ii) any actual or purported termination of the Debtors' authority to use Cash Collateral or (iii) the terms of this DIP Interim Order or any other order or stipulation related to the Debtors' use of Cash Collateral or the provision of adequate protection to any party.

9.      *Limitation on Charging Expenses Against DIP Collateral*.  Subject only to and effective upon entry of the DIP Final Order, except to the extent of the Carve Out, no

-15-

expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code, any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender.

10. *The Cash Collateral*.  The Pre-Petition Collateral includes cash collateral within the meaning of section 363(a) of the Bankruptcy Code.  Any cash subject to a pre-petition lien that is cash collateral within the meaning of section 363(a) of the Bankruptcy Code (including, without limitation, all cash proceeds of the Pre-Petition Collateral) are collectively referred to herein as "Cash Collateral."

11. *Use of Cash Collateral*.  The Debtors hereby are authorized, subject to the terms and conditions of the DIP Credit Documents and this DIP Interim Order, to use all Cash Collateral of the Pre-Petition Lenders, and the Pre-Petition Lenders are directed promptly to turn over to the Debtors all Cash Collateral received or held by them (if any); *provided* that the Pre-Petition Lenders are granted adequate protection as hereinafter set forth.

12. *Adequate Protection*.  The Pre-Petition Lenders hereby are granted, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of their interest in the Pre-Petition Collateral, including the Cash Collateral,

-16-

solely for and equal in amount to the aggregate diminution in the value of the Pre-Petition Lenders' interest in the Pre-Petition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Pre-Petition Collateral,  As adequate protection, the Pre-Petition Lenders, are hereby granted the following (collectively, the "Adequate Protection Obligations"):

       (a)    Adequate Protection Liens.  The Pre-Petition Lenders are hereby granted (effective and perfected upon the date of this DIP Interim Order and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements), liens (the "Adequate Protection Liens") in the amount of such diminution, upon (i) all assets of the Debtors' estates acquired after the Petition Date of the same type and description as the Pre-Petition Collateral (the "Post-Petition Like Kind Collateral") and (ii) solely to the extent that the Adequate Protection Liens on the Post-Petition Like Kind Collateral are insufficient to provide complete adequate protection to the Pre-Petition Lenders, all other property of the Debtors' estates that is not Pre-Petition Collateral or Post-Petition Like Kind Collateral (the "Additional Collateral" and, collectively with the Post-Petition Like Kind Collateral, the "Adequate Protection Collateral").  The Adequate Protection Liens shall be subordinate to the Carve Out and the DIP Liens and valid only to the extent that the Pre-Petition Lenders' lien and/or security on the Pre-Petition Collateral is valid and enforceable and not subject to avoidance.

-17-

(b)      Section 507(b) Claim.    The Pre-Petition Lenders are hereby granted, subject to the Carve Out, a superpriority claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Lender, solely to the extent of any diminution of value of the Pre-Petition Collateral; *provided*, *however*, that the Pre-Petition Lenders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder or otherwise unless and until the DIP Obligations have indefeasibly been paid in cash in full. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Pre-Petition Lenders.

13.    *Perfection of DIP Liens and  Adequate Protection Liens.*

(a)      Subject to the provisions of paragraph 8(a) above, the DIP Lender and the Pre-Petition Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over assets, or take any other action, in each case, in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Lender, in its sole discretion, chooses to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise

-18-

confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this DIP Interim Order.  Upon the request of the DIP Lender, each of the Pre-Petition Lenders, without any further consent of any party, are authorized to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Lender to further validate, perfect, preserve and enforce the DIP Liens; provided that copies of such instruments shall be provided simultaneously to the Debtors.

(b)     A certified copy of this DIP Interim Order may, in the sole discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this DIP Interim Order for filing and recording.

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the transactions granting

-19-

post-petition liens, in such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lender or the Pre-Petition Lenders in accordance with the terms of the DIP Credit Documents or this DIP Interim Order; *provided*, *however*, that nothing herein shall prevent or impair any Debtor's ability to reject, assume or assign any lease, contract, license or other agreement.

14.    *Preservation of Rights Granted Under this DIP Interim Order.*

(a)    No claim or lien having a priority superior to or *pari passu* with those granted by this DIP Interim Order to the DIP Lender the Pre-Petition Lenders, respectively, shall be granted or allowed while any portion of the DIP Loan or the DIP Obligations or the Adequate Protection Obligations remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, as to each, other than the Carve Out.

