**EXHIBIT B**

**DIP CREDIT AGREEMENT**

## CREDIT AND SECURITY AGREEMENT

**THIS CREDIT AND SECURITY AGREEMENT** (this "<u>Agreement</u>"), is made and entered into as of February [___], 2016 (the "<u>Agreement Date</u>"), by Abengoa Bioenergy Company, LLC, Abengoa Bioenergy Engineering & Construction, LLC, Abengoa Bioenergy of Nebraska, LLC, Abengoa Bioenergy Outsourcing, LLC, Abengoa Bioenergy Trading US, LLC, and Abengoa Bioenergy US Holding, LLC (each, a "<u>Debtor</u>"), and The Kimberley Fund, LP (the "<u>DIP Lender</u>").

### WITNESSETH:

**WHEREAS**, on February 24, 2016 (the "<u>Petition Date</u>"), each Debtor commenced Chapter 11 Case Nos. 16-4116, 16-41163, 16-41165, 16-41167, 16-41168, and 16-41171 as administratively consolidated at Chapter 11 Case No. 16-[__] (collectively, the "<u>Cases</u>") by filing voluntary petitions for reorganization under the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of Missouri (the "<u>Bankruptcy Court</u>"), and each Debtor retained possession of its assets and is authorized under sections 1107 and 1108 of the Bankruptcy Code to continue the management and operation of its business as a debtor-in-possession;

**WHEREAS**, each Debtor requested that the DIP Lender provide, and the DIP Lender is willing to provide, subject to the terms and conditions of this Agreement, the other DIP Credit Documents, and the approval of the Bankruptcy Court, a debtor-in-possession financing facility to the Debtors that will supplement the Debtors' use of cash collateral to provide working capital in an aggregate principal amount up to and including $41 million (the "<u>Maximum Commitment</u>"); and

**WHEREAS**, the parties to this Agreement have reached certain mutual understandings and agreements with respect to the matters as set forth in this Agreement, subject to approval of the Bankruptcy Court, and each of the parties believes it to be in their respective best interest to set forth the terms of such mutual understandings and agreements as more particularity provided in this Agreement.

**NOW THEREFORE**, in consideration of the premises and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

Section 1.    <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings as set forth in this <u>Section 1</u>:

(a)    "<u>Account</u>" has the meaning assigned to such term in the UCC.

(b)    "<u>Action</u>" against a Person means an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination, or other proceeding threatened or pending against or affecting such Person or its property, whether

civil, criminal, administrative, investigative, or appellate, in law or equity before any arbitrator or Governmental Body.

(c)    "Additional Draw" has the meaning as set forth in Section 2(a)(iii)(1).

(d)    "Affiliate" means, with respect to a specified Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes:

(i)    any Person which beneficially owns or holds five percent or more of any class of Voting Stock of such Person or other equity interests in such Person;

(ii)    any Person of which such Person beneficially owns or holds five percent or more of any class of Voting Stock, or in which such Person beneficially owns or holds five percent or more of the equity interests; and

(iii)    any director or executive officer of such Person.

For the purposes of this Section 1(c), the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by agreement, or otherwise.  Notwithstanding the foregoing, for purposes of this Agreement, neither the DIP Lender nor any Affiliate of the DIP Lender will be an Affiliate of any Debtor or any of the Debtors' Affiliates.

(e)    "Agreement" has the meaning as set forth in the preamble.

(f)    "Agreement Date" has the meaning as set forth in the preamble.

(g)    "Applicable Rate" means 14% per annum.

(h)    "Asset Sale" means a sale, lease, or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer, or other disposition to, or any exchange of property with, any Person, in one or more transactions, or a series of related transactions, of all or any part of the businesses of any Debtor, or of all or any part of the assets or properties of any kind of any Debtor, whether real, personal, or mixed, and whether tangible or intangible, whether now owned or hereafter acquired, including, the Capital Stock of any Subsidiary of any Debtor, other than inventory sold or leased in the ordinary course of business.

(i)    "Assignee" has the meaning as set forth in Section 14(f)(ii)(1).

(j)    "Assignment" has the meaning as set forth in Section 14(f)(ii)(1).

EAST\121874213.1

(k)    "<u>Authorized Officer</u>" means, as applied to any Person, any individual holding the position of chairman of the board, chief executive officer, president, or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer, treasurer, or any other position with such Person, if such Person is deemed by that Person to be an Authorized Officer for the purposes of this Agreement.

(l)    "<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

(m)    "<u>Bankruptcy Court</u>" has the meaning as set forth in the recitals.

(n)    "<u>Business Day</u>" means a day other than Saturday, Sunday, or other day on which commercial banks in New York City, New York are authorized or required by law or other governmental action to close.

(o)    "<u>Capital Lease</u>" means, as applied to any Person, any lease of any property (whether real, personal, or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

(p)    "<u>Capital Stock</u>" means any and all shares, interests, participations, or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights, or options to purchase or other arrangements or rights to acquire any of the foregoing.

(q)    "<u>Carve Out</u>" has the meaning given such term in the DIP Interim Order and the DIP Final Order.

(r)    "<u>Cases</u>" has the meaning as set forth in the recitals.

(s)    "<u>Change of Control</u>" means any one or more of the following events:

(i)    the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of the Debtors to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act);

(ii)    the liquidation or dissolution of any Debtor or the adoption of a plan by the stockholders, members, or holders of similar rights of the Debtors relating to the dissolution or liquidation of the Debtors; and

(iii)    the sale of the Ravenna Facility.

(t)    "<u>Closing Date</u>" means the date that the Debtors receive the Initial Draw.

EAST\121874213.1

(u)    "<u>Committee</u>" means any statutory committee of unsecured creditors of the Debtors appointed by the United States Trustee for the District were the Cases are pending.

(v)    "<u>Controlled Account</u>" means and includes any deposit account, securities account, or commodity account (as all such terms are defined in the UCC), and any other bank account or investment account over which the DIP Lender has a DIP Lien pursuant to any Financing Order or other order of the Bankruptcy Court.

(w)    "<u>Controlled Account Agreement</u>" means an account control agreement in form and substance acceptable to the DIP Lender as necessary to provide the DIP Lender, to the extent not prohibited by applicable law, with "control" over a Deposit Account (each, a "<u>Controlled Account</u>") as provided for under Section 9-104 of Article 9 of the UCC (or other applicable law) for the purpose of perfecting the security interest which the DIP Lender has in such Deposit Account pursuant to the DIP Collateral Documents.

(x)    "<u>Cumulative Net Cashflow Test</u>" has the meaning as set forth in <u>Section 9(l)(i)</u>.

(y)    "<u>Debtor</u>" has the meaning as set forth in the preamble.

(z)    "<u>Debtor Dataroom</u>" means the electronic dataroom established and maintained by the Debtors for the purposes of, among other things, providing information to the DIP Lender for the transactions contemplated by this Agreement.

(aa)    "<u>Default</u>" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

(bb)    "<u>Deemed Draw</u>" has the meaning as set forth in <u>Section 2(a)(ii)(2)</u>.

(cc)    "<u>Deposit Account</u>" means any deposit account (as such term is defined in the UCC), including, a demand, time, savings, passbook, or like account with a bank, savings and loan association, credit union, or like organization, other than an account evidenced by a negotiable certificate of deposit.

(dd)    "<u>DIP Budget</u>" means the consolidated budget provided by the Debtors annexed to this Agreement as <u>Exhibit B</u>.

(ee)    "<u>DIP Collateral Documents</u>" means the all instruments, documents, and agreements (including this Agreement) delivered by any Debtor pursuant to this Agreement or any of the other DIP Credit Documents pursuant to which any Debtor grants a DIP Lien, or any other Lien, mortgage, or encumbrance, to the DIP Lender, as any of the foregoing may be amended, restated, supplemented, modified, or replaced on one or more occasions.

(ff)    "<u>DIP Collateral</u>" means as security for the DIP Obligations, effective and perfected on the Interim Order Entry Date and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control

agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Lender, security interests and Liens to the DIP Lender (all property identified in this <u>Section 1(ff)</u> being collectively referred to as the "<u>DIP Collateral</u>"), for the benefit of the DIP Lenders, pursuant to the DIP Interim Order, the DIP Final Order, and the other DIP Credit Documents, collectively, the "<u>DIP Liens</u>"):

(i)     Subject only to the Nonavoidable Liens, pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Lender is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and Lien upon all pre- and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date or the date acquired (if acquired after the Petition Date) is not subject to valid, perfected and non-avoidable liens, including, all cash and cash collateral of the Debtors (whether maintained with the DIP Lender or otherwise) and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, post-petition intercompany claims against Debtors), contracts, properties, plants, Equipment, general intangibles, documents, instruments, vehicles, Deposit Accounts, goods, inventory, work-in-progress, fixtures, finished goods, chattel paper, investment property, commercial tort claims, books and records, Investments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other Intellectual Property, Capital Stock of Subsidiaries, other Capital Stock, and the proceeds, rents, profits, accessions, substitution, insurance proceeds, warranty and indemnity proceeds, and all other product, offspring, or profits of all the foregoing; and

(ii)     the DIP Liens will not be subject or subordinate to:

(1)     any Lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code; or

(2)     any Liens arising after the Petition Date including, any Liens or security interests granted in favor of any federal, state, municipal, or other Governmental Body for any liability of the Debtors.

(gg)     "<u>DIP Commitment</u>" means the amount permitted to be advanced to the Debtors under this Agreement in an amount not exceeding the Maximum Commitment.

(hh)     "<u>DIP Credit Documents</u>" means this Agreement, the DIP Note (if any), the DIP Collateral Documents, and all other documents, instruments, or agreements signed and delivered by any Debtor (or by the Lead Debtor on behalf of the other Debtors) for the benefit of the DIP Lender in connection with the transactions contemplated by this Agreement and the other DIP Credit Documents.

(ii)     "<u>DIP Draw Request Date</u>" means the date that the Debtors obtain an advance from the DIP Lender pursuant to a DIP Loan.

(jj)    "DIP Final Order" means a final order (which must be acceptable in form and substance to the DIP Lender in its sole discretion) entered, or to be entered, by the Bankruptcy Court authorizing the secured financing under this Agreement and the other DIP Credit Documents.

(kk)    "DIP Interim Order" means the interim order entered by the Bankruptcy Court authorizing the secured financing under this Agreement and the other DIP Credit Documents.

(ll)    "DIP Lender" has the meaning as set forth in the preamble.

(mm)    "DIP Lien" means any Lien granted under or pursuant to this Agreement, any DIP Collateral Document, the other DIP Credit Documents, or any Financing Order.

(nn)    "DIP Loan" has the meaning given such term in Section 2(a) and includes any amounts that are deemed advanced pursuant to the Debtors' PIK Election.

(oo)    "DIP Loan Certificate" has the meaning as set forth in Section 5(a)(xiii).

(pp)    "DIP Note" has the meaning given such term in Section 2(c).

(qq)    "DIP Obligations" means all Indebtedness, obligations, and liabilities of any Debtor, from time to time, owed to the DIP Lender or any of its Affiliates directly or indirectly, jointly or severally, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law, or otherwise, arising or incurred under this Agreement, the Financing Orders, or any other DIP Credit Documents, or in respect of the DIP Loan, the DIP Note, or any other instruments at any time evidencing any of the foregoing.  The DIP Obligations include, the fees required under this Agreement pursuant to Section 2(f) and elsewhere in this Agreement.

(rr)    "Dollars" or "$" means lawful money of the United States of America.

(ss)    "Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is or, within the six years preceding this Agreement Date, was sponsored, maintained, or contributed to by, or required to be contributed to by, any Debtor or any of their respective ERISA Affiliates.

(tt)    "Environmental Laws" means all federal, state, local, and foreign laws (including common law), statutes, regulations, and rules, whether now or hereinafter in effect relating in any way to the environment, the preservation or reclamation of natural resources, the management, release, or threatened release of any Hazardous Material, or health and safety matters, including the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments

and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act.

(uu)    "Environmental Liability" means any actual, alleged, or contingent liability or obligations of any Debtor, directly or indirectly resulting from or based on:

(i)    violations or alleged violations of any Environmental Law;

(ii)    the generation, use, handling, transportation, management, storage, treatment or disposal of any Hazardous Material;

(iii)    exposure to any Hazardous Material;

(iv)    the release or threatened release of any Hazardous Material into the environment; or

(v)    any contract, agreement, or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

(vv)    "Environmental Permits" means all Permits, licenses, authorizations, registrations and other governmental consents required by applicable Environmental Laws for the use, storage, treatment, transportation, release, emission, and disposal of raw materials, by-products, wastes, and other substances used or produced by, or otherwise relating to, the operations of any Debtor.

(ww)    "Equipment" means, as to each Debtor, all of such Debtors' now owned and hereafter acquired equipment, wherever located, including machinery, data processing, and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto, or used in connection therewith, and substitutions and replacements thereof, wherever located.

(xx)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(yy)    "ERISA Affiliate" means, as applied to any Person:

(i)    any corporation that is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member;

(ii)    any trade or business (whether or not incorporated) that is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and

(iii)    any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any

corporation described in Section 1(yy)(i) or any trade or business described in Section 1(yy)(ii) is a member.

Any former ERISA Affiliate of any Debtor, will continue to be considered an ERISA Affiliate of such Debtor, within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of such Debtor, and with respect to liabilities arising after such period for which such Debtor, could be liable under the Internal Revenue Code or ERISA.

(zz)    "ERISA Event" means:

(i)    a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation);

(ii)    the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan;

(iii)    the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA;

(iv)    the withdrawal by any Debtor or any of their ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability pursuant to Section 4063 or 4064 of ERISA;

(v)    the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan;

(vi)    the imposition of liability on any Debtor or any of their ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA;

(vii)    the withdrawal of any Debtor or any of their ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by any Debtor or any of their ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA;

(viii)    the occurrence of an act or omission which could give rise to the imposition on any Debtor or any of their ERISA Affiliates of fines, penalties, taxes, or

related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (1), or Section 4071 of ERISA in respect of any Employee Benefit Plan;

(ix)    the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against any Debtor or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan;

(x)    receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or

(xi)    the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

(aaa)    "Event of Default" means each of the conditions or events as set forth in Section 11.

(bbb)    "Exchange Act" means the Securities Exchange Act of 1934.

(ccc)    "Exit Fee" has the meaning given such term in Section 2(f).

(ddd)    "Final Order Entry Date" means the date on which the Bankruptcy Court enters the DIP Final Order.

(eee)    "Financial Officer Certification" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of the Debtors that such financial statements fairly present, in all material respects, the financial condition of the Debtors on a consolidated basis as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to the absence of footnotes and changes resulting from audit and normal year-end adjustments.

(fff)    "Financials" means, with respect to any Person for any period, the balance sheet of such Person as at the end of such period, and the related statement of income and expense and statement of cash flow of such Person for such period, each setting forth in comparative form the figures for the previous comparable fiscal period, all in reasonable detail and prepared in accordance with GAAP.

(ggg)    "Financing Order" means, collectively, the DIP Interim Order, the DIP Final Order, and such other orders relating thereto or authorizing the granting of credit by the DIP Lender to the Debtors on an emergency, interim, or permanent basis, pursuant to section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Cases.

(hhh)    "Fiscal Quarter" means a fiscal quarter of any Fiscal Year.

(iii)    "Fiscal Year" means the fiscal year of any Debtor ending on December 31 of each calendar year.

(jjj)    "Formation Expenses" has the meaning as set forth in Section 5(a)(xviii)(1).

(kkk)    "GAAP" means generally accepted accounting principles in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

(lll)    "Governmental Body" means any nation or government, any state or other political subdivision thereof, accounting board or authority that is responsible for the establishment or interpretation of national or international accounting principles, supranational bodies such as the European Union or the European Central Bank, and any agency, branch of government, department or Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any corporation or other Person owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing, whether domestic or foreign.

(mmm)"Hazardous Materials" means any hazardous or toxic substance, waste, contaminant, pollutant, gas, or material, including, radioactive materials, oil, petroleum, and petroleum products and constituents thereof, which are regulated under any Environmental Law, including any substance, waste, or material which is:

(i)    designated a "pollutant", "hazardous substance", "extremely hazardous substance" or "toxic chemical" under any Environmental Law; or

(ii)    regulated in any way under the Regulations of any Governmental Body where any Debtor conducts its business or owns any real property or has any leasehold or in which any of the Debtors' properties are located.

(nnn)    "Hedge Agreements" means any contract (e.g., ISDA Agreement), swap agreement, futures contract, option contract, synthetic cap, or other similar agreement or arrangement, each of which is for the purpose of hedging foreign currency risk, interest rate risk, and other types of business and financial risks of all types and kind associated with the operations of the Debtors.

