**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| ABENGOA BIOENERGY US HOLDING | ) | |
| LLC, et al., | ) | Case No. 16-41161-659 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date and Time:** |
| | ) | Sept. 13, 2021, 11:00 a.m. |
| | ) | **Hearing Location:** |
| | ) | United States Courthouse |
| | ) | Courtroom 7 North |
| | ) | 111 South Tenth Street |
| | ) | St. Louis, Missouri 63102 |

## ENCORE ENERGY SERVICES, INC.'S OPENING BRIEF SUPPORTING ADMINISTRATIVE CLAIMS

Encore Energy Services, Inc. ("Encore"), submits this opening Brief pursuant to the Order concerning the administrative claims Encore filed (Doc. 2248). The administrative claims are supported by the major post-petition value provided by Encore's delivered gas and services.

### Summary Introduction

Drivetrain, LLC, GUC Liquidating Trustee ("Drivetrain") filed its Forty-Fourth Omnibus Claims Objection (Doc. 2243) ("Claims Objection") seeking to reclassify two of Encore's claims, filed as administrative claims, to general unsecured status. While the Claims Objection thus could cause major harm and unfairness to Encore, the Claims Objection does limit issues for the September 13, 2021 evidentiary hearing. Rather than asserting Encore has claimed for amounts Encore was already paid or that Encore did not incur expenses or conduct the business described in the two pertinent Encore claims ("Claims"), the issue is how many administrative dollars will be awarded on account of Encore's post-petition efforts and payment of that amount per Encore's

motion seeking payment of the Claims.

Encore's administrative status is amply justified under two statutory subdivisions, either of which is individually sufficient: expenses of preserving the estate (11 U.S.C. Sec. 503(b)(1) and expenses of substantial contribution to the estate (11 U.S.C. Sec. 503(b)(3)(D). Encore's administrative status also is justified under Section 503(b) itself. See generally 11 U.S.C. Sec. 102(3) ("including" is not limiting); In re Curry Printers, Inc., 135 B.R. 564, 568 (Bankr.N.D. Ind. 1991) ("including" in Sec. 503(b) is not limiting).

Encore preserved the estate and also made a substantial contribution to the estate in multiple ways. Encore need not prove all of the following. Together, the following certainly provide ample value justifying administrative status for Encore's Claims:

- The York and Ravenna ethanol plants were preserved from a "freezing" event specifically and only because of Encore's post-petition supply of natural gas and services.

- Debtors desired to operate and found major value in operating the York and Ravenna ethanol plants at or near capacity. Even after moving for authority to reject Encore's contracts, Debtors deliberately used Encore's gas and then promoted the achievement of getting the York and Ravenna plants operating at or near capacity as a major achieved goal that would add value to selling the plants and allow a more prompt prospect for concluding a sale process.

- Encore at Debtors' request supplied gas post-petition. The contracts that allowed this expressly obligate Debtors to multiple charges for delivered gas and related service. One is the per unit price for physical gas and the associated NYMEX position for that particular pertinent month, but another is the gain or loss, if any, involved with the multi-month forward-purchased NYMEX positions. At the time of rejection, these NYMEX positions were out-of-the-money and unwound at a loss. Debtors, who intentionally pleaded for and received post-petition gas from Encore, thus owe for that part of the overall obligation that includes the $507,696.15 of NYMEX unwinding expense.

- Even if one, incorrectly, considers only the per unit price for physical quantities of gas delivered post-petition and the current month NYMEX settlement expense for the months in which gas was delivered, Encore is owed $139,255.17. This is pursuant to true-up of post-petition gas supplied at York ($129,660.75) and Ravenna ($9594.42).

2

- The fact that Encore's contracts were multi-month provided valuable benefits to the estate. The long-term contracts were considered by the Carl Marks firm and at least one potential buyer as late as May 23, 2016.

