UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>**ABENGOA BIOENERGY US HOLDING, LLC,** et al.,<br><br>Debtors. | Chapter 11<br>Case No. 16-41161-659<br><br>(Jointly Administered) |
| **DRIVETRAIN, LLC, as the Trustee of the ABENGOA LIQUIDATING TRUST,**<br><br>Objector,<br><br>v.<br><br>**ENCORE ENERGY SERVICES, INC.,**<br><br>Respondent. | Contested Matter: GUC Liquidating Trustee's Forty-Fourth Omnibus Claims Objection Seeking to Reclassify Certain Claims (ECF No. 2243) |

### THE LIQUIDATING TRUSTEE'S OPENING BRIEF IN SUPPORT OF ITS FORTY-FOURTH OMNIBUS OBJECTION TO CLAIMS SEEKING TO RECLASSIFY CERTAIN CLAIMS

COMES NOW Drivetrain, LLC, in its capacity as the duly appointed trustee of the Abengoa Liquidating Trust (the "**Liquidating Trustee**") and, in accordance with the Court's *Order Granting, In Part and Continuing In Part Motion to Pay Claims, Alternatively, for Expedited Administrative Claims Discovery and Trial and for Related Relief* (ECF No. 2248), hereby submits this "Opening Brief" in support of its *GUC Liquidating Trustee's Forty-Fourth Omnibus Objection to Claims Seeking to Reclassify Certain Claims* (ECF No. 2243)(the "**Claim Objection**"), pursuant to which the Liquidating Trustee seeks to reclassify as general, unsecured claims the following claims filed by Encore Energy Services, Inc. ("**Encore**") and subsequently

10233347.1

assigned by Encore to Hain Capital Investors, LLC ("**Hain Capital**"), (c) Claim No. 47 filed against the bankruptcy estate of Abengoa Bioenergy Company, LLC, asserting an administrative priority claim in the amount of $229,317.71 ("**Claim No. 47**"); and (d) Claim No. 29 filed against the bankruptcy estate of Abengoa Bioenergy of Nebraska, LLC, asserting administrative priority claim in the amount of $278,378.44 ("**Claim No. 29**" and, together with Claim No. 47, the "**Contested Claims**").

## I. PRELIMINARY STATEMENT

The Contested Claims set forth separate claims for damages that Encore allegedly sustained as a result of this Court's May 31, 2016 Order authorizing the Debtors herein to immediately reject under Bankruptcy Code Section 365(a) a series of unassumed natural gas forward contracts entered into by and between Encore and the Debtors prior to the Petition Date. Although Bankruptcy Code Sections 365(g)(1) and 502(g)(2) unequivocally dictate that any and all such rejection damage claims be treated as prepetition, general, unsecured claims, Encore nevertheless filed the Contested Claims as administrative priority claims and subsequently sold them as such to Hain Capital.

Confronted by the Liquidating Trustee's Claim Objection and facing severe recourse liability and charges to Hain Capital in the event the Contested Claim are properly reclassified as general, unsecured claims, Encore attempts to argue that while framed as rejection damage claims, the Contested Claims were actually intended to serve as a "proxy" or "placeholder" for various other possible administrative priority claims that Encore now theorizes it might be entitled to assert against the Debtors' bankruptcy estates.

As existing jurisprudence makes clear, the Contested Claims must be adjudicated and determined in accordance with the claims asserted therein and not upon some theoretical claims

10233347.1

- 2 -

that Encore attempts to conjure up--nearly five years after the expiration of the applicable claims bar date—in a desperate attempt to somehow validate the administrative priority status that it improperly invoked in filing and subsequently selling the Contested Claims.

## II. BACKGROUND

The Debtors voluntarily commenced these proceedings on February 24, 2016 (the "**Petition Date**").