(b)    Unless all DIP Obligations shall have been indefeasibly paid in full and the Adequate Protection Obligations shall have been paid in full, the Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Debtors to use Cash Collateral if any of the Debtors seek, or if there is entered, (i) any modifications or extensions of this DIP Interim Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction or

-20-

acquiescence by the DIP Lender, (ii) an order converting or dismissing any of the Chapter 11 Cases; (iii) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (iv) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.  If an order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the superpriority claims, priming liens, security interests and replacement security interests granted to the DIP Lender and, as applicable, the Pre-Petition Lenders pursuant to this DIP Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this DIP Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been paid and satisfied in full (and that such Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) to the extent permissible under applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(c)    If any or all of the provisions of this DIP Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations and Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Lender or the Pre-Petition Lenders, as applicable, of the effective date of such reversal, modification, vacation or stay or (ii) the validity or enforceability of any lien or priority authorized or

-21-

created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or DIP Obligations or Adequate Protection Obligations incurred by the Debtors to the DIP Lender or the Pre-Petition Lenders prior to the actual receipt of written notice by the DIP Lender and the Pre-Petition Lenders, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this DIP Interim Order, and the DIP Lender and the Pre-Petition Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this DIP Interim Order and pursuant to the DIP Credit Documents with respect to all uses of Cash Collateral and proceeds of the DIP Loan, DIP Obligations and Adequate Protection Obligations.

(d)    Except as expressly provided in this DIP Interim Order or in the DIP Credit Documents, the DIP Liens, the Superpriority Claims, and all other rights and remedies of the DIP Lender granted by the provisions of this DIP Interim Order and the DIP Credit Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Credit Documents) or (iii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to

-22-

section 1141(d)(4) of the Bankruptcy Code (except as otherwise may be provided in said plan of reorganization), the Debtors have waived any discharge as to any remaining DIP Obligations.  The terms and provisions of this DIP Interim Order and the DIP Credit Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Lender granted by the provisions of this DIP Interim Order and the DIP Credit Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full or otherwise satified.

15.    *Credit Bid.*   The DIP Lender hereby is granted the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Loan, in whole or in part, in connection with any sale or disposition of assets in the Chapter 11 Cases.

16.    *Limitation of Use of DIP Loan Proceeds and Collateral.*  Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, letters of credit, Cash Collateral, Collateral or the Carve Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Credit Documents or the liens or claims granted under this DIP Interim Order, the DIP Credit Documents, (b) investigate (subject to the following proviso), prosecute or assert any Claims and Defenses or causes of action against the DIP Lender or its agents, affiliates, representatives, attorneys or advisors, (c) prevent, hinder

-23-

or otherwise delay the DIP Lender's assertion, enforcement or realization on the Cash Collateral or the Collateral in accordance with the DIP Credit Documents or this DIP Interim Order, (d) seek to modify any of the rights granted to the DIP Lender hereunder or under the DIP Credit Documents, in each of the foregoing cases without such applicable parties' prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) in accordance with the DIP Credit Agreement and the DIP Budget (as defined in the DIP Credit Agreement) as approved by the DIP Lender in its sole discretion.

17.      *Order Governs*.  In the event of any inconsistency between the provisions of this DIP Interim Order and the DIP Credit Documents, the provisions of this DIP Interim Order shall govern.

18.      *Binding Effect; Successors and Assigns*.  The DIP Credit Documents and the provisions of this DIP Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Lender, the Pre-Petition Lenders, any Committee and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender, the Pre-Petition Lenders and the Debtors and their respective successors and assigns; *provided*, *however*, that the DIP Lender shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed

-24-

for the estates of the Debtors and the Pre-Petition Lenders shall have no obligation to consent to the use of its Cash Collateral in connection with any chapter 7 case.  In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this DIP Interim Order or the DIP Credit Documents, the DIP Lender shall not be deemed to be in control of the operations of or participating in the management of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq*., as amended, or any similar federal or state statute).

19.    *Final Hearing*.  The Final Hearing is scheduled for March [___], 2016 at _____ __.m. before this Court.

20.    *Notice*.  The Debtors shall promptly mail copies of this DIP Interim Order (which shall constitute adequate notice of the Final Hearing, including without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under section 506(c) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or such Committee's counsel, if the same shall have been appointed.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) counsel for the Debtors, DLA Piper, 302 North la Salle Street, Suite 1900,

-25-

Chicago, Illinois 60601-1293 (Attention: Richard A. Chelsey, Esq.); (b) counsel for the

DIP Lender, Lowenstein Sandler, LLP, 65 Livingston Avenue, Roseland, New Jersey

07068 (Attention: Sharon Levine, Esq.) and Bryan Cave LLP, One Metropolitan Square,

211 North Broadway, Suite 3600, St. Louis, MO 63102-2750 (Attention: Laura Uberti

Hughes, Esq.); (c) counsel for any Pre-Petition Lenders, (d) counsel for the Committee;

and (e) the Office of the United States Trustee for this District, and shall be filed with the

Clerk of the United States Bankruptcy Court, Eastern District of Missouri, in each case to

allow actual receipt by the foregoing no later than  March [___], 2016 at 4:00 p.m.,

prevailing Central time.


Dated:
      February _____, 2016

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

-26-