(ooo)    "Indebtedness" means, with respect to any Person, without duplication, the following:

(i)    all indebtedness of such Person for borrowed money;

(ii)    all obligations of such Person for the deferred purchase price of property or services, other than accounts payable and accrued liabilities that would be

classified as current liabilities under GAAP which payables and liabilities are incurred in respect of property or services purchased in the ordinary course of business if and only for so long as no item of such accounts payable and accrued liabilities is more than 90 days past due;

(iii)    all obligations of such Person evidenced by notes, bonds, debentures, or similar notes or Securities instruments;

(iv)    all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person;

(v)    all obligations of such Person as lessee under Capital Leases;

(vi)    all obligations of such Person in respect of banker's acceptances and letters of credit;

(vii)    all obligations of such Person secured by Liens on the assets and property of such Person;

(viii)    all obligations of such Person to purchase, redeem, retire, defease, or otherwise make any payment in respect of any Capital Stock or other ownership or profit interest in such Person or any other Person or any warrants, rights, or options to acquire such Capital Stock;

(ix)    net liabilities in respect of such Person's Hedge Agreements as determined in accordance with GAAP;

(x)    all obligations of such Person in respect of any guaranty by such Person of any obligation of another Person of the type described in Section 1(ooo)(i) and Section 1(ooo)(ix) (inclusive); and

(xi)    all obligations of another Person of the type described in Section 1(ooo)(i) through Section 1(ooo)(x) (inclusive) secured by a Lien on the property or assets of such Person (whether or not such Person is otherwise liable for such obligations of such other Person).

(ppp)    "Indemnified Persons" has the meaning as set forth in Section 10(c)(i).

(qqq)    "Initial Draw" has the meaning given such term in Section 2(a)(i).

(rrr)    "Initial Fee" has the meaning given such term in Section 2(f)(i).

(sss)  "Intellectual Property" means, collectively, all copyrights, all patents, and all trademarks, together with:

(i)  all inventions, processes, production methods, proprietary information, know-how, and trade secrets;

(ii)  all licenses or user or other agreements granted to any Debtor with respect to any of the foregoing, in each case whether now or hereafter owned or used including the licenses or other agreements with respect to any DIP Collateral;

(iii)  all customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs;

(iv)  all field repair data, sales data, and other information relating to sales or service of products now or hereafter manufactured;

(v)  all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and

(vi)  all causes of action, claims, and warranties, in each case, now or hereafter owned or acquired by any Debtor in respect of any of the items set forth in this Section 1(sss).

(ttt)  "Interim Order Entry Date" means the date on which the Bankruptcy Court issues the DIP Interim Order.

(uuu)  "Internal Revenue Code" means the Internal Revenue Code of 1986.

(vvv)  "Investment" means:

(i)  any direct or indirect purchase, or other acquisition by any Person of, or of a beneficial interest in, any of the Securities (including any Capital Stock) of any other Person;

(ii)  any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Person from any Person, of any Capital Stock of such Person; and

(iii)  any direct or indirect loan, advance or capital contribution by any Person to any other Person, including all Indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person or constitute ordinary trade credit extended in the ordinary course of business.

Page 13

(www) "Knowledge" means, with respect to the Debtors as the context requires, the Knowledge of the Debtors' or such Debtors' Authorized Officers, after reasonable inquiry by such Authorized Officers.

(xxx)    "Lead Debtor" means Abengoa Bioenergy US Holding, LLC.

(yyy)    "DIP Lender" has the meaning as set forth in the preamble.

(zzz)    "Lien" means any mortgage, deed of trust, security interest, charge, pledge, hypothecation, assignment, attachment, deposit arrangement, encumbrance, lien (statutory, judgment, or otherwise, but excluding any right of setoff arising by operation of law or pursuant to agreements entered into in the ordinary course of business), or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any Capital Lease, any financing lease involving substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC or comparable law of any jurisdiction in respect of the foregoing).

(aaaa)   "Losses" has the meaning as set forth in Section 10(c)(i).

(bbbb) "Margin Stock" means "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System.

(cccc)   "Material Adverse Effect" means any material adverse effect on or change in:

(i)      the business, operations, properties, prospects, assets, or condition (financial or otherwise) of any Debtor;

(ii)     the ability of any Debtor to perform its obligations under this Agreement or the other DIP Credit Documents;

(iii)    the legality, validity, or enforceability of any DIP Credit Documents; or

(iv)     the DIP Collateral or the perfection or priority of any DIP Liens granted to the DIP Lender under this Agreement of the other DIP Collateral Documents.

(dddd)      "Maturity Date" means the earliest to occur of the date that is:

(i)      180 days after the Closing Date (or the extended date as set forth in Section 2(f)(iv), as the Debtors may elect upon the payment of the fee as set forth Section 2(f)(iv));

EAST\121874213.1

(ii)      35 days after entry by the Bankruptcy Court of the DIP Interim Order if the DIP Final Order has not been entered by the Bankruptcy Court prior to such 35th day;

(iii)      the date on which any sale of substantially all of the Debtors' assets occurs;

(iv)      the date on which a plan of reorganization for the Debtors is approved by the Bankruptcy Court;

(v)      that date on which the sale of the Ravenna Facility occurs; and

(vi)      the day on which the DIP Lender accelerates the DIP Obligations (or the DIP Obligations automatically and immediately accelerate) or the DIP Obligations otherwise become immediately due and payable pursuant to the terms of this Agreement.

(eeee) "Maximum Commitment" has the meaning as set forth in the recitals.

(ffff)      "Multiemployer Plan" means any Employee Benefit Plan that is a "multi-employer plan" as defined in Section 3(37) of ERISA.

(gggg) "Net Asset Sale Proceeds" means, for any Debtor, with respect to any Asset Sale, an amount equal to the cash payments, including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received, received by (or on behalf of) any Debtor from such Asset Sale less reasonable, customary, and documented out-of-pocket attorneys' fees, accountants' fees, investment banking fees, and brokerage, consultant and other reasonable customary and documented fees and expenses actually incurred in connection with such Asset Sale.

(hhhh) "Nonavoidable Liens" has the meaning as set forth in Section 6(d).

(iiii)      "Notices" has the meaning as set forth in Section 14(d)(i).

(jjjj)      "Participant" has the meaning as set forth in Section 14(f)(ii)(2).

(kkkk) "Participation" has the meaning as set forth in Section 14(f)(ii)(2).

(llll)      "PATRIOT Act" has the meaning given such term in Section 6(w).

(mmmm)      "PBGC" means the Pension Benefit Guaranty Corporation.

(nnnn) "Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, that is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

Page 15

(oooo)  "Permit" means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance, or other authorization issued, granted, given, or otherwise made available by, or under the authority of, any Governmental Body or pursuant to any federal, state, local, or foreign Regulation.

(pppp)  "Permitted Investment" has the meaning as set forth in Section 9(f).

(qqqq)  "Permitted Liens" has the meaning as set forth in Section 9(c).

(rrrr)  "Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, other legal entities and Governmental Bodies.

(ssss)  "Petition Date" means February 24, 2016.

(tttt)  "PIK Election" has the meaning as set forth in Section 2(d)(iv)(1).

(uuuu)  "Post-Petition" means following the Petition Date.

(vvvv)  "Prepetition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition debt or trade payables or other pre-petition "claims" (as defined in section 101(5) of the U.S. Bankruptcy Code) against the Debtors.

(wwww)  "Principal Office" means, for the DIP Lender, its office located at 16 West 46th Street, 11th Floor, New York, New York 10036, Attention: Thomas Wood and Roberto Moreno, or such other office as the DIP Lender may on one or more occasions designate in writing to the Lead Debtor.

(xxxx)  "Proposed Revised DIP Budget" has the meaning as set forth in Section 7(c).

(yyyy)  "Ravenna Excess Cash" means with respect to the Ravenna Facility, measured on a cumulative basis from the Closing Date:

(i)  the net income (determined in accordance with GAAP) attributable to the Ravenna Facility; plus

(ii)  the noncash amortization and depreciation attributable to the Ravenna Facility; minus

(iii)  the working capital requirements attributable to the Ravenna Facility; minus

Page 16

EAST\121874213.1

(iv)    capital expenditures (paid or committed) attributable to the Ravenna Facility.

(zzzz)    "Ravenna Facility" means the bioethanol production plant located in Ravenna, Nebraska.

(aaaaa)    "Regulation" means each applicable law, rule, regulation, order, guidance, or recommendation (or any change in its interpretation or administration) by any Governmental Body, and any request or directive (whether or not having the force of law) of any of those Persons, and each judgment, injunction, order, writ, decree, or award of any Governmental Body, arbitrator, or other Person.

(bbbbb)    "Released Parties" has the meaning as set forth in Section 18(f)(ii).

(ccccc)    "Securities" means any stock, shares, limited liability company membership interests, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares, or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

(ddddd)    "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture, or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

(eeeee) "Superpriority Claims" means, as additional protection for the DIP Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations will constitute allowed claims against the Debtors (without the need to file any proof of claim) with priority over any and all administrative expenses, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims will be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof.

EAST\121874213.1

(fffff) "Tax" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction, or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld, or assessed.

(ggggg) "UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in the State of New York; provided that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of the DIP Liens is governed by the Uniform Commercial Code as in effect in a United States jurisdiction other than New York, "UCC" will mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions of this Agreement relating to such perfection, effect of perfection or non-perfection or priority.

(hhhhh) "Voting Stock" means with respect to any Person:

(i) one or more classes of Capital Stock of such Person having general voting powers to elect at least a majority of the board of directors, managers, or trustees of such Person, irrespective of whether at the time Capital Stock of any other class or classes have or might have voting power by reason of the happening of any contingency; and

(ii) any Capital Stock of such Person convertible or exchangeable without restriction at the option of the holder thereof into Capital Stock of such Person described in Section 1(hhhhh)(i).

(iiiii) "Weekly Cash Flow Forecast" has the meaning as set forth in Section 7(b)(i).

(jjjjj) "York Facility" means the bioethanol production facility located in York, Nebraska.

(kkkkk) "York/Ravenna Proceeds" has the meaning as set forth in Section 2(b)(v)(3).

Section 2.    DIP Loan.

(a)    The DIP Loan Draws.  Subject to the terms and conditions as set forth in this Agreement and in the Financing Orders, the DIP Lender will make advances available to the Debtors pursuant to this Section 2(a) (the "DIP Loan"):

(i)    On or after the Interim Order Entry Date (or the Business Day immediately succeeding such day), an aggregate advance of $8 million (the "Initial Draw") to be drawn as set forth in Section 2(a)(ii).

(ii)    Initial Draw.

(1)    $7 million of the Initial Draw will be delivered to the Lead Debtor (for the benefit of all of the Debtors), pursuant to the wiring instructions as set

forth on <u>Exhibit C</u>, to be used by the Debtors solely in accordance with the DIP Budget, the use of proceeds as set forth in <u>Section 2(b)</u>, and the other provisions of this Agreement.

        (2)    $1 million of the Initial Draw will be used to pay the Initial Fee to the DIP Lender pursuant to <u>Section 2(f)(i)</u> (the "<u>Deemed Draw</u>").

        (3)    The Deemed Draw will be undertaken to avoid the necessity of round tripping the Initial Fee to the DIP Lender.  On the date that $7 million of the Initial Draw is delivered to the Lead Debtor, the Deemed Draw of $1 million will be a deemed drawn by the Debtors, and such amount will be deemed paid to the DIP Lender in payment of the Initial Fee.  From and after the date of the Initial Draw, such Deemed Draw will be deemed, and will be, an outstanding obligation under the DIP Loan.

        (iii)    <u>Additional Draws</u>.

        (1)    On or after the Final Order Entry Date (or the Business Day immediately succeeding such day), the Debtors may draw on one or more occasions, additional amounts under the DIP Loan to be used solely in accordance with the DIP Budget, the use of proceeds as set forth in <u>Section 2(b)</u>, and the other provisions of this Agreement.  The Debtors may draw $33 million (the "<u>Additional Draw</u>") in addition to the Initial Draw.

        (2)    Upon an Event of Default and during the continuance of an Event of Default, the Debtors may not make or request advances under the Additional Draw.

        (3)    Amounts may be drawn under the Additional Draw if the Debtors' cash on hand is less than the cash that the Debtors reasonably anticipate that they will require for the then next four week forward-looking period.  If the condition as set forth in the prior sentence is satisfied, then the Debtors can request an amount under the Additional Draw that is the greater of:

        (A)    $1 million; or

        (B)    the cash that the Debtors reasonably anticipate that they will require for the then next four week forward-looking period <u>less</u> the amount of the Debtors' cash on hand at the time of the request.

        (4)    Each draw under the Additional Draw must be on seven Business Day notice by the Lead Debtor to the DIP Lender.

        (iv)    The aggregate principal amount that may be drawn by the Debtors pursuant to this Agreement (<u>i.e.</u>, the sum of the Initial Draw and Additional Draws) is the Maximum Commitment.

(v)    Once repaid, the DIP Loan amounts borrowed under this Agreement may not be reborrowed; the Maximum Commitment will be reduced by the amount of such prepayments or repayments.

(vi)    Notwithstanding anything to the contrary in Section 2(a)(iii), the DIP Loan deemed advanced by the DIP Lender pursuant to the PIK Election as set forth at Section 2(d)(iv) will not reduce the Maximum Commitment.

(b)    Use of Proceeds.

(i)    The DIP Loan and proceeds thereof will be used by the Debtors solely for the purposes as set forth in this Agreement and the DIP Budget.

(ii)    Notwithstanding any provision to the contrary in this Agreement or the DIP Budget, the DIP Loan proceeds that may be used by the Debtors for the purpose of restarting, operating, or otherwise related to, the York Facility are limited to an aggregate of $3.8 million.

(iii)    In the event of a conflict between the terms of the DIP Budget and the limitation with respect to the York Facility as set forth in Section 2(b)(ii), the terms of Section 2(b)(ii) will control.

(iv)    If and to the extent that the Debtors seek to use additional proceeds of the DIP Loan, above the amount as set forth in Section 2(b)(ii), then additional and adequate Collateral (such Collateral to be provided with the consent of the holder of the first Lien with respect to the York Facility) must be granted to the DIP Lender (e.g., tolling agreement) for the specific additional amount of the DIP Loan on terms satisfactory to the DIP Lender.

(v)    Ravenna Excess Cash.

(1)    Provided that no Event of Default has occurred and is continuing, Ravenna Excess Cash may be used for the restart and operation of, or otherwise related to, the York Facility.

(2)    If the Debtors use Ravenna Excess Cash for the York Facility, the Debtors will, prior to the use of such Ravenna Excess Cash, notify the DIP Lender of the intended use and provide the DIP Lender with a detailed written statement setting forth the Ravenna Excess Cash calculation.

(3)    Since Ravenna Excess Cash is calculated on a cumulative basis, in the event that Ravenna Excess Cash decreases after the use of Ravenna Excess Cash for the York Facility (the "York/Ravenna Proceeds") is made, no further use of Ravenna Excess Cash can be made pursuant to this Section 2(b)(v) until the amount of Ravenna Excess Cash once again exceeds the amount of the York/Ravenna Proceeds.

(vi)    None of the proceeds of the DIP Loan will be used in:

(1)    connection with the investigation, including discovery proceedings, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the DIP Lender, including in connection with the validity of the DIP Liens granted to the DIP Lender; the foregoing will be without prejudice to any other rights of any Debtor; and

(2)    for the benefit of any party other than the Debtors (i.e., the proceeds of the DIP Loan may not be used for, advanced or made available to, or otherwise for the benefit of, the Debtors' Affiliates and Subsidiaries).

(c)    <u>Evidence of Debt</u>.    The Debtors will, if requested by the DIP Lender, sign and deliver a promissory note (a "<u>DIP Note</u>") in a form satisfactory to the DIP Lender to evidence the DIP Lender's DIP Loan.

(d)    <u>Interest on the DIP Loans; Payment</u>.

(i)    <u>Applicable Rate</u>.    Except as otherwise set forth in this Agreement, the DIP Loan will bear interest on the unpaid principal amount thereof from the date made through repayment, whether by acceleration or otherwise, at the Applicable Rate.

(ii)    <u>Interest Calculation</u>.    Interest payable pursuant to this Agreement will be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.  In computing interest on the DIP Loan, the date of the making of an advance under the DIP Loan will be included, and the date of payment of the DIP Loan will be excluded.

(iii)    <u>Cash Interest</u>.    Subject to <u>Section 2(d)(iv)</u>, accrued and unpaid interest on the DIP Loan will be payable in arrears on:

(1)    the first day of each calendar month, and if such day is not a Business Day, the immediately preceding Business Day;

(2)    the date of any prepayment or payment of the DIP Loan principal, whether voluntary or mandatory, to the extent accrued on the amount being prepaid or paid; and

(3)    the Maturity Date.