Encore was especially positioned to amply justify administrative expense classification. Encore was not a "run of the mill" creditor. For example: Encore prepetition contracted with third parties for control of priority space or capacity, so to speak, in the gas pipelines serving York and Ravenna. Without Encore providing for Debtors of Encore's contractually obtained gas and pipeline space, so to speak, the York and Ravenna facilities would have been subject to substantial freeze damage and could not have produced ethanol or related products at or near their ethanol plants' capacity as desired by Debtors. In the case of York, Encore's analysis is the plant could not have produced at all without using Encore's contractually obtained pipeline space. A second example: The Bankruptcy Code, such as Section 556, allowed Encore to terminate all prepetition contracts. Congress felt so strongly about the importance of protecting forward contract merchants such as Encore that Section 556 provides that the termination and liquidation right trumps any contrary Bankruptcy Code provision or bankruptcy court order and that the forward contract merchant shall not be stayed by any such provision or court order. A third example: Pursuant to FERC tariffs and/or interstate pipeline rules and/or utility tariffs and/or rules, it takes two weeks to a month to change natural gas suppliers and such change cannot be effectuated mid-month, as is widely known in the industry. Encore was uniquely positioned to, and did, provide administrative expense value to Debtors' estate.

Nothing in the Bankruptcy Code limits a claimant, who happens to have an executory contract that was rejected, from obtaining administrative expense status for contract-related claims. The claims are based not on the mere fact of rejection of the contract, but instead on the fact the claimant has claims satisfying the standards of Section 503(b), such as but not limited to Sec.

503(b)(1) or (3)(D).  The Supreme Court and the Eighth Circuit, concur:

> If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay *for the reasonable value of those services,* which, depending on the circumstances of a particular contract, may be what is specified in the contract. 465 U.S. at 531, 104 S.Ct. at 1199 (emphasis added) (citations omitted)

*U.S. on Behalf of U.S. Postal Serv. v. Dewey Freight System, Inc.,* 31 F.3d 620, 624 (8th Cir. 1994), quoting *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

## **Legal Analysis**

### A.  Drivetrain bears the burden of overcoming the Claims.

A party objecting to a properly filed proof of claim "must produce evidence rebutting the claimant or else the claimant will prevail." *In re Vantage Investments, Inc.*, 385 B.R. 670, 679 (Bankr. W.D. Mo. 2008). Such evidence must "meet, overcome, or at a minimum, equalize the valid claim." *In re Farmland Indus., Inc.*, 305 B.R. 497, 501 (Bankr. W.D. Mo. 2004).  Drivetrain has not met this threshold. It is notable that Drivetrain's Claim Objection does not discuss at all the amount of value or benefits, *see American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene S. A.* 280, F. 2d. 119, 124-25 (2d. Cir. 1960), cited by *Dewey*, provided by Encore post-petition.

### B.  Whether seen as arising from a post-petition or prepetition agreement between Debtors and Encore, the funds Encore seeks in the Claims are amply justified for preservation of and a substantial contribution to the estate.

Encore's position is that Debtors made and confirmed a post-petition agreement with Encore concerning which the Base Agreement and confirming orders were substantially similar to the prepetition arrangement.  These agreements were not limited to delivery of physical natural gas but also included features like a NYMEX position and related responsibilities. Specifically, Encore made a post-petition agreement with Debtor to forgo its rights to terminate and liquidate

4

as afforded under the Bankruptcy Code to forward market merchants operating under forward market contracts.   Notwithstanding,   whether or not Encore's post-petition transactions with Debtors are viewed as arising post-petition or constituting post-petition performance of prepetition contracts, the key is reasonable value or benefits of those goods and services.

A "transaction" for administrative expense purposes is broadly viewed. Thus, a prepetition revenue distribution agreement was held to have administrative expense status when breached post-petition by a debtor in *In re Athens / Alphas Gas Corp.*, 332 B.R. 578, 580-81 (8th Cir. B.A.P. 2005). In *Athens / Alpha Gas,* the debtor retained funds in the estate and used them to "pay operating expenses and keep the business going." The 8th Circuit BAP noted that the "estate's creditors should pay for those expenses necessary to produce the distribution" that the debtor's operations eventually allowed. It also was notable that the court awarded an administrative expense of exactly $333,089.65. Id at 581. By reviewing the *Athens/Alpha Gas* lower court's order, one can determine this is exactly the amount of dollars provided before in the prepetition contract had it been honored by the debtor. See *In re Athens / Gas Corp*, Bankr. No. 03-30008 (Bankr. D.N.D. April 19, 2005) Order at p.3.