Prior to the Petition Date, Encore and certain of the Debtors entered into a series of contracts (collectively, the "**Prepetition Gas Forward Contracts**") regarding Encore's future supply of natural gas to the Debtors' bioenergy plants, including, in particular: (a) the bioenergy plant in York, Nebraska (the "**York Plant**") owned and operated by Debtor Abengoa Bioenergy Company, LLC ("**ABC**"); and (b) the bioenergy plant in Ravenna, Nebraska (the "**Ravenna Plant**") owned and operated by Debtor Abengoa Bioenergy of Nebraska, LLC ("**ABNE**").

The above-referenced Prepetition Gas Forward Contracts were generally memorialized through two sets of documents: (1) a so-called Base Agreement setting forth the general terms and conditions governing the parties' proposed transactions; and (2) a series of so-called "Confirming Orders" setting forth the specific volumes and corresponding pricing terms that would govern Encore's future monthly supply of natural gas to one of the Debtors' plant over the ensuing calendar year.

Thus, in the case of York Plant, ABC and Encore entered into the following prepetition contracts with respect to Encore's future monthly supply of natural gas over the 2016 calendar year (collectively, the "**Prepetition York Forward Contracts (2016)**"):  (a) a Base Agreement dated March 14, 2011 (the "**York Base Agreement**"); (b) Confirming Order No. 2322 dated August 15, 2015 ("**Confirming Order No. 2322**"); (c) Confirming Order No. 2335 dated August

10233347.1

- 3 -

21, 2015 ("**Confirming Order No. 2335**"); (d) Confirming Order No. 2391 dated September 21, 2015 ("**Confirming Order No. 2391**"); and (e) Confirming Order No. 2441 dated September 30, 2015 (**"Confirming Order No. 2441**").

Similarly, in the case of the Ravenna Plant, ABNE and Encore entered into the following prepetition contracts with respect to Encore's future monthly supply of natural gas over the 2016 calendar year (collectively, the "**Prepetition Ravenna Forward Contracts (2016)**" and, together with the Prepetition York 2016 Forward Contracts, the "**Prepetition Forward Contracts (2016)**"): (a) a Base Agreement dated March 14, 2011 (the "**Ravenna Base Agreement**"); (b) Confirming Order No. 2323 ("**Confirming Order No. 2323**"); (b) Confirming Order No. 2336 dated August 21, 2015 ("**Confirming Order No. 2336**"); (c) Confirming Order No. 2390 dated September 21, 2015 ("**Confirming Order No. 2390**"); and (d) Confirming Order No. 2442 dated September 30, 2015 (**"Confirming Order No. 2442**").

On April 1, 2016—i.e., approximately five weeks after filing for bankruptcy---the Debtors filed their *Debtors' Motion for Entry of an Order Authorizing Rejection of Unexpired Contracts with Encore Energy Services, Inc.* (ECF No. 188) (the "**Rejection Motion**"), wherein they sought to reject under Bankruptcy Code Section 365(a) all of their unexpired prepetition contracts with Encore (including the Prepetition Forward Contracts (2016)). Specifically, Debtors asserted that they would realize "significant savings" from the rejection of the above-referenced contracts because they would be "able to purchase natural gas on the spot market at rates significantly lower than [provided for in Prepetition Forward Contracts (2016)]." Rejection Motion, ¶12.

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the Debtors' Chapter 11 proceedings threw its full support behind the relief being requested by the

10233347.1

- 4 -

Debtors in their Rejection Motion. *See Statement in Support of Debtors' Motion for Entry of an Order Authorizing Rejection of Unexpired Contracts With Encore Energy Services, Inc.* (ECF No. 339) filed on May 27, 2016.