(iv)    <u>PIK Election</u>.

(1)    In lieu of paying cash interest to the DIP Lender as set forth in <u>Section 2(d)(iii)(1)</u>, on the day that interest would otherwise be payable, as set forth in <u>Section 2(d)(iii)(1)</u>, such interest will be added to the principal balance of the DIP Loan (the "<u>PIK Election</u>").

(2)    The interest added to the principal of the DIP Loan under the PIK Election will, similar to the principal balance of the DIP Loan, accrue interest at the same rate as the DIP Loan principal, be secured by all of the DIP Collateral, and in respect to which, the DIP Lender will be entitled to, and enjoy, all of the rights, benefits, interests, and privileges granted to it under this Agreement, the Financing Orders, and the other DIP Credit Documents.

(v)    Upon an Event of Default, and during the continuance of an Event of Default, the Debtors will not be able to utilize the PIK Election and all interest accrued, unpaid, and due during such period will be paid to the DIP Lender in accordance with Section 2(d)(iii)(1), as applicable, or the other provisions of Section 2(d)(iii).

(e)    Default Interest.

(i)    Upon the occurrence and during the continuance of an Event of Default, the principal amount of the DIP Loan and, to the extent permitted by applicable law, any interest payments on the DIP Loan, any fees, or other amounts owed under this Agreement that are not paid when due, in each case, whether at stated maturity, by notice of prepayment, by acceleration, or otherwise, will thereafter bear interest (including, interest, as provided in this Agreement, accruing during the Cases, whether or not such interest accrues or is recoverable against the Debtors after the filing of the Cases for purposes of the Bankruptcy Code or is an allowed claim in such proceeding) payable on written demand (or automatically upon the occurrence and during the continuation of an Event of Default) at the Applicable Rate plus 600 basis points.

(ii)    Payment or acceptance of the increased rate of interest provided for in Section 2(e)(i) is not a permitted alternative to timely payment and will not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the DIP Lender.

(f)    Fees.

(i)    The Debtors will pay to the DIP Lender a fee (the "Initial Fee") of $1 million which will be deemed fully earned and nonrefundable on the Interim Order Entry Date and be payable to the DIP Lender on the Closing Date as a Deemed Draw under the DIP Loan as set forth in Section 2(a)(i).

(ii)    In consideration of the DIP Lender providing the DIP Loan, and providing other accommodations to the Debtors under this Agreement, the Debtors will pay to the DIP Lender, on any date, including the Maturity Date, on which the Debtors makes any prepayment (whether mandatory or voluntary) or repayment of any or all of the DIP Loan, a fee in an aggregate amount equal to $1.5 million (the "Exit Fee").

(iii)    The Exit Fee will be deemed fully earned on the Closing Date and will be nonrefundable.  The Debtors will pay the Exit Fee on the earlier to occur of the date (without duplication):

(1)    the DIP Loan is required repaid in full (i.e., the Maturity Date); and

(2)    the DIP Loan is paid in full or in part prior to the Maturity Date (for part payment, the Exit Fee will be paid to the DIP Lender on a pro rata basis to the repayment of principal (e.g., if 50% of the then outstanding principal balance is prepaid, $750,000 of the Exit Fee would need to be paid to the DIP Lender with the prepayment of the principal, and the balance of the Exit Fee, $750,000, would need to be paid to the DIP Lender when the balance of the principal is repaid)).

(iv)    If the DIP Loan is not repaid on or before the initial agreed Maturity Date (i.e., 180 days from the Closing Date), time being of the essence, and no Event of Default exists and is continuing, the Debtors may pay to the DIP Lender, in addition to all other amounts owed under the DIP Loan, an additional renewal fee of $1.5 million.  Upon the payment of the renewal fee as set forth in this Section 2(f)(iv), the Maturity Date will be extended by an additional 180 days from the initial agreed Maturity Date.

(v)    All amounts due and owing to the DIP Lender under this Agreement and the other DIP Loan Documents will be paid in Dollars, by wire transfer in immediately available funds, to the DIP Lender's account as set forth on Exhibit D, or such other account as the DIP Lender may inform the Debtors on one or more occasions.  Any inbound wire that is received by the DIP Lender's bank after 3:00 PM on a Business Day will be deemed received on the next Business Day.

(vi)    All amounts to be delivered to the Debtors under this Agreement and the other DIP Loan Documents will be paid in Dollars to the Lead Debtor (for the benefit of the Lead Debtor and the other Debtors), by wire transfer in immediately available funds, to the account of the Lead Debtor as set forth on Exhibit C, or such other account as the Lead Debtor may inform the DIP Lender on one or more occasions.

Section 3.    Priority and Liens.  Subject to the Carve Out and the Nonavoidable Liens, each of the Debtors hereby covenant, represent, and warrant that, upon entry of the DIP Interim Order, and the DIP Final Order, as applicable, the DIP Obligations:

(a)    pursuant to Section 364(c)(1) of the Bankruptcy Code, will at all times constitute joint and several Superpriority Claims in the Cases;

(b)    pursuant to Section 364(c)(2) of the Bankruptcy Code, will at all times be secured by a perfected first priority Lien on all real, personal, tangible, and intangible property of the Debtors' respective estates in the Cases (including, all of the outstanding shares of Capital Stock of the Debtors' Subsidiaries);

(c)        pursuant to Section 364(d)(1) of the Bankruptcy Code, will be secured by a valid, binding, continuing, enforceable, and fully-perfected first priority senior priming security interest in and senior priming Lien on all of the tangible and intangible property of the Debtors;

(d)        pursuant to Section 364(c)(3) of the Bankruptcy Code, will be secured by a perfected junior Lien upon all real, personal, tangible, and intangible property of the Debtors' respective estates in the Cases.

(i)        <u>Payment Obligations</u>.  On the Maturity Date, whether by acceleration or otherwise, of any of the DIP Obligations under this Agreement or the other DIP Credit Documents, the DIP Lenders will be entitled to immediate payment of the DIP Obligations without further application to, or order of, the Bankruptcy Court.

(ii)        <u>No Discharge; Survival of Claims</u>.

(1)        Each Debtor acknowledges that:

(A)        its obligations under this Agreement and under the other DIP Credit Documents will not be discharged by the entry of an order confirming a plan of reorganization under section 1129, and each of the Debtors, pursuant to section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge,; and

(B)        the Superpriority Claim granted to the DIP Lender pursuant to the Financing Orders and the Liens granted to the DIP Lender pursuant to the Financing Orders will not be affected in any manner by the entry of any order:

(I)        converting any Case to a case under Chapter 7 of the Bankruptcy Code, dismissing the Cases, terminating the joint administration of any Case, or by any other act or omission;

(II)        approving the sale of any Collateral pursuant to Section 363(b) of the Bankruptcy Code; or

(III)        confirming a plan of reorganization.

(iii)        <u>Use of Cash Collateral</u>.  Notwithstanding anything to the contrary contained in this Agreement, the Debtors will not be permitted to request an advance under the DIP Loan unless the Bankruptcy Court will have entered the DIP Interim Order and will at that time have granted to the Debtors use of all cash collateral, subject to the Financing Orders.

(iv)        The DIP Lender is authorized by the Debtors to file UCC financing statements with respect to all DIP Collateral of the Debtors in all jurisdictions as may be necessary or, in the opinion of the DIP Lender, desirable, to perfect the security interests created in such DIP Collateral pursuant to the DIP Collateral Documents and this Agreement.

Section 4.    <u>Other DIP Loan Terms</u>.

(a)    <u>Repayment</u>.  The DIP Loan will be due and payable, and on the Maturity Date, the Debtors will repay all of the DIP Obligations, including all accrued and unpaid principal, interest (including interest under the PIK Election), fees, costs, expenses, and all other obligations under this Agreement and the DIP Credit Documents.

(b)    <u>Optional Prepayment</u>.

(i)    Subject to the Financing Orders and the DIP Budget, on one or more occasions, the Debtors may prepay the DIP Loan on any Business Day in whole or in part; any such prepayment must include all accrued and unpaid interest on the DIP Loan being prepaid thereby, and all other accrued and unpaid fees, including the applicable portion of the Exit Fee, expenses, fees, and other amounts payable under the DIP Credit Documents.

(ii)    The prepayment as set forth in <u>Section 4(b)(i)</u> will be made on a Business Day and upon not less than five Business Days' prior written notice from the Lead Debtor to the DIP Lender.  Upon the giving of such notice, the principal amount of the DIP Loan, including the applicable portion of the Exit Fee, specified in such notice, will become due and payable on the date specified therein.

(c)    <u>Net Asset Sale Proceeds</u>.

(i)    No later than the first Business Day following the date of receipt by any Debtor of any Net Asset Sales Proceeds, the Debtors will prepay the DIP Loan (including the applicable portion of the Exit Fee, and all other accrued fees, costs, and expenses) in an aggregate amount equal to such Net Asset Sales Proceeds; <u>provided</u>, <u>however</u>, that, so long as no Default or Event of Default will have occurred and be continuing or would result therefrom, the Debtors will not be required to prepay the DIP Loan pursuant to this <u>Section 4(c)</u> with the Net Asset Sale Proceeds of any transaction or series of related transactions under $25,000.

(ii)    Concurrent with any prepayment of the DIP Loan pursuant to <u>Section 4(c)</u>, the Debtors will deliver to the DIP Lender a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable Net Asset Sale Proceeds.  In the event that any Debtor will subsequently determine that the actual amount received exceeded the amount as set forth in such certificate, the Debtors will promptly make an additional prepayment of the DIP Loan in an amount equal to such excess, and the Debtors will concurrently therewith deliver to the DIP Lender a certificate of an Authorized Officer demonstrating the calculation of such excess.

(d)    <u>Application of Payments and Proceeds</u>.

(i)    Any amount required to be paid pursuant to this Agreement (including pursuant to <u>Section 4(b)(i)</u>) and all proceeds of the DIP Collateral, whether before or after an Event of Default, will be applied:

(1)    first, to repay any fees, costs, or expenses payable to the DIP Lender;

(2)    second, to repay any principal amounts outstanding in respect of the DIP Loan; and

(3)    third, to pay accrued and unpaid interest, the Exit Fee, and any other fees, costs, expenses, and other outstanding DIP Obligations.

(ii)    Payments to Include Accrued Interest.  All payments in respect of the principal amount of the DIP Loan (whether mandatory or optional) will include payment of accrued interest on the principal amount being repaid or prepaid.

(iii)    Business Day.  Whenever any payment to be made under this Agreement will be stated to be due on a day that is not a Business Day, such payment will be made on the immediate preceding Business Day.

Section 5.    Conditions Precedent; Conditions Subsequent.

(a)    Conditions Precedent; Closing Date.  The obligation of the DIP Lender to make the DIP Loan and the other financial accommodations as set forth in this Agreement on the Closing Date, or any other date on which the Debtors requests an advance of the DIP Loan, is subject to the satisfaction, or waiver, of the following conditions on or before (such satisfaction or waiver demonstrated by the funding of a DIP Loan):

(i)    DIP Interim Order and DIP Final Order.  The DIP Interim Order and the DIP Final Order, and all motions relating thereto, approving and authorizing the DIP Loan, all provisions thereof and the priorities and DIP Liens granted under Bankruptcy Code section 364(c) and (d), as applicable, will be in form and substance satisfactory to the DIP Lender and its counsel, the Interim Order will have been entered by the Bankruptcy Court, and the DIP Final Order will be scheduled to be issued no later than 35 days following the entry of the DIP Interim Order, in a form and substance acceptable to the DIP Lender and will include, provisions:

(1)    modifying the automatic stay to permit the creation and perfection of the DIP Liens;

(2)    prohibiting any granting or imposition of Liens other than DIP Liens and Permitted Liens; and

(3)    authorizing and approving the Debtors to sign and deliver the DIP Credit Documents to which each will be a party and the transactions contemplated therein, including, the granting of the super priority status, the first-priority, and DIP Liens upon the DIP Collateral, and the payment of all fees and expenses due to the DIP Lender.

Page 26

(ii)    As of the Final Order Entry Date, the DIP Final Order will further state, among other things, that, upon entry of the DIP Final Order:

(1)    the DIP Lender and its counsel, advisors, and consultants, will each be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code; and

(2)    permit the DIP Lender the right to credit bid, pursuant to section 363(k) of the Bankruptcy Code or applicable law, the DIP Loan, in whole or in part, in connection with any plan, sale, or other disposition of assets in the Cases.

(iii)    <u>Compliance with Financing Orders</u>.

(1)    No Financing Order will have been reversed, modified, amended, stayed, or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the DIP Lender.

(2)    The Debtors will be in compliance in all respects with the Financing Orders and all other orders of the Bankruptcy Court binding on them.

(iv)    <u>Debtor-in-Possession</u>.    No trustee or examiner will have been appointed with respect to the Debtors or their properties.

(v)    <u>DIP Budget and Projections</u>.    The DIP Lender will have received:

(1)    the DIP Budget;

(2)    all information then required to be delivered to the DIP Lender pursuant to <u>Section 7(b)</u>; and

(3)    such other information (financial or otherwise) as may be reasonably requested by the DIP Lender.

(vi)    <u>Performance of Obligations</u>.    All costs, fees, expenses, and other compensation payable to the DIP Lender will have been paid to the extent due and payable in accordance with the terms of the DIP Interim Order, the DIP Final Order, this Agreement, and the other DIP Credit Documents, and the Debtors will have complied in all material respects with all of their other obligations to the DIP Lender as set forth in this Agreement and the other DIP Credit Documents.

(vii)    <u>Litigation, Etc</u>.    There will not exist any action, suit, investigation, litigation, or proceeding pending (other than the Cases) or threatened in any court or before any Governmental Body that, in the opinion of the DIP Lender, affects any of the transactions contemplated by this Agreement, or that has or could be reasonably likely to have a Material Adverse Effect.

EAST\121874213.1

(viii)    <u>Cash Management</u>.    The Debtors will use commercially reasonable efforts to put into place cash management arrangements, as set forth in <u>Section 8</u> reasonably satisfactory to the DIP Lender in form and substance on or before the date that is 20 days after the Closing Date; <u>provided</u>, <u>however</u>, that a failure to have the cash management arrangements in place within the time as set forth in this <u>Section 5(a)(viii)</u> will not be a breach of this Agreement nor will it prevent a draw on the DIP Loan.

(ix)    <u>Insurance/Assets</u>.    The DIP Lender will be named as loss payee (in respect of property/casualty insurance policies maintained by the Debtors) and additional insured (in respect of liability insurance policies maintained by Debtors), and that the DIP Lender will be provided with 30 days' advance notice of non-renewal, cancellation, or amendment riders in respect of such policies.

(x)    <u>Waivers/Consents</u>.    As may be required, the DIP Lender will have received all necessary third party and Governmental Body waivers and consents, and the Debtors will have complied with all applicable laws, decrees, and material agreements of any Governmental Body.

(xi)    <u>No Default</u>.    No Default or Event of Default will exist at the time of, or after giving effect to, the transactions contemplated on the Closing Date, including the advancing of the DIP Loan.

(xii)    <u>Representations and Warranties</u>.    All representations and warranties in the DIP Credit Documents and this Agreement will be true and correct in all material respects as of the Closing Date.

(xiii)    <u>DIP Loan Certificate</u>.    The DIP Lender will have received a signed DIP Loan Certificate, in the form of <u>Exhibit E</u> (the "<u>DIP Loan Certificate</u>"), from the Debtors, together with any attachments thereto.

(xiv)    <u>DIP Credit Documents</u>.    The DIP Lender will have received signed original copies of each DIP Credit Document.

(xv)    <u>DIP Collateral</u>.

(1)    The DIP Lender will have received all certificates, instruments and promissory notes (including promissory notes evidencing all intercompany Indebtedness held by the Debtors) (which certificates, instruments and promissory notes will be accompanied by instruments of transfer or assignment duly endorsed in blank and otherwise in form and substance satisfactory to the DIP Lender) representing or evidencing all negotiable documents, instruments, tangible chattel paper, certificated securities and certificates of title covering goods included in the DIP Collateral and pledged pursuant to the DIP Collateral Documents.

EAST\121874213.1

(2)    The DIP Lender will have received evidence that each Debtor will have taken or caused to be taken any other action, signed and delivered or caused to be signed and delivered any other agreement, document and instrument, and made or caused to be made any other filing and recording (other than as set forth in this Agreement), reasonably required by the DIP Lender to perfect, and to ensure the perfection of, their security interests in the DIP Collateral with the priority required by the DIP Credit Documents.

(xvi)    <u>Other Information</u>.  The DIP Lender will have received any other financial or non-financial information regarding any Debtor as the DIP Lender may reasonably request.

(xvii)    <u>Proceedings</u>.    All proceedings taken or to be taken in connection with the transactions contemplated by this Agreement will be satisfactory to the DIP Lender and its counsel.