Similarly, a claimant's performance of a prepetition contract, and a debtor's acceptance of that claimant's performance can establish a "post-petition transaction" appropriate for administrative expense status. *In re Goody's Family Clothing, Inc.,* 401 B.R. 656, 671 (D. Del. 2009).  Chief Judge Lindquist also so held in *In re Curry Printers, Inc.,* 135 B.R. 564, 568–69 (Bankr. N.D. Ind. 1991):

> If a reorganization is to succeed, creditors asked to extend credit after the petition is filed must be given priority so they will be moved to furnish the necessary credit to enable the bankrupt to function. *See, In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976) (Coffin, Chief Judge). Thus, "[w]hen third parties are *induced* to supply goods or services to the debtor-in-possession *569 ... the purposes of [§ 503] plainly require that their claims be afforded priority."

Chief Judge Lindquist went on to hold a prepetition equipment lessor, even though the leases were eventually rejected, would receive administrative expense treatment, per Section 503(b)(1), for the "reasonable value of the property, regardless of the actual use made thereof by the estate," noting that the lessor cited to *In re Xonics, Inc.,* 65 B.R. 69, 73 (Bankr.N.D.Ill.1986).   The particular administrative claimant in *Curry Printers* argued for administrative status for use value equal to the prepetition lease's contract terms, and Chief Judge Lindquist agreed, though he gave the debtor an opportunity to see if it could carry a burden of showing the prepetition terms were not reasonable.   *In re Curry Printers, Inc.,* 135 B.R. 564, 567 (Bankr. N.D. Ind. 1991).

The substantial contribution provision in Section 503(b)(3) also, independently, justifies administrative status for Encore.   Section 503(b)(3) "is intended to promote meaningful participation in the reorganization process . . ." *See, e.g., In re S & Y Enterprises, LLC,* 480 B.R. 452, 459 (Bankr. E.D. N.Y. 2012); *In re Albert Holdings Inc.,* 157 B.R. 753, 757 (Bankr. S.D. N.Y. 1993); *In re Dana Corp.,* 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008); *In re Granite Partners,* 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997). *See also, In re 9085 E. Mineral Office Bldg. Ltd.,* 119 B.R. 246, 253 (Bankr. D. Colo. 1990) (warning that a narrow application of substantial contribution awards would have a chilling effect upon the Bankruptcy Code's goal of encouraging meaningful participation).

The substantial contribution requirement is satisfied when the claimant's services substantially contributed to an actual and demonstrable benefit to the debtor's estate and creditors. *See, e.g., In re Service Merchandise, Co.,* 256 B.R. 738, 742 (Bankr. M.D. Tenn. 1999); *9085 E. Mineral Office,* 119 B.R. 246, 250.

The party seeking an allowed administrative expense claim based on a "substantial

contribution" need not have intended to benefit the estate. Rather, what matters is that the party's actions did, in fact, benefit the estate. *See In re DP Partners Ltd Partnership,* 106 F.3d 667, 673 (5th Cir.), cert. denied, 552 U.S. 815 (1997) (unsuccessful bidder for debtor's assets entitled to allowed substantial contribution claim because its participation in the process increased recoveries for creditors); *see also In re Celotex Corp.*, 227 F.3d 1336, 1339 (11th Cir. 2000); *Richton Int'l Corp.,* 15 B.R. 854, 856 (Bankr. S.D.N.Y. 1981) (substantial contribution claim can be made even when party's efforts were in its own interest, but also benefited the estate).