As the counterparty to the contracts to be rejected, however, Encore vehemently opposed the Debtors' Rejection Motion. Among other things, Encore insisted that the Debtors' Rejection Motion had been brought in "bad faith." *See Encore Energy Services, Inc.'s Objection to the Debtors' Motion for Entry of an Order Authorizing Rejection of Unexpired Contracts with Encore Energy Services, Inc.* (ECF No.249 )("**Rejection Opposition**") ¶6.; Opening Statement of Bruce Ruzinsky (Counsel for Encore) at May 31, 2016 Hearing on Debtors' Rejection Motion.[1] Specifically, Encore contended that prior to filing their Rejection Motion, the Debtors lulled Encore into continuing to do business with them by: (a) initially including Encore on a list of "Utility Company List" purportedly attached to the Court's *Interim Utilities Order* [ECF No. 91] but later removing Encore from the Court's *Final Utilities Order* [ECF No. 233]; and (b) having "an officer of the Debtors assure[ ] Encore that the Debtors wanted to continue business as usual with Encore." *Id*.

After a day-long evidentiary hearing held on May 31, 2016 during which more than two and half hours of live testimony was elicited from a total of four different witnesses, the Court entered an *Order* (ECF No. 351) (the "**Rejection Order**") that same day (i.e., May 31, 2016) overruling Encore's Rejection Objection, granting the Debtors' Rejection Motion and providing for the immediate rejection (effective as of May 31, 2016) of the unexpired prepetition contracts between the Debtors and Encore, including, without limitation, the Prepetition Forward Contracts (2016)..

---

[1] The Liquidating Trustee has requested a written transcript of the May 31, 2016 rejection hearing, which should be completed and will made fully available to all parties and the Court prior to the September 13, 2021 hearing on the Liquidating Trustee's Claim Objection.

10233347.1

- 5 -

In so ruling, the Court expressly found and concluded that the "testimony provided by the Debtors indicated that there was no bad faith or gross abuse in their business judgment. Further Encore Energy provided no evidence of any bad faith or abuse by Debtors." Rejection Order, p. 3 (citations and quotations omitted).

Following the entry of the Rejection Order, Encore filed the Contested Claims, wherein Encore clearly and equivocally asserted a right to recover the alleged damages resulting from the rejection of the Prepetition Forward Contracts (2016). Thus, as reflected in the highlighted and annotated version of Encore's Claim No. 47 attached hereto as **Exhibit A**, the damage calculations set forth in Encore's Claim No. 47 are based upon the exact monthly quantities and prices set forth in the Prepetition York Forward Contracts (2016) for those monthly periods following the Debtors' rejection of the Prepetition York Forward Contracts. Likewise, as reflected in the highlighted and annotated version of Encore's Claim No. 22 attached hereto as **Exhibit B**, the damages set forth in Encore's Claim No. 22 are explicitly based upon the exact monthly quantities and prices set forth in the Prepetition Ravenna Forward Contracts (2016) for those monthly periods following the Debtors' rejection of the Prepetition Ravenna Forward Contracts.

Under the provisions of Bankruptcy Code Section 562(a)(1), damages resulting from the rejection of a prepetition forward contract or other "safe harbor" contract are to be measured as of the date of rejection, that is, provided there are commercially reasonable determinants of value available as of such date. In keeping with this statutory directive and as further confirmation of its intent to assert claims for the alleged damages resulting from the rejection of the Prepetition Forward Contracts (2016), Encore expressly measured the damages set forth in the Contested

Claims using a "Contract Termination Date" of "5-31-16" (i.e., the exact date that Prepetition Forward Contracts (2016) were rejected).

As the provisions of Bankruptcy Code Section 502(g)(2) make clear, like other rejection damage claims, damages resulting from the rejection of an unassumed prepetition forward contract or other "safe harbor" contract are recoverable as prepetition, general, unsecured claims, not as administrative priority claims. *See* 11 U.S.C. §502(g)(2)("a claim for damages calculated in accordance with section 562 shall be determined, and shall be allowed . . . the same as if claim had arisen before the date of the filing of the petition."); *see also* 11 U.S.C. §365(g)(1)(providing that "rejection" of an unassumed executory contract constitutes a breach of such contract "immediately before the date of the filing of the petition.").

Notwithstanding the foregoing, Encore filed the Contested Claims as administrative priority claims and then turned-around and sold them as such to Hain Capital.