(xviii)    <u>Certain Expenses</u>.

(1)    The DIP Interim Order and the DIP Budget will provide for the Debtors to pay, on the terms and schedule provided therein, all fees and reasonable out-of-pocket expenses of the DIP Lender incurred in connection with this Agreement and the other DIP Credit Documents, including the reasonable fees, costs and expenses of Lowenstein Sandler LLP, counsel to the DIP Lender, local counsel of Lowenstein Sandler LLP in any jurisdiction, and any other reasonable attorneys' fees, costs and expenses in an amount not to exceed $150,000 (the "<u>Formation Expenses</u>").

(2)    The DIP Lender will be satisfied, in its sole discretion, that all such fees and expenses constitute DIP Obligations under the Financing Orders and are secured in full by the DIP Liens on the DIP Collateral.

(3)    The limitation on Formation Expenses as set forth in <u>Section 5(a)(xviii)(1)</u> will not restrict or limit the Debtors' obligations as set forth in <u>Section 10(c)</u> if a Default or an Event of Default occurs.

(xix)    <u>No Material Adverse Change</u>.  Each Debtor, as Debtor-in-possession, will have continued to operate its businesses in the ordinary course through the Closing Date, and since the Petition Date, there will have been no Material Adverse Effect.

(b)    <u>Conditions to each Advance under the DIP Loan</u>.

(i)    The obligations of the DIP Lender to make advances under the DIP Loan, including the Closing Date, is subject to the satisfaction or waiver, of the following conditions precedent:

(ii)    <u>DIP Loan Certificate</u>.  The DIP Lender will have received a fully signed and delivered DIP Loan Certificate in accordance with <u>Section 5(a)(xiii)</u>.  Each DIP Loan Certificate will be signed by an Authorized Officer of the Debtor and delivered to the DIP Lender.

Page 29

(iii)    <u>Representations and Warranties</u>.  As of the date of request for a draw (the "<u>DIP Draw Request Date</u>") of a DIP Loan (both before and after giving effect to the advance of the DIP Loan and application of its proceeds), the representations and warranties of the Debtors contained in the DIP Credit Documents will be true and correct in all material respects on and as of that DIP Draw Request Date, as if made on and as of that DIP Draw Request Date (except to the extent such representations and warranties specifically relate to an earlier date, such representations and warranties were true and correct in all material respects as of such earlier date).

(iv)    <u>No Default or Event of Default</u>.  As of such DIP Draw Request Date, no event will have occurred and be continuing or would result from the consummation of the applicable DIP Loan (or the application of its proceeds) that would constitute an Event of Default or a Default.

(v)    <u>Available Commitments</u>.  After making the DIP Loan requested on such DIP Draw Request Date, the aggregate outstanding principal amount of the DIP Loan will not exceed the aggregate amount of the Maximum Commitment.

(vi)    <u>Use of Proceeds</u>.  The Debtors will have confirmed in writing that the proceeds of such DIP Loan will be used only in accordance with the provisions of Section [_____].

(vii)    <u>No Material Adverse Effect</u>.  Since the Petition Date, no Material Adverse Effect will have occurred after giving effect to the making of the DIP Loan in the sole opinion of the DIP Lender.

(viii)    <u>Conditions Subsequent</u>.  The Debtors will satisfy each of the following conditions in the time period provided below therefor; <u>provided,</u> <u>however</u> that the DIP Lender may extend any such time period in its sole discretion.

(ix)    <u>Notice to Customers of Controlled Accounts</u>.  The Debtors will, within five Business Days after the DIP Lender's request, give written notice to all of its customers directing each of them to remit payment directly to the Controlled Accounts, and will thereafter uses its commercially reasonable best efforts to cause such customers to do so.

(x)    <u>Insurance Endorsements</u>.  The Debtors will, within 10 Business Days after the DIP Lender's request, take all actions reasonably required by the DIP Lender to:

(1)    (x) make each insurance policy of the Debtors payable to the DIP Lender for the benefit of the DIP Lender, as their interests may appear, in case of loss, or (y) name the DIP Lender, for the benefit of the DIP Lender, as an additional insured under each such policy; and

(2)    deliver to the DIP Lender endorsements, reasonably satisfactory to the DIP Lender in its sole discretion, with respect to such policies.

Section 6.    <u>Representations and Warranties</u>.    In order to induce the DIP Lender to enter into this Agreement and to make each DIP Loan, each Debtor hereby represents and warrants to the DIP Lender, on the Closing Date and on each DIP Draw Request Date as follows:

(a)    <u>Status; Authorization</u>.

(i)    Each Debtor is duly organized, validly existing, and, if applicable, in good standing under the laws of its jurisdiction of organization and is duly qualified and in good standing in every other jurisdiction where it is doing business except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect, and subject to the entry by the Bankruptcy Court of the DIP Interim Order and the DIP Final Order the signing, delivery and performance by each Debtor of the DIP Credit Documents:

(1)    are within its respective authority;

(2)    have been duly authorized; and

(3)    does not conflict with or contravene its constitutive documents subject to the entry by the Bankruptcy Court of the DIP Interim Order and the DIP Final Order.

(ii)    The signing, delivery, and performance of any Debtors obligations, and exercise of their respective rights under the DIP Credit Documents, including, the making of the DIP Loan under this Agreement:

(1)    does not require any consents that have not been obtained; and

(2)    are not and will not be in conflict with or prohibited or prevented by:

(A)    any Regulation;

(B)    any corporate governance document, corporate minute, or resolution; or

(C)    any instrument, agreement, or provision thereof, in each case binding on any of the Debtors or affecting any of their property.

(b)    <u>Signing and Binding Effect</u>.    Subject to the entry by the Bankruptcy Court of the DIP Interim Order and the DIP Final Order, upon signing and delivery thereof, each DIP Credit Document will constitute the legal, valid, and binding joint and several obligation of each of the Debtors, enforceable in accordance with its terms.

EAST\121874213.1

(c)     <u>Properties</u>.

(i)     Each Debtor has good and marketable title to all real property owned or purported to be owned by it, in each case free of all Liens other than the Permitted Liens.

(ii)     Each Debtor is lawfully possessed of a valid and subsisting leasehold estate in and to its leasehold properties which it purports to lease free and clear of all Liens other than the Permitted Liens.

(iii)     Each Debtor enjoys, and will enjoy, peaceful and undisturbed possession of, or a lease or license to use, all property, subject only to the Permitted Liens, that are necessary for its businesses.

(iv)     Each Debtor owns, or is licensed or otherwise has the right to use, the Intellectual Property necessary to own and operate its properties and to carry on its business as presently conducted and presently planned to be conducted without conflict with the rights of others, except for such instances of noncompliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(d)     <u>Nonavoidable Liens</u>.   Set forth on <u>Exhibit F</u> is a true and accurate schedule setting forth the Debtors' Collateral, as of the Petition Date, that is subject to valid, perfected, and non-avoidable Liens (the "<u>Nonavoidable Liens</u>").   In addition, <u>Exhibit F</u> sets forth the nature and extent of such Nonavoidable Liens.

(e)     <u>Litigation</u>.     There are no legal or other proceedings or investigations pending or, to the Knowledge of Debtors, threatened against the Debtors before any Governmental Body which could, if adversely determined, alone or together, reasonably be expected to have a Material Adverse Effect.

(f)     <u>Governmental Approvals and Filings</u>.   Other than the Bankruptcy Court entering the DIP Interim Order and DIP Final Order, no approval, order, consent, authorization, certificate, license, permit or validation of, or exemption or other action by, or filing, recording or registration with, or notice to, any Governmental Body is or will be necessary in connection with the signing and delivery of this Agreement or any other DIP Credit Documents, consummation by each Debtor of the transactions in this Agreement, or performance of or compliance with the terms and conditions of this Agreement.

(g)     <u>Absence of Conflicts</u>.   Subject to the Bankruptcy Court's entry of the DIP Interim Order and DIP Final Order, the signing and delivery by each Debtor of this Agreement and each other DIP Credit Documents and performance by it under this Agreement and thereunder will not violate any law (including, Regulations T, U and X of the Federal Reserve Board) and will not conflict with or result in a breach of any order, writ, injunction, resolution, decree or other similar document or instrument of any court or Governmental Body or its certificate of incorporation or by-laws or similar constituent documents or create (with or without the giving of notice or lapse of time, or both) a default under or breach of any material

agreement, bond, note or indenture, in each case to which it is a party (by successor in interest or otherwise), or by which it is bound or any material portion of its properties or assets is affected, or, except under the DIP Collateral Documents, result in the imposition of any Lien (other than Permitted Liens) of any nature whatsoever upon any of the properties or assets owned by or used in connection with the business of any Debtor.

      (h)      DIP Collateral.

      (i)      From and after the issuance of the DIP Interim Order and the DIP Final Order, the DIP Lender will have first-priority perfected security interests and DIP Liens in and to all of the DIP Collateral, free and clear of any Liens other than the Permitted Liens, and entitled to priority under applicable law, with no financing statements, hypothecations, chattel mortgages, real estate mortgages, or similar filings on record with respect to any DIP Collateral anywhere other than such filings in connection with this Agreement, the DIP Collateral Documents, or the Permitted Liens.

      (ii)      Each of the representations and warranties made by each Debtor in each DIP Credit Document is true and correct in all material respects as of each date made or deemed made.

      (iii)      The DIP Interim Order and the DIP Final Order will be and are effective to create in favor of the DIP Lender legal, valid, enforceable, and fully perfected security interests in and DIP Liens on the DIP Collateral of the Debtors.

      (iv)      Subject to the DIP Interim Order and the entry by the Bankruptcy Court of the DIP Final Order, the provisions of each DIP Collateral Document are effective to create in favor of the DIP Lender, a legal, valid, and enforceable security interest in all right, title, and interest of the Debtors in the DIP Collateral described therein, and the DIP Lender will have a fully perfected security interest in all right, title, and interest in all of the DIP Collateral described therein, in each case, subject to the exceptions contained in the Financing Orders and this Agreement, superior to and prior to the rights of all third Persons, and subject to no other Liens other than Permitted Liens.

      (v)      The provisions of each DIP Collateral Document are effective to create in favor of the DIP Lender, a legal, valid and enforceable security interest in all right, title, and interest of the Debtors in the DIP Collateral described therein, and, upon the registrations, recordings and other actions necessary or appropriate to create, preserve and perfect the security interest granted to the extent contemplated by the DIP Collateral Documents, the DIP Lender, will have a fully perfected security interest in all right, title, and interest in all of the DIP Collateral described therein.

      (i)      Partnerships, Etc.  None of the Debtors is a partner (general or limited) of any partnership, is a party to any joint venture or owns (beneficially or of record) any equity or similar interest in any similar Person (including, any interest pursuant to which each Debtor has or may in any circumstance have an obligation to make capital contributions to, or be

Page 33

generally liable for or on account of the liabilities, acts or omissions of such other Person) other than, in each case, such arrangement solely between or among each Debtor.

(j) <u>Fiscal Year</u>. The fiscal year of The Debtors begins on January 1 of each calendar year and ends on December 31 of each calendar year.

(k) <u>Material Misstatements and Omissions</u>.

(i) There are no facts pertaining to each Debtor, its assets, or properties or its businesses which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect and which have not been disclosed in the DIP Credit Documents.

(ii) None of the representations or warranties of any Debtor contained in the DIP Credit Documents are untrue or incorrect in any material respect when made and on the Closing Date. None of the information posted to the Debtor Dataroom contains untrue or incorrect facts in any material respect

(iii) There is no information, as of the Closing Date, which would contradict or is inconsistent in any material respect with any representation or warranty of any Debtor contained in or delivered pursuant to the DIP Credit Documents or contained in Debtor Dataroom.

(iv) Any projections and pro forma financial information contained in or delivered pursuant to any DIP Credit Documents, including the DIP Budget, or any other document, certificate or written statement furnished to the DIP Lender pursuant to any DIP Credit Documents are based upon good faith estimates and assumptions believed by the Debtors to be reasonable at the time made, it being recognized by the DIP Lender that any projections as to future events contained therein are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.

(l) <u>DIP Budget</u>.

(i) All facts in the DIP Budget are accurate and each Debtor has disclosed to the DIP Lender all material assumptions in the DIP Budget.

(ii) After giving effect to the DIP Loan projected to be made under the DIP Budget, each of the Debtors believes, in good faith and in the exercise of its commercially reasonable judgment, that it has or will have sufficient capital and funds to pay and satisfy the expenses, obligations, and liabilities of the Debtors as set forth, as and when provided to be paid or satisfied, in the DIP Budget.

(m) <u>Labor Practices</u>.

(i) The Debtors are not engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.

Page 34

(ii)    There is no:

(1)    unfair labor practice complaint pending against any Debtor or to their Knowledge threatened against any Debtor before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against each Debtor or to their Knowledge threatened against any of them;

(2)    strike or work stoppage in existence or to their Knowledge threatened involving any Debtor; and

(3)    union representation question existing with respect to the employees of any Debtor, as the case may be, and no union organization activity that is taking place.

(n)    <u>Employee Benefits</u>.

(i)    Each Debtor and each of their ERISA Affiliates:

(1)    are in substantial compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan, except where the failure to perform such obligations could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(2)    have no material liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any Trust established under Title IV of ERISA has been or is reasonably expected to be incurred by the Debtors or any of their ERISA Affiliates, other than contributions required to be made to Employee Benefit Plans or Trusts;

(3)    have not had any ERISA Event or is reasonably expects such an event to occur which could reasonably be expected to have a Material Adverse Effect; and

(4)    the Debtors and each of its ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan).

(ii)    Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Debtor or any of their respective ERISA Affiliates.

(iii)    Each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code is the subject of a favorable determination, opinion, or advisory letter from the Internal Revenue Service.

(o)    <u>Environmental Matters</u>.

(i)    None of the Debtors has any Environmental Liabilities at any of their properties or locations, which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(ii)    The Debtors:

(1)    have operated their business in compliance with all applicable Environmental Laws;

(2)    except for the Colwich and Portales plants, has obtained all Environmental Permits required by applicable Environmental Laws for the ownership and operation of their properties, and all such Environmental Permits are in full force and effect or such Person has made all appropriate filings for issuance or renewal of such Environmental Permits;

(3)    are not aware of any acts, omissions, events or circumstances that may interfere with or prevent continued compliance with the Environmental Laws and Environmental Permits referred to in <u>Section 6(o)(ii)(1)</u> or <u>Section 6(o)(ii)(2)</u>;

(4)    has not received notice of any asserted or threatened claim, action, suit, proceeding, hearing, investigation, or request for information relating to any environmental matter; and

(5)    has not received notice from any Governmental Body that the Debtors are a potentially responsible party under any Environmental Law at any disposal site containing Hazardous Materials, nor received any notice that any Lien under any Environmental Law against any property of the Debtors exists, which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(p)    <u>Insurance</u>.  The policies, binders, or self-insurance programs for fire, liability, product liability, workmen's compensation, vehicular and other insurance currently held by or on behalf of the Debtors insure its material properties and business activities against such losses and risks as are adequate to protect its properties in accordance with customary industry practice when entered into or renewed.

(q)    <u>Intellectual Property</u>.

(i)    The Debtors owns or licenses or otherwise has the right to use all Intellectual Property necessary for the operation of its business as presently conducted or proposed to be conducted.  No event has occurred which permits or would permit after notice or passage of time or both, the revocation, suspension or termination of such rights.

EAST\121874213.1

(ii)    To the best of the Debtors' Knowledge, no slogan or other advertising device, product, process, method, substance or other Intellectual Property or goods bearing or using any Intellectual Property presently contemplated to be sold by or employed by the Debtors infringes any patent, trademark, servicemark, tradename, copyright, license or other Intellectual Property owned by any other Person presently and no claim or litigation is pending or threatened against or affecting the Debtors contesting its right to sell or use any such Intellectual Property.

(r)    <u>Absence of Events of Default and Material Adverse Effect</u>.

(i)    Since the Petition Date, no event has occurred and is continuing and no condition exists which constitutes a Default or Event of Default; and since the Petition Date, the consolidated book value of any Debtors' consolidated assets determined in accordance with GAAP, and of each specific category of assets comprising such consolidated assets, has not decreased by ten percent or more compared to the corresponding book values thereof (on an aggregate or specific asset category basis) determined in accordance with GAAP and set forth in the consolidated balance sheet of any Debtor as at the Petition Date (which balance sheet each Debtor has previously provided to the DIP Lender, and each Debtor hereby represents was prepared in accordance with GAAP, except for the absence of footnote disclosures and normal year-end audit adjustments required in accordance with GAAP), which comparison has been made after taking into account and giving effect to all impairment, depreciation, amortization and other charges and writedowns of asset book values required to have been or be made in accordance with GAAP (regardless of whether actually made) since the Petition Date.