Although the Bankruptcy Code does not define "substantial contribution," courts have held that an applicant has substantially contributed to a chapter 11 case if it has provided "an actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders." *In re Dana Corp.,* 390 B.R. at 108 (quoting *In re U.S. Lines, Inc.,* 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989)). Courts have considered various factors in determining whether a party has conferred an actual demonstrable benefit, including: (i) whether the services benefited the estate itself or all of the parties in the bankruptcy case; (ii) whether the services resulted in a significant and demonstrably positive benefit to the estate; and (iii) whether the services duplicated the efforts by others. *See Trade Creditor Group v. L. J. Hooker Corp. (In re Hooker Invs., Inc.),* 188 B.R. 117, 120 (S.D.N.Y. 1995), *aff'd,* 104 F.3d 349 (2d Cir. 1996); *In re Bethlehem Steel Corp.,* 2003 WL 21738964, at *6 (Bankr, S.D.N.Y., July 28, 2003).

Applying these substantial contribution factors as a whole to Encore's situation, Encore has undoubtedly made a substantial contribution to this case, its services could not have been duplicated by other parties, and its services resulted in a significant and demonstrable benefit to the estate. Further Encore incurred expenses in order to facilitate the orderly administration of the Debtor's case.

7

The natural gas supplied by Encore was crucial for preservation of the estate. Multiple officers of the Debtors pleaded with Encore to supply gas, and Debtors' Chief Financial Officer was among those who promised and represented to Encore that Debtors would pay Encore for the gas through the multiple months of the arrangement and pay on the same terms as the prepetition contracts.

Encore was willing to reach a post-petition agreement with Debtors with the similar confirming orders and base agreement provisions as the prepetition contracts and the assurance that Debtors would honor the multi-month contracts through their durations, ending at year-end, 2016, unless extended by mutual express agreement.  Debtors, including ABC and ABNE, agreed to this and promised and represented to Encore they would so perform.

As shown in the Debtors' Motion for Entry of Interim and Final Orders pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, for DIP financing dated on or about Feb. 24, 2016, and Order thereon (Doc. 85) and/or the Motion for Entry of an Order (I) (A) Approving and Authorizing Bidding Procedures in Connection with the Sale … and (B) Approving Stalking Horse Protections etc. (Doc. 378), Debtors sought to have the York and Ravenna plants operating and such operating status was a main goal and desired to be at or near capacity, with a budget and other financial information assuming such status.  Debtors desired to and found major value in operating the York and Ravenna plants at or near capacity.  Encore's delivery of gas allowed this, and Debtor's intentionally used the gas post-petition, both before and after moving for authority to reject Encore's contract.

No one forced Debtors to strive to operate the York and Ravenna plants so vigorously before obtaining court authorization to reject Encore's contracts.   Although Debtors were contractually bound by April, 2016, to Encore, they made a decision to try to operate the York and

Ravenna plants at or near capacity and indeed reaped benefits from using Encore-supplied gas to do so.

In addition to the operating revenues from the plants, touted by the Debtor's in their motion to approve bidding procedures and for stalking horse protections, Encore notes the difference also between plants sold while operating and while not operating.  Debtors' Colwich plant sold while not operating, for $3,150,000. Debtor's operating plants at York, Ravenna, and, combined, Indiana and Illinois sold respectively for $37,375,000; $115,000,000; and $200,000,000.

Although it is true that on April 1, 2016, Debtors moved for authority to reject the Encore contracts, sometimes, as the Court knows, a debtor tactically moves for authority to reject tacitly seeking to enhance bargaining position with a supposed executory contract creditor. But, whether or not Debtors sought to keep options open, they intentionally kept using Encore's delivered gas and benefiting from the overall contracts with Encore before rejection.

Moreover, the estate was clearly preserved from a "freezing" event specifically and only because of Encore's natural gas and services.  Encore's evidence is that only because of natural gas delivered by Encore were ABC and ABNE able to warm the plants in the winter of 2016, such that they did not undergo freezing, which would have incurred millions and likely tens of millions of dollars of damage, and/or interruption of operations, which would have significantly reduced operating revenue, reliability, and affected confidence of employees, other vendors and creditors and prospective buyers.