In conjunction the performance of its fiduciary duties herein, the Liquidating Trustee filed is Claim Objection seeking to properly reclassify the Contested Claims as general, unsecured claims in accordance with the statutory dictates set forth in Bankruptcy Code Sections 365(g)(1) and 502(g)(2),.

In response to the Liquidating Trustee's Claim Objection, Encore attempts to avoid application of the foregoing provisions (and the irrefutable outcome that they dictate) by arguing that although framed as rejection damage claims, the Contested Claims were actually intended to serve as a "proxy" or "placeholder" for various other possible administrative priority claims that Encore now theorizes it might be entitled to assert against the Debtors' bankruptcy estates. Thus, in its *Statement Opposing Drivetrain's Forty-Fourth Omnibus Objection* (ECF No. 2253)(the "**Opposition Statement**"), Encore attempts advance (in a rambling and inscrutable

10233347.1

fashion) a series of different theories—most (if not all) of which simply seem to echo the "good faith" objections that Encore unsuccessfully raised more than five years ago in opposition to the Debtors' Rejection Motion---under which Encore now contends it might be entitled to assert an administrative priority claim against the Debtors' estates.

.      As nearly five years has elapsed since the expiration of the applicable claims bar date,[2] Encore clearly cannot attempt to advance the new theories of recovery set forth in its Opposition Statement under the guise of attempting to defend the administrative priority status of the Contested Claims.  Nevertheless, even if these new theories of recovery could be properly considered, it is evident that they are implausible and devoid of merit.

### III. ARGUMENT

**A.    The Contested Claims Must Be Adjudicated And Determined In Accordance With The Rejection Damages Claims Asserted Therein And Not Upon Some Alleged Administrative Claims That Encore Now Theorizes It Could Have Asserted**

As is well-established in this District and elsewhere, a creditor cannot amend a timely-filed claim after the expiration of the applicable claim bar date for the purpose of asserting what amounts to a new or different rights of recovery.  *See, e.g., U.S. v. Baker (In re Baker)*, 129 B.R. 607, 608 (E.D. Mo. 1991)(upholding bankruptcy court's rejection of supplemental claim that attempted to assert "an entirely new, different, separate and distinct claim from that asserted in the original claim."); *In re Fischer,* 109 B.R. 384, 389 (Bankr. E.D. Mo. 1989) aff'd 131 B.R. 137 (E.D. Mo. 1990)(same); *see also* 2D Bankr. Services L. Ed. §22:100 (2021)("A proposed amendment to a proof of claim will not be allowed if it is a veiled attempt to assert a new right or claim to payment.").

---

[2] Pursuant to its *Order Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* (ECF No. 626), the Court established herein a general claims bar date of **September 28, 2016** and an Initial Administrative Claims Bar Date of **October 17, 2016**.

10233347.1

- 8 -

Similarly, it is clear that after the expiration of the claims bar date, a creditor such as Encore cannot attempt to "recast" or "re-purpose" a timely-filed proof of claim in order to assert what is clearly a new or different right of recovery. This point is probably best and most analogously illustrated by the decision in *Maxwell v Novell, Inc. (In re Marchfirst, Inc.)*, 431 B.R. 436 (Bankr. N.D. Ill. 2010).

The *Marchfirst* case involved a claimant that had entered into a series of prepetition agreements with a debtor in which the claimant, among other things, made a $100 million equity investment in the debtor. The debtor then merged with another company before subsequently being forced to file bankruptcy approximately a year later. *Id*., at 439-440.

During the debtor's bankruptcy case, the claimant filed a proof of claim against the bankruptcy estate in the amount of $100 million. *Id*. at 440. In an attachment to its proof of claim, the claimant stated if it had known of the debtor's intention to merge with another company, it would not have made its $100 million equity investment. Accordingly, the claimant maintained that "[a]s a direct and proximate result of the [debtor's] fraud, . . . it had been injured and suffered damages in the amount of 100,000,000.00, plus interest and fees as allowed by law." *Id*., at 440 (internal quotations omitted).