(ii)    Since the Petition Date, no Material Adverse Effect has occurred.

(s)    <u>Absence of Other Defaults</u>.

(i)    The Debtors has complied and is in compliance in all respect with all laws, except for such instances of noncompliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(t)    <u>Brokerage Fees</u>.  No broker's or finder's fee or commission will be payable with respect to the signing and delivery of this Agreement and the other DIP Credit Documents.

(u)    <u>Margin Regulations</u>.  No part of the proceeds of the DIP Loan issued under this Agreement will be used for the purpose of buying or carrying any Margin Stock or to extend credit to others for the purpose of buying or carrying any Margin Stock, in either case in a manner which would violate or conflict with Regulations T, U or X of the Board Governors of the Federal Reserve System.  No Debtor is engaged in the business of extending credit to others for the purpose of buying or carrying Margin Stock.

(v)    Taxes.

(i)    The Debtors filed all federal and other material Tax returns (other than its 2014 federal tax return) required to be filed by it and has not failed to pay any material taxes, or interest and penalties relating thereto, on or before the due dates thereof except for Taxes not yet due and except for those the amount or validity of which is currently being contested in good faith by appropriate proceedings diligently pursued and available to each Debtor, as the case may be, and with respect to which adequate reserves have been set aside on its books.

(ii)    Except as may be previously disclosed in writing to the DIP Lender and except to the extent that reserves therefor are reflected in the Financials:

(1)    there are no material federal, state or local tax liabilities of the Debtors, due or to become due for any tax year ended on or prior to this Agreement Date relating to each Debtor, that are not reflected in the Financials of the Debtors; and

(2)    there are no material claims pending, proposed or to the Knowledge of any Debtor threatened against each Debtor for past federal, state or local taxes, except those, if any, as to which proper reserves in accordance with GAAP are reflected in such Financials.

(w)    USA Patriot Act; Etc.   Each Debtor that is subject to the USA Patriot Act (Title III of Pulp.  107-56 (signed into law October 26, 2001)) (the "PATRIOT Act") is in compliance in all material respects therewith.  No part of the proceeds of the extensions of credit under this Agreement will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the federal Foreign Corrupt Practices Act of 1977.

Section 7.    Affirmative Covenants.

(a)    Until payment in full of all DIP Obligations (other than indemnification obligations for which a claim does not exist as of the applicable date of determination), each Debtor will perform, all the covenants in this Agreement, including this Section 7, and the other DIP Credit Documents applicable to it.

(b)    Reporting Requirements.   The Debtors will furnish to the DIP Lender:

(i)    On the third Business Day of each week after this Agreement Date, an updated rolling cash flow forecast ending on the earlier of:

(1)    thirteen (13) weeks after the week in which such cash flow forecast is delivered; and

(2)    the scheduled Maturity Date;

(each such forecast, a "Weekly Cash Flow Forecast"), in the same form and with the same level of detail as the DIP Budget.

(ii)    On the third Business Day of each week following this Agreement Date, a report setting forth, in a form and in sufficient detail satisfactory to the DIP Lender, a comparison of actual receipts and expenses to budgeted receipts and expenses in the then current DIP Budget for the preceding week;

(iii)    As soon as available and in any event within 25 days after the end of each calendar month, a report setting forth, in each case in a form and in sufficient detail satisfactory to the DIP Lender:

(1)    balance sheets of each Debtor as of the end of such month;

(2)    statements of income and cash flows of each Debtor for such month, and for the period commencing at the end of the previous Fiscal Year and ending with the end of such month; and

(3)    profit and loss statements of each Debtor for such month and for the period commencing at the end of the previous Fiscal Year and ending with the end of such month, in each case, prepared in accordance with GAAP (subject to the absence of footnote disclosures and to normal year-end adjustments).

(iv)    Concurrent with delivery of the monthly disclosures set forth in Section 7(b)(iii), a written certification by an Authorized Officer that such report is complete and correct and that the Debtors are in full compliance with the terms of this Agreement, including that such Debtors are in compliance with each of the covenants as set forth in Section 7, Section 8, Section 9, or, if any of such certifications cannot be given, stating in reasonable detail the necessary qualifications to such certifications.

(v)    Promptly upon receipt, copies of any detailed audit reports, management letters, or recommendations submitted to any Debtor by auditors or other financial professionals in connection with the accounts or books of any Debtor, or any audit of any Debtor.

(vi)    As soon as possible and in any event within five days after the occurrence of any Default or Event of Default, a statement of an Authorized Officer of the Debtors setting forth details of such Default or Event of Default and the action that the Debtors have taken and propose to take with respect thereto.

(vii)    Within 5 days after any Debtor obtains Knowledge thereof, a statement of an Authorized Officer of the Debtors setting forth details of:

Page 39

(1)     any litigation or governmental proceeding pending or threatened in writing against any Debtor; and

(2)     any other event, act or condition that has or could reasonably be expected to have a Material Adverse Effect.

(viii)   Promptly and in any event within 5 Business Days after the existence of any of the following conditions, a duly executed certificate of an Authorized Officer of the Debtors specifying in detail the nature of such condition and, if applicable, the proposed response of the Debtors thereto:

(1)     receipt by any Debtor of any written communication from a Governmental Authority or any written communication from any other Person or other source of written information, including (to the extent not privileged) reports prepared by any Debtor, that alleges or indicates that any Debtors is not in compliance in all material respects with applicable Environmental Laws;

(2)     any Debtor obtains Knowledge that there exists any Environmental Liability or threatened in writing against any Debtor;

(3)     any Debtor obtains Knowledge of any release, threatened release, emission, discharge or disposal of any Hazardous Materials or obtains Knowledge of any material noncompliance with any Environmental Laws that, in either such case, could reasonably be expected to form the basis for an Environmental Liability against any Debtor.

(ix)    Within 25 days after the end of each calendar month, an operating statement certified as complete and correct by an Authorized Officer of the Debtors regarding the operation and performance of each of the Debtors facilities for such month.  Such operating statements will contain each of the items as set forth on Exhibit G.

(x)     Concurrently with delivery of such reports to the equity holders of the Debtors, all financial statements, operating reports and other reports provided to the equity holders of the Debtors or the Board of Directors (or similar body) of the Debtors (and the Debtors Affiliates).

(xi)    As soon as practicable in advance of filing with the Bankruptcy Court or delivering to the Committee appointed in the Cases or to the United States Trustee for the District where the Cases are pending, as the case may be, the DIP Final Order (which must be in form and substance reasonably satisfactory to the DIP Lender), all other proposed orders and pleadings related to the approval of this Agreement and the transactions contemplated in this Agreement (which must be in form and substance reasonably satisfactory to the DIP Lender) and any plan of reorganization or any disclosure statement related thereto or any proposed asset purchase agreements, merger agreements, or acquisition agreements;

(xii)   As promptly as reasonably practicable on one or more occasions following the DIP Lender's request therefor, such other information (including

Page 40

historical information) regarding the operations, business affairs and financial condition of Debtor, the progress of the Cases (including Case exit strategies) or compliance with the terms of the DIP Loan Document, as the DIP Lender may reasonably request.

(xiii)    Prior to the Initial Draw, the Debtors and their advisors will provide to the Lender information concerning the post-petition custody of cash and internal controls procedures to ensure that the Debtors' cash is used and disbursed in accordance with the terms of this Agreement, and that only appropriate Authorized Officers employed by the Debtors can initiate cash transfers.

(c)    DIP Budget.  The Debtors, on one or more occasions, may propose a revised DIP Budget (the "Proposed Revised DIP Budget") to replace or amend the then current DIP Budget.  If the Debtors seek to submit a Proposed Revised DIP Budget for review and consideration by the DIP Lender, the Debtors will deliver such Proposed Revised DIP Budget to the DIP Lender and respond inquires by the DIP Lender and its advisors concerning the Proposed Revised DIP Budget.  If and to the extent that the DIP Lender approves of such Proposed Revised DIP Budget, the DIP Lender will deliver such written approval to the Lead Debtor, and from and after the delivery of such written approval, the Proposed Revised DIP Budget will be deemed, and will be, the DIP Budget for the purposes of this Agreement.

(d)    Visitation; Verification.

(i)    The Debtors will keep true and accurate books of account in accordance with GAAP and will permit the DIP Lender and, if an Event of Default has occurred and is continuing, any DIP Lender, or any of their designated representatives, upon reasonable notice and at the expense of any Debtor, during normal business hours to visit and inspect the premises of any Debtor, to examine the books of account of any such Persons and their Subsidiaries (and to make copies or extracts therefrom) and to discuss the affairs, finances and accounts of such Persons and their Subsidiaries with, and to be advised as to the same by, the managers, executives and officers of such Persons and to be advised as to such or other business records upon the request of the DIP Lender.

(ii)    Management, advisors, consultants and senior personnel of the Debtors will be available upon reasonable advance notice from DIP Lender (or their agents or representatives) for meetings with DIP Lender and their agents or representatives at reasonable times and locations.

(e)    Existence; Maintenance of Properties; Compliance with Regulations.  The Debtors will maintain its corporate/legal existence and business, maintain its assets in good operating conditions and repair (subject to ordinary wear and tear and casualty damage and to all provisions of this Agreement permitting sales of certain of the Debtors' assets), keep its business and assets adequately insured, maintain its chief executive office in the United States, continue to engage in the same or substantially similar lines of business as of the Petition Date, and comply in all respects with all Regulations, including ERISA and Environmental Laws.

EAST\121874213.1

(f)     Notice of Material Events.  Each Debtor will notify the DIP Lender promptly in writing upon an Authorized Officer becoming aware of any of the following:

(1)     the occurrence of any Default or Event of Default;

(2)     any noncompliance with ERISA or any Environmental Law or proceeding in respect thereof which could reasonably be expected to have a Material Adverse Effect;

(3)     any change of chief executive office address of any Debtor;

(4)     any pending or, to the Knowledge of Debtor, threatened litigation or similar proceeding affecting each Debtor involving claims in excess of $100,000 in the aggregate or any material change in any such litigation or proceeding previously reported;

(5)     claims in excess of $100,000 in the aggregate against any assets or properties of any Debtor encumbered in favor of the DIP Lender or the DIP Lender; and

(6)     any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(g)     Use of Proceeds.

(i)     The Debtors will use the proceeds of the DIP Loan only as permitted by this Agreement (including Section 2(b)) and the DIP Budget.

(ii)     Except as expressly permitted by this Agreement, the Debtors will not transfer any of the proceeds of the DIP Loan to, nor use any such proceeds for the benefit of, any of its Subsidiaries (that are not Debtors) or the Debtors Affiliates (including parent entities that are Affiliates of the Debtors).

(h)     Further Assurances.

(i)     The Debtors will cooperate with the DIP Lender and take such action, sign such documents, and provide such information as the DIP Lender may, on one or more occasions, reasonably request in order to effect the transactions contemplated by and the purposes and intent of the DIP Credit Documents.

(ii)     The Debtors will promptly, upon request by the DIP Lender, to correct any defect or error that may be discovered in any DIP Credit Documents or in the execution, acknowledgment, or recordation of the DIP Credit Documents.

(iii)     Promptly upon request by the DIP Lender, the Debtors will execute, authorize, acknowledge, deliver, record, file and register, any and all such further acts,

deeds, conveyances, documents, security agreements, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments as the DIP Lender may require on one or more occasions in order to carry out more effectively the purposes and intent of each DIP Credit Document.

(iv)     Without limiting the foregoing, the Debtors, will:

(1)     authorize, and hereby authorizes the DIP Lender to undertake (without any further action, notice, or consent of the Debtors), the filing by the DIP Lender of UCC-1 financing statements for all jurisdictions deemed necessary or desirable by the DIP Lender; and

(2)     take such action on one or more occasions (including, authorizing, filing, executing or delivering such assignments, security agreements and other instruments) as will be reasonably requested by the DIP Lender to create, in favor of the DIP Lender, to the extent required under the respective DIP Collateral Documents and to the maximum extent permitted under applicable law, a first-priority perfected Lien in all of the DIP Collateral, subject only to Permitted Liens.

Section 8.     Controlled Account Agreements.

(a)     Subject to Section 5(a)(viii), each Debtor will use its commercially reasonable efforts to enter into an account control agreement in form and substance acceptable to the DIP Lender (each, a "Controlled Account Agreement") as necessary to provide the DIP Lender, to the extent not prohibited by applicable law, with "control" over, except as set forth below, each Deposit Account of such Debtor (each, a "Controlled Account") as provided for under Section 9-104 of Article 9 of the UCC (or other applicable law) for the purpose of perfecting the security interest which the DIP Lender has in such Deposit Account pursuant to the DIP Collateral Documents.

(b)     No arrangement contemplated by this Agreement or by any Controlled Account Agreement in respect of any such Deposit Account of the Debtors, will be modified by any Debtor without the prior written consent of the DIP Lender.

(c)     The Debtors will deposit all Account payments into a Controlled Account.  Each Debtor and, will bear all bank charges for the Controlled Accounts.

(d)     Upon the occurrence and during the continuance of an Event of Default, any disbursements of proceeds in any Controlled Account will only be made at the direction of the DIP Lender; prior to the occurrence of an Event of Default, each Debtor will have access to any funds on deposit in the Controlled Accounts for use solely in accordance with this Agreement and the other DIP Credit Documents.

(e)     The DIP Lender assumes no responsibility for the Controlled Accounts, including, any claim of accord and satisfaction or release with respect to deposits which any banks accept thereunder.

EAST\121874213.1

(f)    Upon the occurrence and during the continuance of an Event of Default, all remittances which each Debtor receives in payment of any Accounts, and the proceeds of any other DIP Collateral, will be:

(i)    kept separate and apart from such Debtors' own funds so that they are capable of identification as the DIP Lender's property;

(ii)    held by any Debtor as trustee of an express trust for the DIP Lender's benefit; and

(iii)    immediately deposited in such accounts designated by the DIP Lender.

(g)    Upon the occurrence and during the continuance of an Event of Default, all proceeds received or collected by the DIP Lender with respect to Accounts, and reserves and other property of any Debtor in possession of the DIP Lender at any time or times hereafter, may be held by the DIP Lender without interest to any Debtor until all DIP Obligations are paid in full or applied by the DIP Lender on account of the DIP Obligations.

(h)    The DIP Lender may release to each Debtor such portions of such reserves and proceeds as the DIP Lender may determine.  The DIP Lender has no duty to protect, insure, collect or realize upon the Accounts to preserve rights in them.

(i)    <u>Insurance</u>.

(i)    Each Debtor will maintain, at its respective expense, and keep in effect with responsible insurance companies, such liability insurance for bodily injury and third-party property damage as is customary in the case of companies engaged in the same or similar business or having similar properties, similarly situated.

(ii)    Each Debtor will, keep and maintain, at its expense, its material real and personal property insured against loss or damage by fire, theft, explosion, spoilage and all other risks ordinarily insured against by other owners or users of such properties in similar businesses in an amount equal to the full replacement or cash value thereof, subject to deductible amounts which the Debtors, in its reasonable judgment, deems prudent.

(iii)    At any time that a Default or an Event of Default has occurred and is continuing, the DIP Lender may make, settle, and adjust all claims under the Debtors' policies of insurance and make all determinations and decisions with respect to such policies of insurance.

EAST\121874213.1

(j)    Information Regarding DIP Collateral.

(i)    Each Debtor will furnish to the DIP Lender prompt written notice of any change in:

(1)    any Debtors' corporate name or any trade name used to identify it in the conduct of its business or any Debtors' chief executive office, its principal place of business or its jurisdiction of organization:

(2)    any Debtors' identity or corporate structure; or

(3)    any Debtors' federal Taxpayer Identification Number.

(ii)    Each Debtor will not effect or permit any change referred to in Section 8(j)(i) unless all filings have been made under the UCC and all other actions have been taken that are required so that such change will not at any time adversely affect the validity, perfection or priority of any Lien established under any DIP Credit Documents on the DIP Collateral.

(k)    Existence; Conduct of Business.

(i)    Each Debtor will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, Permits (including, Environmental Permits) privileges, franchises, patent, copyrights, trademarks and trade names material to the conduct of its business, except to the extent that failure to so act, which either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(ii)    The Debtors will maintain their credit and risk policies substantially as in effect on the Petition Date.

(l)    Payment of Obligations.