The contract wording also contained an obligation on Encore to provide any and all gas to the plants on a "Firm" basis up to the "Maximum Daily Quantity (MDQ)" as specified in the Confirming Orders.  Encore could not release (or otherwise turn back) its valuable winter pipeline capacity or gas supplies as it had to stand ready to provide the MDQ at a moment's notice, which

also gave Debtors valuable business prospects.

    C.  Any attempt to change the Encore contracts, such as by paying only for some of the NYMEX close-outs and not for others, is unfair and unpersuasive.

Debtors never asked Encore postpetition to supply gas on a month-to-month, uncommitted arrangement.  Instead, Debtors asked Encore to reach a postpetition agreement in which Debtors would abide by the entirety of Encore's contracts and promised they would honor them. Any attempt to rewrite the contracts, to somehow claim that Encore and Debtors re-contracted each month on a month-by-month basis, is unfair and unpersuasive. That was not actually what occurred. Moreover, to do so is extremely prejudicial to Encore, because, among other things, it allows Debtors to leave Encore hanging after intentionally pleading with Encore to deliver gas and maintain the corresponding NYMEX positions and repeatedly commenting to Encore how important it was to the postpetition estate's York and Ravenna plants to have the Encore agreement.  In addition, Encore was contractually considered to be a 'critical supplier' by Debtor.

Moreover, even isolating on the post-petition physical gas used by Debtors in May, 2021, and (wrongly) ignoring for the sake of argument Debtors other obligations then-existing for future NYMEX positions, Debtors never fully paid Encore. Debtors were invoiced $129,660.75 for the true-up related to May, 2016, for York (ABC) and $9,594.42 for the May 2016 true-up related to Ravenna (ABNE). Debtors never paid. This $139,255.17 clearly is an important expense of preserving the estate and also constitutes a substantial contribution to the estate. It is major value provided by Encore.

Drivetrain has shown interest in connection with the September 13 forthcoming trial with some court-filed "Utility Orders" (e.g., Doc. 233) and the Court's May 31, 2016, order authorizing rejection of Encore's prepetition contracts (Doc. 351).  But those orders did not impair Encore's rights as a forward market merchant.  See 11 U.S.C. Sec. 556 (rights shall not be stayed, avoided

10

or otherwise limited by court order).   Indeed, the Interim Utility Order Drivetrain uplifts underscores that Debtors felt, in the crucial early stages of their bankruptcies, that Encore's gas services were highly valuable to the estate.

The estate has benefitted significantly more than the $507,596.15 Claims Amount, the minimum amount for which Encore seeks administrative expense status.

## <u>Conclusion</u>

Encore, having provided value and benefit of preserving the estate and substantially contributing to it, seeks administrative expense status for a modest part of the value provided. Encore should receive at least $507,696.15 administrative expense allowance, and such amount should be paid per Encore's motion for payment.

Respectfully submitted,

BAIRD HOLM LLP

<u>/s/ Thomas O. Ashby</u>
Thomas O. Ashby (MO Bar #60559)
1700 Farnam Street, Ste 1500
Omaha, NE 68102
402-344-0500
tashby@bairdholm.com

CARMODY MACDONALD P.C.

ROBERT E. EGGMANN (MO Bar #37374)
THOMAS H. RISKE (MO Bar #61838)
120 South Central Ave., Suite 1800
St. Louis, MO 63105
(314) 854-8600
(314) 854-8660 (fax)
ree@carmodymacdonald.com
thr@carmodymacdonald.com

COUNSEL FOR ENCORE ENERGY SERVICES, INC.

11

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on August 30, 2021, a true and correct copy of this document has been served on the contested parties in interest via email to the following.

David Farrell
dfarrell@thompsoncoburn.com

Mark Bossi
mbossi@tompsoncoburn.com

Ronald J. Silverman
ronald.silverman@hoganlovells.com

David Dunn
David.dunn@hoganlovells.com

*/s/Sarah J. Applegate*

DOCS/2683349.4