After the debtor's bankruptcy case was converted to a Chapter 7 proceeding and long after the expiration of the applicable claims bar date, the Chapter 7 trustee appointed in the case sought to have the claimant's claim subordinated under the provisions of Bankruptcy Code Section 510(b), which generally provide for the automatic subordination of claims arising from the purchase or sale of stock or equity in a debtor or its affiliates.

In response to the above challenge, the claimant's counsel conceded that if claimant's claim were based upon the claimant's equity investment in the debtor, then it clearly would be subject to subordination under the provisions of Bankruptcy Code Section 510(b).

However, the claimant's counsel insisted that the claimant's proof of claim was not based upon claimant's equity investment in the debtor but, instead, represented a breach of contract claim arising under another prepetition agreement (*i.e.*, a so-called "Alliance Agreement") entered into by parties (a copy of which was attached to the claimant's proof of claim). Accordingly, as a breach of contract claim, claimant's counsel maintained that its client's proof of claim was not subject to automatic subordination under Bankruptcy Code Section 510(b).

In support of its breach-of-contract characterization, claimant's counsel noted that in the attachment to his client's proof of claim, the claimant had explicitly stated that "following Closing, [the debtor] made little or no effort to meet its obligation under the Alliance Agreement" *Id.*, at 444.  Moreover, with regard to the $100 million amount set forth in the claimant's proof of claim—which, of course, exactly matched the amount of the claimant's prepetition equity investment in the debtor—claimant's counsel insisted that this figure (i.e., $100 million) was merely intended to serve as a "placeholder" for the unliquidated damages that the claimant was asserting in connection with its supposed breach of contract. *Id.*, at 445.

Rejecting all of the above arguments, the court in *Marchfirst* held that the claimant's proof of claim had to be recognized and determined for what it was—i.e., a claim based upon the claimant's prepetition equity investment in the debtor, which is statutorily subordinated by operation of Bankruptcy Code Section 510(b). *Id.*, at 446   In so ruling, the *Marchfirst* court explained that:

> The purpose of proofs of claim . . . is to alert the court, trustee and other creditors, as well as the debtor to claims against the estate. A proof of claim must therefore be sufficiently specific to give notice of the claim.

*Id*., at 442-3 (citations and quotations omitted).

In case before it, the *Marchfirst* court held that the claimant's claim did not provide notice of a breach of contract claim but rather of "a claim seeking the return of [the claimant's] $100 million investment in the debtor based on fraud." Id., at 443-4. Accordingly, the claimant could not come back after the expiration of the claims bar date and attempt to recharacterize the claim as being a breach-of-contract simply to circumvent the statutory subordination provisions set forth in Bankruptcy Code Section 510(b).

In further support of its ruling, the *Marchfirst* invoked the case law addressing post-bar date amendments to proofs of claim, which *Marchfirst* court summarized as standing for the principle that "[a] late amendment to a proof of claim will therefore be allowed only if, among other things, it is not a veiled attempt to assert a distinctly new right to payment but one to which the original claim fairly alerted the parties." *Id*., at 443 (citations and quotations omitted).

Turning to the matter at hand, it is clear that the Contested Claims were intended to set forth and provide notice of Encore's claims for the damages resulting from the Debtors' rejection of the parties' Prepetition Forward Contracts (2016). Indeed, as indicated above, the Contested Claims set forth a calculation of the foregoing rejection damages down to the penny.

However, like the claimant's counsel in *Marchfirst*, Encore's counsel undoubtedly now realizes that if the Contested Claims are recognized for what they are (i.e., rejection damage claims), then Bankruptcy Code Section 365(g)(2) mandates that such Claims be reclassified as general, unsecured claims. Accordingly, much like the claimant in the *Marchfirst*, Encore desperately attempts to re-cast the Contested Claims as something other than rejection damage

claims. Specifically, Encore maintains that the Contested Claims are intended to assert an administrative priority claim for the actual, necessary costs and expenses that Encore allegedly incurred in preserving the estate and/or for the substantial contribution that Encore allegedly made to the Debtors' Chapter 11 cases. *See* Encore's Opposition Statement, ¶4 (asserting administrative priority status under Bankruptcy Code Section 503(b)(1)(A) and/or (3)(D).