(i)    In accordance with the Bankruptcy Code and the DIP Budget, and subject to Bankruptcy Court approval, and except for Indebtedness or other obligations (in each case, other than (x) Tax liabilities, (y) obligations in respect of workers' compensation, unemployment insurance and other social security legislation and (z) other Indebtedness and obligations that have resulted in, or could result in, by statute or otherwise, Liens in any of the DIP Collateral that are prior in ranking to, or otherwise pari passu with, any of the Liens in favor of the DIP Lender curing the DIP Obligations) that each Debtor are not permitted to pay at such time in accordance with Section [__] and the Applicable Current Budget, the Debtors will pay its Indebtedness and other obligations, including Tax liabilities, before the same will become delinquent or in default, except where:

Page 45

(1)    the validity or amount thereof is being contested in good faith by appropriate proceedings diligently pursued and available to each Debtor, as the case may be;

(2)    each Debtor or any Debtor has set aside on its books adequate reserves with respect thereto in accordance with GAAP;

(3)    such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation; and

(4)    the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

(m)    <u>Compliance with Laws</u>.    Except as otherwise excused by the Bankruptcy Code, the Debtors will comply with all laws (including, all Environmental Laws), rules, licenses, Permits, Regulations and orders of any Governmental Body applicable to it or its property, except where failures to do so, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(n)    <u>Subsidiaries</u>.    If any Subsidiary is formed or acquired by the Debtors after the Closing Date, the Debtors will, prior to the date upon which such Subsidiary is formed or acquired, notify the DIP Lender thereof and immediately following such formation or acquisition, cause any equity interest in, assets owned or leased by, or Indebtedness owned by or on behalf, of such Subsidiary to be added to the DIP Collateral.

(o)    <u>Compliance with ERISA</u>.

(i)    The Debtors will and will cause its ERISA Affiliates to:

(1)    maintain each Employee Benefit Plan in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other Federal and State law;

(2)    cause each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Internal Revenue Code to maintain such qualification;

(3)    not terminate any Pension Plan so as to incur any material liability to the PBGC;

(4)    not allow or suffer to exist any prohibited transaction involving any Employee Benefit Plan or any trust created thereunder which would subject the Debtors, such Guarantor, such Debtor or such ERISA Affiliate to a material tax or other material liability on prohibited transactions imposed under Section 4975 of the Internal Revenue Code or ERISA;

Page 46

(5)    make all required contributions to any Employee Benefit Plan which it is obligated to pay under Section 302 of ERISA, Section 412 of the Internal Revenue Code or the terms of such Employee Benefit Plan; or

(6)    not allow or suffer to exist any occurrence of, with respect to any such Pension Plan, an ERISA Event which could reasonably be likely to have a Material Adverse Effect or any other event or condition which presents a material risk of termination by the PBGC of any Employee Benefit Plan that is a single employer plan, which termination could result in any material liability to the PBGC.

(p)    Mortgages.  At the request of the DIP Lender, to the extent that the Debtors has or acquires any ownership interest in real property, the Debtors will sign and deliver to the DIP Lender, mortgages, deeds of trust or similar instruments in form and substance satisfactory to the DIP Lender will deem necessary or appropriate to grant, evidence and perfect a first priority Lien in such property in favor of the DIP Lender, together with such other assignments, conveyances, agreements, surveys, appraisals, title insurance policies, environmental assessments and other documents, in each case, as the DIP Lender will deem necessary or appropriate in connection with same.

Section 9.    Negative Covenants/Financial Covenants.

(a)    Each Debtor will, until all of the DIP Obligations (other than indemnification obligations for which a claim does not exist as of the applicable date of determination) have been paid in full, perform, all covenants in this Agreement.

(b)    Indebtedness.  Each Debtor will not, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), any Indebtedness, performance, obligations or dividends of any other Person, except:

(i)    the DIP Obligations;

(ii)    purchase money Indebtedness (including Capital Leases) to the extent secured by purchase money security interests in Equipment (including Capital Leases) not to exceed $100,000 in the aggregate at any time outstanding so long as such security interests do not apply to any property of the Debtors other than the Equipment so acquired, and the Indebtedness secured thereby does not exceed the cost of the Equipment so acquired, as the case may be;

(iii)    guarantee, indemnity, reimbursement and contribution agreements and similar agreements entered into in the ordinary cause in connection with performance bonds issued for the account of any Debtor; and

(iv)    unsecured trade debt of any Debtor incurred in the ordinary course of business after the Petition Date.

(c)     Liens.  The Debtors will not create or incur, any Liens on any of the property or assets of the Debtors, except the Liens described in Section 9(c)(i)Section 9(c)(xii) (inclusive) (such Liens set forth in Section 9(c)(i) through Section 9(c)(xii) (inclusive), the "Permitted Liens"):

(i)     the security interests and Liens of the DIP Lender;

(ii)     Nonavoidable Liens;

(iii)     Liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to the Debtors, and with respect to which adequate reserves have been set aside on its books;

(iv)     nonconsensual statutory Liens (other than Liens securing the payment of taxes) arising in the ordinary course of the Debtors' business to the extent:

(1)     such Liens secure Indebtedness which is not overdue; or

(2)     such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to the Debtors, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on its books;

(v)     zoning and land use restrictions, easements, encumbrances, licenses, covenants and other restrictions affecting the use of real property which do not interfere in any material respect with the use of such real property or ordinary conduct of the business of the Debtors as presently conducted thereon or materially impair the value of the real property which may be subject thereto;

(vi)     purchase money security interests in Equipment (including Capital Leases) to secure Indebtedness permitted under this Agreement;

(vii)     pledges and deposits of cash by the Debtors in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of the Debtors;

(viii)     Liens arising from:

(1)     operating leases and the precautionary UCC financing statement filings in respect thereof; and

(2)     Equipment or other materials which are not owned by the Debtors located on the premises of the Debtors (but not in connection with, or as part of,

the financing thereof) on one or more occasions in the ordinary course of business and consistent with current practices of the Debtors and the precautionary UCC financing statement filings in respect thereof;

(ix)    judgments and other similar Liens arising in connection with court proceedings that do not constitute an Event of Default; provided, that:

(I)    the enforcement of such judgments and Liens remain at all times subject to the automatic stay provisions of the Bankruptcy Code;

(II)    except as otherwise consented to in writing by the DIP Lender, such Liens are being contested in good faith and by appropriate proceedings diligently pursued and available to the Debtors, as the case may be; and

(III)    adequate    reserves    or    other appropriate provision, if any, as are required by GAAP have been made therefor;

(x)    the security interests and Liens in existence as of and annexed to this Agreement as Exhibit H;

(xi)    any Liens which the underlying fee interest of the owners of real property leased by the Debtors is subject, including any Liens that apply to the leasehold interests of the Debtors by virtue of the underlying fee interest being subject to such Liens; and

(xii)    landlord Liens for rent not yet due and payable provided that the such landlords and their agents are enjoined from enforcing such Liens pursuant to the automatic stay provisions of the Bankruptcy Code.

(d)    The Debtors will not, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which any Debtor:

(i)    has sold or transferred or is to sell or to transfer to any other Person (other than the Debtors); or

(ii)    intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by any Debtor to any Person (other than the Debtors) in connection with such lease.

(e)    Transactions with Affiliates.  The Debtors will not directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service, including as part of any management, consulting or advisory contract or arrangement) with any holder of 5% or more of any class of Capital Stock of any Debtor or with any Affiliate of any Debtor, except:

(i)      those transactions that are on terms no less favorable to the Debtors, as the case may be, than those that generally might be obtained at the time from a Person who is not such a holder or an Affiliate;

(ii)      transactions between or among each Debtor;

(iii)      sales of inventory to Affiliates so long as at the time of any such sale:

(1)      no Default or Event of Default will have occurred and be continuing or would result therefrom; and

(2)      any such sale made pursuant to this Section [____] does not exceed $50,000 in any instance and all such sales made pursuant to this Section [____] will not exceed $150,000 in the aggregate.

(f)      <u>Investments</u>.  The Debtors will make any Investments other than Investments in (each of the items set forth in Section 9(f)(i) and Section 9(f)(iv) (inclusive), a "<u>Permitted Investment</u>"):

(i)      marketable obligations of the United States maturing within one (1) year;

(ii)      certificates of deposit, bankers' acceptances and time and demand deposits of United States banks having total assets in excess of $1 billion or other similar cash equivalents;

(iii)      ownership by the Debtors of the Capital Stock of their existing Subsidiaries (unless such Subsidiaries are also Debtors, but, subject to the limitation as set forth in <u>Section 2(b)(ii)</u>;

(iv)      Investments consisting of Accounts and promissory notes created, acquired or made and trade credit extended in the ordinary course of business and payable or dischargeable in accordance with customary trade terms.

(g)      <u>Mergers; Asset Sales</u>.

(i)      The Debtors will not:

(1)      consummate a merger, amalgamation or consolidation,

(2)      engage in any Asset Sales,

(3)      purchase, sell, lease or otherwise dispose of assets other than (X) in the ordinary course (including the sale or worn or obsolete parts) or (Y) as set forth in the DIP Budget;

(4)    make any changes in the corporate structure or identity of the Debtors which could reasonably be expected to have a Material Adverse Effect or

(5)    enter into any binding agreement to do any of the foregoing; other than any of the following so long as:

(A)    the Net Asset Sale Proceeds from any of the sales, disposals, transactions, or actions described in Section 9(g)(i)(2) are used to prepay the DIP Loan in accordance with Section [_____].

(h)    <u>Fiscal Year; Fiscal Quarter</u>.  No Debtor will change its fiscal year or fiscal quarter without the prior written consent of the DIP Lender, which consent will not be unreasonably withheld.

(i)    <u>Subsidiaries</u>.  No Debtor will form, or cause to be formed, any other Subsidiary, unless:

(i)    all property and assets of such newly formed Subsidiary and

(ii)    all outstanding Capital Stock of any class of such newly formed Subsidiary are pledged to the DIP Lender for the benefit of the DIP Lender in accordance with the terms of this Agreement and the DIP Collateral Documents.

(j)    <u>Conduct of Business</u>.  From and after the Closing Date, the Debtor will not engage in any business other than:

(i)    the business engaged in by any Debtor on the Closing Date and similar or related businesses; and

(ii)    such other lines of business as may be consented to by the DIP Lender.

(k)    <u>Disposition of DIP Collateral</u>.

(i)    Except as provided in <u>Section 9(g)(i)(2)</u> and <u>Section 9(g)(i)(3)</u>, the Debtor may not sell, assign, lease, convey, transfer or otherwise dispose of any DIP Collateral or enter into any agreement to do any of the foregoing without the prior written consent of the DIP Lender.

(ii)    <u>Chapter 11 Claims</u>.  Except as provided in the Financing Orders, the Debtors will not incur, create, assume, suffer to exist or permit any other superpriority expense claim under Section 364 of the Bankruptcy Code or any or Lien which is senior to or <u>pari passu</u> with, the DIP Obligations.

(l)    Financial Covenant.

(i)    The Debtors will not permit or suffer to exist, tested on a weekly basis, actual cumulative Net Cashflow to exceed, or be less than, as the case may be, using the percentages as set forth Section 9(l)(ii)  the DIP Budgeted cumulative Net Cashflow as set forth on the DIP Budget for the applicable week (the "Cumulative Net Cashflow Test").

(ii)    Cumulative Net Cashflow Test.

(1)    If the DIP Budgeted cumulative Net Cashflow for the applicable week is a negative number, then the Cumulative Net Cashflow Test will be breached if the actual cumulative Net Cashflow is less than (i.e., a bigger negative number) than 110% of the DIP Budgeted cumulative Net Cashflow for the applicable week.

(2)    If the DIP Budgeted cumulative Net Cashflow for the applicable week is a positive number, then the Cumulative Net Cashflow Test will be breached if the actual cumulative Net Cashflow is less than (i.e., a smaller positive number, zero, or a negative number) than 90% of the DIP Budgeted cumulative Net Cashflow for the applicable week.

(iii)    For the purposes of example only, if the weekly Net Cashflow in the DIP Budget were ($100) for the first week, ($200) for the second week, and $350 for the third week, the DIP Budgeted cumulative Net Cashflow at the end of the first week would be ($100), at the end of the second week ($300), and at the end of the third week $50. The Debtors would be in compliance with the Cumulative Net Cashflow Test if:

(1)    the actual cumulative Net Cashflow at the end of the first week was a number greater than ($110) (e.g., ($109);

(2)    the actual cumulative Net Cashflow at the end of the second week was a number greater than ($330) (e.g., ($310); and

(3)    the actual cumulative Net Cashflow at the end of the third week was a number greater than $45 (e.g., $46).

Section 10.    Taxes; Indemnifications, Setoff; Etc.

(a)    Payments to Be Free and Clear.  All sums payable by any Debtor under this Agreement and under the other DIP Credit Documents will (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than a Tax on the overall net income of any DIP Lender) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of any Debtor or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b)    <u>Withholding of Taxes</u>.    If any Debtor or any other Person is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by any Debtor to the DIP Lender in the ordinary or general conduct of business:

(i)    the Debtors will notify the DIP Lender of any such requirement or any change in any such requirement as soon as the Debtors becomes aware of it,

(ii)    the Debtors will pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Debtor) for its own account or (if that liability is imposed on the DIP Lender, as the case may be) on behalf of and in the name of the DIP Lender,

(iii)    in the case of Taxes other than Taxes on the overall net income of any DIP Lender or Taxes otherwise excluded from payment or indemnity under Section 7.2(a), the sum payable by any Debtor in respect of which the relevant deduction, withholding or payment is required will be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, the DIP Lender, as the case may be, receives on the an amount equal to what it would have received had no such deduction, withholding or payment been required or made, and

(iv)    within 30 days after paying any sum from which it is required by law to make any deduction or withholding, and within 30 days after the due date of payment of any Tax which it is required by clause (ii) above to pay, the Debtors will deliver to the DIP Lender evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority.

(c)    <u>Indemnification by the Debtors</u>.

(i)    The Debtors will indemnify and defend the DIP Lender and each of their respective shareholders, partners, members, managers, directors, officers, employees, agents, attorneys and Affiliates (collectively, the "<u>Indemnified Persons</u>") against and hold each Indemnified Person harmless from any and all liabilities, obligations, losses, damages, costs, expenses, claims, penalties, Actions, judgments, disbursements of any kind or nature whatsoever, interest, fines, cleanup costs, settlements, costs of preparation and investigation, costs incurred in enforcing this indemnity and reasonable attorneys' fees and expenses (collectively, "<u>Losses</u>"), that any of the Indemnified Persons may incur, suffer, sustain or become subject to arising out of, relating to, or due to:

(1)    any inaccuracy or breach of any of the representations and warranties of any Debtor contained in any DIP Credit Document or in any certificate delivered thereunder,

(2)    the nonfulfillment or breach of any covenant, undertaking, agreement or other obligation of any Debtor contained in any DIP Credit Documents or in any certificate delivered thereunder,

(3)    any Environmental Liability, or

Page 53

(4)     any use of proceeds of any Loans; provided that such indemnity will not, as to any Indemnified Person, be available to the extent such Losses arise out of the fraud or willful misconduct of such Indemnified Person.

(ii)     Upon request of an Indemnified Person, the Debtors will retain counsel reasonably satisfactory to the Indemnified Person to represent the Indemnified Person in connection with any Losses or threatened Losses and will pay the reasonable fees and disbursements of such counsel.

(iii)     The Indemnified Person will have the right to employ its own counsel at the expense of the Debtors if:

(1)     the employment of counsel by the Indemnified Person at the Debtors' expense has been authorized in writing by the Debtors,

(2)     the Debtors has not in fact employed counsel to represent the Indemnified Person within a reasonable time after receiving notice of a request for the retention of counsel; or

(3)     both the Indemnified Person and the Debtors are implicated with respect to the Losses or the threatened Losses, and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them, in each of which cases the reasonable fees and expenses of counsel (including local counsel) will be at the expense of the Debtors, and all such fees and expenses will be reimbursed promptly as they are incurred.

(d)     <u>Contribution</u>.  If the indemnification provided for in Section [__] is prohibited under applicable Regulations to an Indemnified Person, then the Debtors, in lieu of indemnifying the Indemnified Person, will contribute to the amount paid or payable by the Indemnified Person as a result of the Losses in such proportion as is appropriate to reflect the relative fault of the Debtors, on the one hand, and of the Indemnified Person, on the other, in connection with the events or circumstances which resulted in the Losses as well as any other relevant equitable considerations.

(e)     <u>Right of Setoff</u>.

(i)     In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default the DIP Lender is hereby authorized by each Debtor at any time or on one or more occasions, without notice to any Debtor or to any other Person, any such notice being hereby expressly waived, to setoff and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such DIP Lender to or for the credit or the account of any Debtor against and on account of the DIP Obligations of any Debtor to such DIP Lender hereunder, irrespective of whether or not:

(1)      such DIP Lender will have made any demand under this Agreement; or

(2)      the principal of or the interest on the DIP Loan or any other amounts due under this Agreement or the other DIP Credit Documents will have become due and payable and although such obligations and liabilities, or any of them, may be contingent or unmatured.