As for the precise dollar amounts of the Contested Claims and their exact correspondence to damages resulting from the rejection of the Prepetition Forward Contracts (2016), Encore resorts to the same failed argument advanced by the claimant in *Marchfirst*, that is, the to-the-penny claim amounts set forth in its Contested Claims were merely intended to serve as a "placeholder" for Encore's "actual" administrative priority claims.

Of course, nowhere in the Contested Claims is there any reference whatsoever to the expenses that Encore allegedly incurred in preserving the estate and/or the substantial contribution that Encore purportedly made to the Debtors' Chapter 11 cases. Instead, the only substance and detail set forth in the Contested Claim is the month-by-month, contract-by-contract calculation of the damages that Encore sustained as a result of the Debtors' rejection of the parties' Prepetition Forward Contracts (2016). Thus, it is evident that the Contested Claims failed to provide the Court, the Liquidating Trustee and any other parties-in-the-interest with any notice of any alleged claims other than Encore's rejection damage claims.

To the extent that Encore wished to advance creative and/or novel theories as to how it might have an administrative expense against the Debtors' bankruptcy estate, the time for it do so was five years ago *(i.e.*, before the expiration of the Initial Administrative Claim Bar Date). Allowing parties such as Encore to come in five years after-the-fact and advance such theoretical claims under the guise of defending and/or expounding upon a timely-filed claim would severely

10233347.1

- 12 -

subvert the functionality of the claims adjudication process—particularly in large cases such as this. Accordingly, the Contested Claims should be recognized for what they are (*i.e.,* rejection damage claims) and reclassified in accordance with the statutory dictates of Bankruptcy Code Sections 365(g)(1) and 502(g)(2).

      **B.**   **There Is No Plausibility or Validity to the Various Theories That Encore Attempts to Advances In Its Opposition Statement As to Its Alleged Entitlement To Assert An Administrative Priority Claim Against Debtors' Estates**

As more fully set forth above, given that it was filed nearly five years after the expiration of the applicable claims bar date, Encore cannot properly use its Opposition Statement as a means of advancing new theories under which it would allegedly be entitled to an administrative priority claim against the Debtors' bankruptcy estates. Nevertheless, even if these efforts were not improper, it is evident that the various theories that Encore now attempts to advance in the foregoing regard are implausible and invalid.

Thus, for instance, echoing an identical argument that it unsuccessfully advanced in opposition to the Debtors' Rejection Motion, Encore suggests that it is entitled to an administrative priority claim because the Debtors improperly lulled Encore into continuing to do business with the Debtors during the initial weeks of the Debtors' bankruptcy case and, as a result, Encore refrained from exercising its immediate right to terminate the Prepetition Forward Contracts (2016) under Bankruptcy Code Section 556.. *See, e.g.*, Encore's Opposition Statement, ¶8 ("Encore made a post-petition agreement with Debtor to forgo its right to terminate and liquidate as afforded under the Bankruptcy Code to forward contract merchants operating under forward contract markets.").

The short answer to this argument is that if Encore felt that its ongoing performance under the Prepetition Forward Contracts (2016) exposed it to unfair risk or other jeopardy, it

10233347.1

- 13 -

should have brought an appropriate motion under Bankruptcy Code Section 365(d)(2), requesting the Court to shorten the Debtors' time to decide whether to assume or reject the Prepetition Forward Contracts (2016). Moreover, while Encore complains that if not for the Debtors alleged representations regarding their ongoing desire to do business with Encore, Encore would have exercised its rights under Bankruptcy Code Section 556 to immediately terminate the Prepetition Forward Contracts (2016), the fact of the matter is that Encore's resulting damages in such circumstances would have likewise been deemed to be prepetition, general, unsecured claims under Bankruptcy Code Section 502(g)(2). Accordingly, Encore clearly cannot claim entitlement to an administrative priority claim on the basis of its alleged forbearance from exercising the above-referenced rights.