Section 11.    <u>Events of Default</u>.  Any one or more of the following events which will occur and be continuing will constitute an "<u>Event of Default</u>":

(a)      <u>Failure to Make Payments When Due</u>.  Failure by any Debtor to pay any of the DIP Obligations, including failure by any Debtor to pay when due any installment of principal of, or interest on, the DIP Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise, or any fee or any other amount due under this Agreement, and such failure, except in respect of principal and interest, is continuing for three (3) Business Days after the date due therefor.

(b)      <u>Breach of Certain Covenants</u>.  Failure of any Debtor to perform or comply with any term or condition contained in [_____], such failure is continuing 5 days after the date such term or condition should have been performed or complied with; provided, that such 5 day period will not apply in the case of:

(c)      any failure to observe any such covenant which is not capable of being cured at all or within such 5 day period or which has been the subject of a prior failure within a six (6) month period; or

(d)      an intentional breach by the Debtors or any Debtor of any such covenant.

(e)      <u>Breach of Representations, Etc</u>.  Any representation, warranty, certification or other statement made or deemed made by any Debtor in any DIP Credit Documents or in any statement or certificate at any time given by any Debtor in writing, pursuant to this Agreement or thereto or in connection herewith or therewith will be false in any material respect as of the date made or deemed made.

(f)      <u>Other Defaults Under DIP Credit Documents</u>.  Any Debtor will default in the performance of or compliance with any term contained in any of the DIP Credit Documents, other than any such term referred to in any other section of this Section 8.1, and such default will not have been remedied or waived within 5 days after the earlier of (i) the date upon which an Authorized Officer of the Debtors had Knowledge of such default and (ii) the date upon which written notice thereof is given to the Debtors by the DIP Lender.

(g)      <u>Default in Other Agreements</u>.

(i)      The failure of any Debtor to pay when due and required pursuant to any Financing Order, any principal of or interest on or any other amount payable in

Page 55

respect of one or more items of Indebtedness in an individual principal amount of $25,000 or more or with an aggregate principal amount of $50,000 or more, in each case beyond the grace period, if any, provided therefor, or

        (ii)      breach or default by any Debtor with respect to any other material term of

        (1)      one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above or

        (2)      any loan agreement, mortgage, indenture or other agreement relating to such item of Indebtedness, in each case without cure or waiver within the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee on behalf of such holder or holders), to cause, such Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be.

        (h)      <u>Involuntary Bankruptcy, Appointment of Receiver, etc.</u>

        (i)      A court of competent jurisdiction will enter a decree or order for relief in respect of any Debtor in an involuntary case under the Bankruptcy Code or under any other Debtor Relief Law now or hereafter in effect, which decree or order is not stayed, or any other similar relief will be granted under any applicable federal or state law.

        (ii)      An involuntary case will be commenced against each Debtor under the Bankruptcy Code or under any other Debtor Relief Law now or hereafter in effect, or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, manager, liquidator, sequestrator, trustee, custodian, examiner or other officer having similar powers over each Debtor, or over all or a substantial part of its property, will have been entered; or there will have occurred the involuntary appointment of an interim receiver, trustee or other custodian of any Debtor for all or a substantial part of its property or a warrant of attachment, execution or similar process will have been issued against any substantial part of the property of any Debtor, and any such event described in this clause (ii) will continue for 5 days without having been dismissed, bonded or discharged.

        (i)      <u>Voluntary Bankruptcy, Appointment of Receiver, Etc.</u>

        (i)      Each Debtor, will have an order for relief entered with respect to it or will commence a voluntary case (other than the Cases) under the Bankruptcy Code or under any other Debtor Relief Law now or hereafter in effect, or will consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or will consent to the appointment of or taking possession by a receiver, manager, trustee, examiner or other custodian for all or a substantial part of its property; or each Debtor, will make any assignment for the benefit of creditors.

(1)    A Debtor, will be unable, or will be likely to be unable, or will fail generally, or will admit in writing its inability, to pay its debts in accordance with the Applicable Current Budget; or the board of directors (or similar governing body) of the Debtors, (or any committee thereof) will adopt any resolution or otherwise authorize any action to approve any of the actions referred to in this Agreement or in Section [___].

(j)    <u>Change of Control</u>.  A Change of Control occurs.

(k)    DIP Collateral Documents and other DIP Credit Documents.

(i)    At any time after the signing and delivery thereof:

(1)    this Agreement or any DIP Credit Documents ceases to be in full force and effect (other than by reason of a release of DIP Collateral in accordance with the terms of this Agreement or thereof or the satisfaction in full of the DIP Obligations in accordance with the terms of this Agreement) or will be declared null and void, or the DIP Lender will not have or will cease to have a valid and perfected first priority Lien, subject only to Permitted Liens, in any material portion of DIP Collateral purported to be covered by the DIP Collateral Documents (except (A) as expressly permitted by the DIP Collateral Documents or (B) as a direct result of the actions or inactions of the DIP Lender); or

(2)    any Debtor will contest the validity or enforceability of any DIP Credit Documents in writing or deny in writing that it has any further liability under any DIP Credit Documents to which it is a party.

(l)    <u>Liens</u>.  At any time after the signing and delivery thereof, the Liens created by the DIP Collateral Documents will not constitute a valid and perfected first priority Lien on the DIP Collateral intended to be covered thereby (to the extent perfection by filing, registration, recordation or possession is required in this Agreement or therein) in favor of the DIP Lender, free and clear of all other Liens (other than Permitted Liens or Liens permitted under the respective DIP Collateral Documents), or, except for expiration in accordance with its terms, any of the DIP Collateral Documents will for whatever reason be terminated or cease to be in full force and effect, or the enforceability thereof will be contested by any Debtor.

(m)    <u>Condemnation or Forfeiture of DIP Collateral</u>.  Any judicial process, condemnation or forfeiture proceedings is brought against any material item or portion of the DIP Collateral or any rights therein will be subject to such judicial process, condemnation or forfeiture proceedings.

(n)    Any Debtor files a plan of reorganization or liquidation, or enters into any Transaction that does not provide for payment in full in cash of the DIP Obligations and all other amounts owing to the DIP Lender on and annexed to this Agreement as Exhibit [___] of such plan or Transaction.

(o)    A trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), will be appointed in the Cases.

Page 57

(p)     Any other Lien will be granted with respect to any of the DIP Collateral (other than the "Carve Out", as defined in the Financing Orders) without the prior consent of the DIP Lender.

(q)     Other than payments authorized by the Bankruptcy Court in respect of:

(i)     accrued payroll and related expenses as of the commencement of the Cases, and

(ii)    certain creditors, in each case to the extent authorized by one or more "first day" or other orders satisfactory to the DIP Lender, or as otherwise permitted under the DIP Credit Documents, the Debtor will make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables.

(r)     The Bankruptcy Court will enter an order granting relief from the automatic stay to any creditor or party in interest:

(i)     to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor; or

(ii)    to permit other actions that the DIP Lender may, in its sole discretion, deem to have a Material Adverse Effect.

(s)     Any material provision of the DIP Credit Documents will cease to be valid or binding on any Debtor, or any Obligor will so assert in any pleading filed in any court.

(t)     Any order will be entered reversing, amending, supplementing, staying for a period in excess of 5 Business Days, vacating or otherwise modifying in any material respect the DIP Interim Order or the DIP Final Order without the prior written consent of the DIP Lender.

(u)     The exclusive period for each Debtor to file a plan of reorganization under section 1121(b) of the Bankruptcy Code expires or is terminated.

(v)     The DIP Final Order will not have been entered by the Bankruptcy Court within 30 days after the Bankruptcy Court's entry of the DIP Interim Order.

(w)     Other than as disclosed on Schedule 4.1(f) as of the Closing Date, any judgments which are in the aggregate in excess of $25,000 as to any Post-Petition obligation will be rendered against each Debtor or other Credit Parties and the enforcement thereof will not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants); or there will be rendered against each Debtor or other Credit Parties a nonmonetary judgment with respect to a Post-Petition event which causes or would reasonably be expected to cause a Material Adverse Effect.

(x)    Any DIP Credit Documents will cease to be effective or any DIP Credit Documents will be contested by a Debtor or any of its Affiliates.

(y)    Debtor will fail to comply with, or there is otherwise any breach or default of, any Financing Order or any other order of the Bankruptcy Court.

(z)    The filing of a motion, pleading or proceeding by each Debtor which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lender under the DIP Credit Documents or any Financing Order or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment.

Section 12.    <u>Remedies</u>.  Upon and after the occurrence of an Event of Default:

(a)    <u>Non-Bankruptcy Related Defaults</u>.  Then, and in any such event, and at any time thereafter, if any Event of Default occurs and is continuing, the DIP Lender may, take any or all of the following actions, at the same or different times, in each case without further order of or application to the Bankruptcy Court (provided, that with respect to the enforcement of Liens or other remedies with respect to the DIP Collateral under clause (iii) below, the DIP Lender will provide Debtor (with a copy to counsel for the Committee and to the United States Trustee) with 5 Business Days' written notice prior to taking the action contemplated thereby; in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing):

(i)    declare the DIP Commitments terminated, whereupon all DIP Commitments of each DIP Lender will forthwith terminate immediately;

(ii)    declare the principal of and any accrued interest in respect of the DIP Loan and the DIP Notes evidencing such DIP Loan and all other DIP Obligations owing with respect thereto under this Agreement and thereunder to be, whereupon the same will become, forthwith immediately with due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Debtor; and

(iii)    enforce, as the DIP Lender, all of the DIP Liens and security interests created pursuant to the DIP Collateral Documents securing DIP Obligations owing to the DIP Lender in accordance with applicable Regulations.

(b)    <u>Bankruptcy Events of Default</u>.  In the case of any of the Events of Default specified in either Section 8.1(f) or 8.1(g), automatically, without any notice to each Debtor or any other act by the DIP Lender, automatically:

(i)    the DIP Commitments will thereupon terminate, and

(ii)    each of the following will immediately become due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Debtor and each other Debtor:

Page 59

(1)    the unpaid principal amount of and interest on the DIP Loan, and

(2)    all other DIP Obligations;

(c)    <u>Remedies in All Events of Default</u>.  In addition to the foregoing, upon the occurrence of an Event of Default, the DIP Lender may:

(i)    exercise any right of counterclaim, setoff, banker's lien or otherwise which it may have with respect to money or property of any Debtor;

(ii)    bring any lawsuit, action or other proceeding permitted by law for the specific performance of, or injunction against any violation of, any DIP Credit Documents and may exercise any power granted under or to recover judgment under any DIP Credit Documents, and

(iii)    exercise any other right or remedy permitted by application Regulations or otherwise available to the DIP Lender at law, in equity or otherwise.

(d)    <u>Remedies Cumulative</u>.  No remedy in this Agreement conferred upon any DIP Lender or the DIP Lender or the holder of any DIP Note is intended to be exclusive of any other remedy and each and every remedy will be cumulative and will be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute or any other provision of law.

Section 13.    <u>Additional DIP Lender Provisions</u>.

(a)    <u>DIP Lender is Right to Realize on DIP Collateral</u>.  Anything contained in any of the DIP Credit Documents to the contrary notwithstanding the Debtors, and the DIP Lender hereby acknowledged that (i) in the event of a foreclosure by the DIP Lender on any of the DIP Collateral pursuant to a public or private sale, the DIP Lender may be the purchaser of any or all of such DIP Collateral at any such sale will be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the DIP Collateral sold at any such public sale or any sale under Section 363 of the Bankruptcy Code or any reorganization, to use and apply any of the DIP Obligations as a credit on account of the purchase price for any collateral payable by the DIP Lender at such sale.

(b)    <u>Notice of Default</u>.  The DIP Lender will not be deemed to have Knowledge or notice of the occurrence of any Default or Event of Default under this Agreement unless the DIP Lender has received notice from a the Debtors referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".

(c)    <u>Delivery of Documents, Notices, Etc</u>.  In addition to, and in furtherance of any requirement placed upon the DIP Lender in this Agreement to deliver, provide, distribute, notify or otherwise convey items received from the Debtors to the DIP Lender, the DIP Lender will promptly notify the DIP Lender of any notices, documents, requests, demands or other items the DIP Lender received from the Debtors and promptly deliver or

Page 60

convey, to the extent they are in written form, such notices, documents, requests, demands or items to the DIP Lender.

Section 14.    Miscellaneous.

(a)    Amendments and Waivers; Release of DIP Collateral.  No amendment, modification, termination (other than pursuant to the express terms of the DIP Credit Documents) or waiver of any provision of the DIP Credit Documents, or consent to any departure by any Debtor therefrom, will be effective without the written consent of the DIP Lender.

(b)    Effect of Notices, Waivers or Consents.  Any waiver or consent will be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Debtor in any case will entitle any Debtor to any other or further notice (except as otherwise specifically required under this Agreement or under any of the DIP Credit Documents) or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.1 will be binding upon each DIP Lender at the time outstanding, each future DIP Lender and, if signed by a Debtor, on any Debtor.

(c)    Certain DIP Collateral Releases.  The Debtors are entitled to receive, and the DIP Lender is authorized to effect (and the DIP Lender will so effect), the release of DIP Collateral that is the subject of an Asset Sale, or any other sale, transfer or other disposition, in each case, expressly permitted by, and consummated in accordance with, Section 6.1(g) from the Lien of the DIP Collateral Documents, so long as the proceeds (including the Net Asset Sale Proceeds) of such Asset Sale or other sale, transfer or disposition that are required to be used to prepay the DIP Loan pursuant to the terms of the DIP Credit Documents are in fact so prepaid as required by this Agreement (including as required by Section 2.12(b)).

(d)    Notices.

(i)    All notices, requests, demands and other communications to any party or given under any DIP Credit Documents (collectively, the "Notices") will be in writing and delivered personally, by overnight courier or by registered mail to the parties at the following address or sent by facsimile, with confirmation received, to the facsimile number specified below (or at such other address or telecopy number as will be specified by a party by like notice given at least five days prior thereto):

If to the Debtors:        Abengoa Bioenergy US Holding, LLC
                          ]16150 Main Circle Drive, Suite 300
                          Chesterfield, Missouri 63017
                          Attention:  Mr. Salvador Martos

                          with a copy to
                          (which will not constitute notice):

Page 61

DLA Piper LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Attention:  Richard Chesley, Esq.

If to the DIP
Lender:

[The Kimberley Fund, LP]
c/o Sandton Capital Partners, L.P.
16 West 46th Street, 11th Floor
New York, New York 10036
Attention:      Mr. Thomas Wood
                      Mr. Roberto Moreno

with a copy to
(which will not constitute notice):

Lowenstein Sandler LLP
1251 Avenue of the Americas, 17th Floor
New York, New York 10020
Attention:      Richard Bernstein, Esq.
                      Sharon L.  Levine, Esq.

(ii)      All Notices will be deemed delivered when actually received.  Each of the parties will hereafter notify the other in accordance with this Section 14(d) of any change of address or telecopy number to which notice is required to be mailed.

(e)      Expenses.  Whether or not, but subject to the proviso at the end of this Section, the transactions contemplated by this Agreement will be consummated or the DIP Loan will be made, each Debtor agrees to pay promptly subject to the Financing Order upon written demand from the DIP Lender, at the instruction of the DIP Lender, (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval in the event the transactions contemplated by this Agreement are consummated:

(i)      prior to the occurrence of a Default, all the reasonable, out-of-pocket costs, and expenses of preparation of the DIP Credit Documents and any consents, amendments, waivers, or other modifications thereto, the reasonable fees, expenses, and disbursements of outside counsel to the DIP Lender in connection with the negotiation, preparation, signing, and administration of the DIP Credit Documents, and any consents, amendments, supplements, waivers, or other modifications thereto, and any other documents or matters requested by the Debtors as well as site visits and inspections for all costs and reasonable fees, expenses, and disbursements of any advisors, including, attorneys, auditors, accountants, consultants or appraisers up to $150,000;

(ii)    upon the occurrence and during the continuance of a Default or an Event of Default, all the actual costs and reasonable fees, expenses, and disbursements of any advisors, including, attorneys, auditors, accountants, consultants, or appraisers, including all out-of-pocket costs and expenses, including, reasonable attorneys' fees and out-of-pocket costs of settlement, incurred by the DIP Lender in enforcing any of the DIP Obligations of, or in collecting any payments due from, any Debtor under this Agreement or under the other DIP Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon, any of the DIP Collateral or in connection with any negotiations, reviews, refinancing, or restructuring of the credit arrangements provided under this Agreement, including in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings; and

(iii)    the foregoing will not be in addition to, and will not be construed to limit, any other provisions of the DIP Credit Documents regarding costs and expenses to be paid by the Debtors; provided, however, that no such costs and expenses will be due from each Debtor to a DIP Lender if such DIP Lender fails or refuses to advance any funds to the Debtors in violation of this Agreement, or as a result of the Bankruptcy Court's denial of any Debtors' motion to approve the DIP Loan on an interim or final basis.