Similarly, Encore suggests that Encore and the Debtors entered into an apparently undocumented set of agreements that effectively superseded the Prepetition Forward Contracts (2016) and that pursuant to these alleged postpetition agreements, Encore is entitled to assert an administrative priority claim against the Debtors' bankruptcy estates. *See, e.g.*, Encore's Opposition Statement, ¶8 ("Encore's position in that Debtors made and confirmed a post-petition agreement with Encore concerning which the Base Agreements and confirming orders were substantially similar to the prepetition agreements."). Given that there was absolutely no mention of any such postpetition agreements during the entire proceedings on the Debtors' Rejection Motion, the foregoing assertion clearly exceeds all bounds of credulity. Nevertheless, even if it were true that the parties had negotiated such postpetition agreements, there is nothing in the record indicating that the Court ever authorized and approved the Debtors' entry into such agreements, which the Court clearly would have needed to do in order for such agreements to be valid and unenforceable, for a postpetition agreement that effectively supersedes and replaces an

unassumed executory contract is most assuredly a transaction outside "the ordinary course of business" for purposes of Bankruptcy Code Section 363(b)(1).

Finally, Encore seems to suggest that because the natural gas it supplied to the Debtors' bioenergy plants prevented the plants from sustaining damages from purportedly freezing temperatures in late February and/or early March, 2016, Encore is entitled not only to the value of the gas it supplied during this period (for which Encore has already been paid) but also to an administrative priority claim for the potential loss in value that the Debtors' plants would have sustained had Encore not provided such natural gas. Encore's Opposition Statement, ¶¶18, 19. This, of course, is equivalent to arguing that a security guard who guards a Chapter 11 debtor's manufacturing plant and prevents the theft of a $10 million piece of equipment is entitled not only to be paid her normal hourly wages from the debtor but is also entitled to an administrative priority claim in the amount of $10 million against the debtor's bankruptcy estate. Obviously, this is not what the law provides. *Cf N.L.R.B. v. Bildisco and Bildisco*, 104 S.Ct. 1188, 1199 (1984)("If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the *reasonable value* of those services, which *may* be what is specified in the contract")(emphasis added)(citations and quotations omitted).

## IV. CONCLUSION

For all of the foregoing reasons and those reasons in all related pleadings, the Liquidating Trustee respectfully maintains that the Court should sustain the Liquidating Trustee's *Forty-Fourth Omnibus Claims Objection Seeking the Reclassification of Certain Claims* (ECF No. 2243).

10233347.1

Respectfully submitted,

THOMPSON COBURN LLP

By  */s/ David D. Farrell*
    David D. Farrell, Esq, (MO #39969)
    dfarrell@thompsoncoburn.com
    One US Bank Plaza, Suite 2700
    St. Louis, Missouri  63101
    TELE: 314-552-6000
    FAX 314-552-7000

Attorneys for Drivetrain, LLC, as the duly appointed trustee of the Abengoa Liquidating Trust a.k.a. the GUC Liquidating Trust

10233347.1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the Liquidating Trustee's Opening Brief was duly served on August 30, 2021, via email transmission to and on: (a) Thomas O. Ashby, Esq. Baird Holm LLP , 1700 Farnam Street, Suite 1500, Omaha, NE 68102-2068, Email: tashby@bairdholm.com; and (b) Thomas H. Riske, Esq., Carmody MacDonald P.C,, 120 S. Central Ave., Suite 1800, St. Louis, Missouri 63105, Email: thr@carmodymacdonald.com.

/s/ David D. Farrell

10233347.1