(f)    Enforceability; Successors and Assigns.

(i)    Enforceability; Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of, and is enforceable by, the respective successors and permitted assigns of the parties to this Agreement.  This Agreement may not be assigned by the Debtors without the prior written consent of the DIP Lender.  Any assignment or attempted assignment in contravention of this Section will be void ab initio and will not relieve the assigning party of any obligation under this Agreement.

(ii)    Assignments; Participations.

(1)    The DIP Lender may assign (each, an "Assignment") to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of such DIP Loan and DIP Notes, as the case may be.  Such Assignment may be made without the consent of the Debtors.

(2)    The DIP Lender may sell participations (each, a "Participation") to one or more Persons (each, a "Participant") in all or a portion of the DIP Lender's rights and obligations under this Agreement (including all or a portion of such DIP Lender's DIP Loans and DIP Notes, as the case may be); provided that:

(A)    such DIP Lender's obligations under this Agreement will remain unchanged;

(B)    such DIP Lender will remain solely responsible to the Debtors for the performance of such obligations; and

Page 63

(C)    the Debtors will continue to deal solely and directly with the DIP Lender in connection with the DIP Lender's rights and obligations under this Agreement.

(3)    Any agreement or instrument pursuant to which the DIP Lender sells such Participation will provide that the DIP Lender will retain the sole right to enforce the DIP Credit Documents and to approve any amendment, modification, or waiver of any provision of the DIP Credit Documents.

(4)    The Debtors hereby consents to the disclosure of any information obtained by the DIP Lender in connection with this Agreement or any other DIP Credit Documents to any Person to which such DIP Lender participates, or proposes to participate, its DIP Loan, or DIP Notes.

(5)    Notwithstanding anything else to the contrary contained in this Agreement, the DIP Lender may any time pledge its DIP Loans and such DIP Lender's rights under this Agreement and the other DIP Credit Documents to a Federal Reserve Bank and, in the case of any DIP Lender that is a fund, to its trustee for the benefit of its investors; <u>provided</u> that no such pledge to a Federal Reserve Bank (or in the case of any DIP Lender that is a fund, to its trustee for the benefit of its investors) will release such DIP Lender from such DIP Lender's obligations under this Agreement or under any other DIP Credit Document.

(g)    <u>Integration</u>.  This Agreement and the other DIP Credit Documents contain and constitute the entire agreement of the parties with respect to the subject matter of this Agreement and supersede all prior negotiations, agreements, and understandings, whether written or oral, of the parties to this Agreement.

(h)    <u>No Course of Dealing</u>.  No course of dealing and no delay on the part of any party to this Agreement in exercising any right, power, or remedy conferred by this Agreement will operate as a waiver thereof or otherwise prejudice such party's rights, powers, and remedies conferred by this Agreement, or will preclude any other or further exercise thereof or the exercise of any other right, power, and remedy.

(i)    <u>No Waiver; Remedies</u>.  No failure or delay by any party in exercising any right, power, or privilege under this Agreement or any of the other DIP Credit Documents will operate as a waiver of such right, power, or privilege.  A single or partial exercise of any right, power, or privilege will not preclude any other or further exercise of the right, power, or privilege or the exercise of any other right, power, or privilege.  The rights and remedies provided in the DIP Credit Documents will be cumulative and not exclusive of any rights or remedies provided by law.

(j)    <u>Setoff</u>.

(i)    The Debtors hereby, subject to the Financing Orders and the Carve Out, grant to the DIP Lender a continuing lien, security interest, and right of setoff as

Page 64

security for all liabilities and obligations to the DIP Lender, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping, or control of the DIP Lender or any Affiliate and their successors and assigns or in transit to any of them.

(ii)    Regardless of the adequacy of any DIP Collateral, if any of the DIP Obligations are due and payable and have not been paid or any Event of Default will have occurred, any deposits or other sums credited by or due from the DIP Lender to any the Debtors and any Securities or other property of any the Debtors in the possession of the DIP Lender may be applied to, or setoff by, the DIP Lender against the payment of the DIP Obligations and any and all other liabilities, direct, or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of any the Debtors to the DIP Lender.

(iii)    ANY AND ALL RIGHTS TO REQUIRE THE DIP LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER DIP COLLATERAL WHICH SECURES THE DIP OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS, OR OTHER PROPERTY OF ANY DEBTOR ARE HEREBY KNOWINGLY, VOLUNTARILY, AND IRREVOCABLY WAIVED.

(k)    <u>Counterpart; Electronic Signature</u>.    This Agreement may be signed:

(i)    in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same Agreement and binding on all of the parties to this Agreement, notwithstanding that all of the parties are not a signatory to the original or to the same counterpart, and

(ii)    via facsimile transmission or other electronic transmission which provides an accurate copy of this Agreement, which such copy will be deemed an original.

Section 15.    <u>Immunity</u>.  To the extent that any party to this Agreement has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, then such party hereby irrevocably waives such immunity in respect of its obligations under this Agreement and the other DIP Credit Documents.

Section 16.    <u>Third Party Beneficiaries</u>.

(a)    Except for the parties to this Agreement, the Indemnified Persons, and the Released Parties, this Agreement is not intended, and will not be deemed, to:

(i)    confer any rights or remedies upon any Person other than the parties to this Agreement and their respective successors and permitted assigns; or

(ii)    otherwise create any third party beneficiary to this Agreement.

(b)    Each Indemnified Person and Released Party is an intended third party beneficiary of this Agreement and is entitled to such rights and benefits as if such Indemnified Person were a party to this Agreement.

Section 17.    <u>Attorney-In-Fact</u>.

(a)    Each Debtor hereby constitutes and appoints the DIP Lender, the true and lawful attorney-in-fact of the Debtors, with full power and authority in the place and stead of the Debtors and in the name of the Debtors, to enforce all rights, interests, and remedies of the Debtors with respect to the DIP Collateral or enforce all rights, interests, and remedies of the DIP Lender under this Agreement; <u>provided</u>, <u>however</u>, that the DIP Lender will not exercise any of the aforementioned rights unless an Event of Default has occurred and is continuing and has not been waived or cured in accordance with this Agreement and the other DIP Credit Documents.

(b)    The power of attorney as set forth in this <u>Section 17</u>, is a power coupled with an interest and will be irrevocable.

Section 18.    <u>Governing Law; Submission to Exclusive Jurisdiction; Venue; Waiver of Jury Trial</u>.

(a)    Subject to the jurisdiction of the Bankruptcy Court, this Agreement and the other DIP Credit Documents and the rights and obligations of the parties under this Agreement and thereunder will be construed in accordance with and be governed by the internal law of the State of New York, without regard to conflict of laws rules and principles thereunder, and, to the extent applicable, this Bankruptcy Code. Any legal action or proceeding with respect to this Agreement or any other DIP Credit Document will be brought exclusively in the Bankruptcy Court, and, by execution and delivery of this Agreement or any other DIP Credit Document:

(i)    Each Debtor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

(ii)    Each Debtor hereby further irrevocably waives any claim that any such courts lack personal jurisdiction over such Debtor, and agrees not to plead or claim, in any legal action proceeding with respect to this Agreement or any other DIP Credit Document brought in any of the aforementioned courts, that such courts lack personal jurisdiction over any Debtor.

(iii)    Each Debtor hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement or any other DIP Credit Document brought in the courts referred to in <u>Section 18(a)</u>, and hereby further irrevocably

Page 66

waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

(b)    <u>JURY WAIVER</u>.    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

(c)    <u>Severability</u>.

(i)    If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner adverse to any party.

(ii)    Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties to this Agreement will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement and the other DIP Credit Documents are fulfilled to the extent possible.

(d)    <u>Survival</u>.    All representations, warranties, covenants, agreements, and conditions contained in or made pursuant to this Agreement and the other DIP Credit Documents will survive:

(i)    the making of the DIP Loan and the payment of the DIP Obligations; and

(ii)    the performance, observance, and compliance with the covenants, terms and conditions, express or implied, of all DIP Credit Documents, until the due and punctual:

(1)    indefeasible payment of the DIP Obligations; and

(2)    performance, observance, and compliance with the covenants, terms, and conditions, express or implied, of this Agreement and all of the other DIP Credit Documents.

(e)    <u>Maximum Lawful Interest</u>.

(i)    Notwithstanding anything to the contrary contained in this Agreement, in no event will the amount of interest and other charges for the use of money payable under this Agreement or any other DIP Credit Documents exceed the maximum amounts permissible under any law that a court of competent jurisdiction will, in a final determination, deem applicable.

EAST\121874213.1

(ii)     The Debtors and the DIP Lender, in signing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and other charges for the use of money and manner of payment stated within it; provided, however, that, anything contained in this Agreement to the contrary notwithstanding, if the amount of such interest and other charges for the use of money or manner of payment exceeds the maximum amount allowable under applicable law, then, ipso facto as of the Closing Date, the Debtors are and will be liable only for the payment of such maximum as allowed by law, and payment received from the Debtors in excess of such legal maximum, whenever received, will be applied to reduce the principal balance of the DIP Loan to the extent of such excess.

(f)     Releases.

(i)     Each Debtor hereby acknowledges that it has no defense, counterclaim, offset, cross-complaint, claim, or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of its liability to repay the DIP Obligations.

(ii)     Each Debtor hereby voluntarily and knowingly releases and forever discharges the DIP Lender, its Affiliates, and each of their respective agents, employees, successors, and assigns (collectively, the "Released Parties") from all possible claims, demands, actions, causes of action, damages, costs, expenses, obligations, debts and liabilities whatsoever, whether known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, or at law or in equity, in any case originating in whole or in part on or before this Agreement is signed that such Debtor may now or hereafter have against the Released Parties, if any, irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise, and that arise from the DIP Loans, the exercise of any rights and remedies under the DIP Credit Documents, or negotiation for, and signing of, this Agreement, including, any contracting for, charging, taking, reserving, collecting, or receiving interest in excess of the highest lawful rate applicable.

(iii)     Notwithstanding anything to the contrary as set forth in this Agreement, the foregoing release will be subject to the rights of a Committee appointed pursuant to section 1102 of this Bankruptcy Code or any other party in interest under the Interim DIP Order, the Final DIP Order, or any successor provision in any other Financing Orders.

(g)     Modifications.

(i)     Except as specifically contemplated in the Financing Orders, the DIP Liens, lien priority, administrative priorities, and other rights, and remedies granted to the DIP Lender pursuant to this Agreement and the Financing Orders (specifically, including, the existence, perfection, and priority of the DIP Liens provided in this Agreement and therein and the administrative priority in this Agreement and therein) will not be modified, altered, or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Debtor (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Cases, or by any other act or omission whatsoever (other than in connection with any asset disposition permitted under this Agreement).   Without

Page 68

limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(1)    except for the Carve Out having priority over the DIP Obligations, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the DIP Lender against any Debtor in respect of any DIP Obligation; and

(2)    the DIP Liens and security interests granted under this Agreement and the other DIP Credit Documents will continue to be valid and perfected and with the specified priority without the necessity that financing statements be filed or that any other action be taken, or document or instrument registered or delivered, under applicable non-bankruptcy law.

(ii)    Notwithstanding any failure on the part of any Debtor or the DIP Lender to perfect, maintain, protect, or enforce the DIP Liens and security interests in the DIP Collateral granted under the DIP Collateral Documents, the Financing Orders will automatically, and without further action by any Person, perfect such DIP Liens and security interests against the DIP Collateral of the Debtors.

(h)    <u>Lead Debtor</u>.  The Lead Debtor is authorized to act for, and on behalf of, all of the Debtors.  Any act, direction, notice, waiver, or other consent provided by the Lead Debtor or an Authorized Representative of the Lead Debtor will be deemed, and will be, the act, direction, notice, waiver, or other consent of each Debtor.

(i)    <u>Strict Construction</u>.  The language used in this Agreement will be deemed the language chosen by the parties to express their collective intent; no rule of strict construction will be applied against any party.

(j)    <u>Interpretation</u>.

(i)    The headings contained in this Agreement are for convenience of reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

(ii)    Whenever the words "include," "includes," or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation" (whether or not such words or similar words are used).

(iii)    The meanings given to terms defined in this Agreement will be equally applicable to both the singular and plural forms of such terms.

(iv)    Unless otherwise indicated to the contrary in this Agreement by the context or use in this Agreement, the words, "in this Agreement," "hereto," "of this Agreement" and words of similar import refer to this Agreement as a whole and not to any particular Section or paragraph of this Agreement.

(v)     Words importing the masculine gender will also include the feminine and neutral genders, and vice versa.

(vi)     Any reference to an accounting term that is not otherwise defined in this Agreement will have the meaning ascribed to such accounting term under GAAP.

(vii)     Unless otherwise specified, all accounting terms used in this Agreement will be interpreted, all accounting determinations and computations under this Agreement will be made, and all financial statements required to be delivered under this Agreement will be prepared, in accordance with GAAP.

(viii)     Any terms used in this Agreement which are defined in the UCC will be construed and defined as set forth in the UCC, unless otherwise defined in this Agreement.

(ix)     The words "will" and "shall" have the same meaning and effect.

(x)     The word "or" is not exclusive and is deemed to have the meaning "and/or."

(xi)     The word "any" is not limiting and means "any and all" unless the context clearly requires or the language provides otherwise.

(xii)     Unless the context otherwise requires, any reference in this Agreement to any Person will be construed to include such Person's successors, assigns, as a debtor, as a debtor-in-possession, and any receiver or trustee for such Person.

(xiii)     The Exhibits referred to in this Agreement will be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim in this Agreement.

(xiv)     Unless the context otherwise requires, references in this Agreement to:

(1)     Sections and Exhibits mean the Sections of, and Exhibits annexed to, this Agreement;

(2)     an agreement, instrument, or other document means such agreement, instrument, or other document as amended, amended and restated, supplemented, and modified on one or more occasions to the extent permitted by the provisions thereof; and

(3)     a statute, law, or regulation means such statute, law, or regulation as amended, modified, codified, replaced, or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any statute, law, or regulation means that provision of such statute, law, or regulation from time to time in effect and constituting the substantive

EAST\121874213.1

amendment, modification, codification, replacement, or reenactment of such section or other provision.

(xv)    A reference to day or days without further qualification means calendar days.  A reference to any time means New York time.

(xvi)    This Agreement may use several different limitations, tests, or measurements to regulate the same or similar matters.  All such limitations, tests, and measurements are cumulative and will each be performed in accordance with their respective terms.

Section 19.    <u>Joint and Several</u>.  The obligations (including the DIP Obligations) of each Debtor under this Agreement, and each of the other DIP Credit Documents, constitutes the joint and several obligations of all the Debtors.  All representations, warranties, undertakings, agreements, and obligations of each Debtor expressed or implied in this Agreement or any other DIP Credit Document will be deemed to be made, given, or assumed by the Debtors jointly and severally.

*[signature pages follow]*

       **IN WITNESS WHEREOF**, the parties to this Agreement have signed this Agreement as of this Agreement Date.

**ABENGOA BIOENERGY COMPANY, LLC**


By:_____
     Name:
     Title:


**ABENGOA BIOENERGY ENGINEERING & CONSTRUCTION, LLC**


By:_____
     Name:
     Title:


**ABENGOA BIOENERGY OF NEBRASKA, LLC**


By:_____
     Name:
     Title:


**ABENGOA BIOENERGY OUTSOURCING, LLC**


By:_____
     Name:
     Title:


**ABENGOA BIOENERGY TRADING US, LLC**


By:_____
     Name:
     Title:

**ABENGOA BIOENERGY US HOLDING, LLC**


By:_____
      Name:
      Title:


**THE KIMBERLEY FUND, LP**


By:_____
      Thomas Wood
      Managing Director

**EXHIBIT A**

**CLOSING DATE CERTIFICATE**

**(To Come)**

**EXHIBIT B**

**DIP BUDGET**

**(To Come)**

**EXHIBIT C**

**LEAD DEBTOR WIRING INSTRUCTIONS**

**(To Come)**

[_____]
[_____]
[_____]
[_____]
[_____]
[_____]
[_____]
[_____]

**EXHIBIT D**

**LENDER WIRING INSTRUCTIONS**

Account Bank: Citibank N.A.
Address: Citigroup Private Bank
New York, NY 10043
ABA Number: 021000089
SWIFT: CITIUS33
Account #: 4979190970

**EXHIBIT E**

**DIP LOAN CERTIFICATE**

**(To Come)**

**EXHIBIT F**

**NONAVOIDABLE LIENS**

**(To Come)**

**EXHIBIT G**

**ETHANOL DISCLOSURES**

**(To Come)**

# EXHIBIT H

# PERMITTED LIENS

## (To Come)