UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| **ABENGOA BIOENERGY US HOLDING LLC, *ET AL*.,** | ) ) ) ) ) | **Case No. 16-41161-659** **Chapter 11** |
| **Debtors.** | ) | **PUBLISHED** |

## O R D E R

The matter before the Court is the Motion to Pay Claims, Alternatively, For Expedited Administrative Claims Discovery and Trial, and For Related Relief filed by Encore Energy Services, Inc. (Doc. 2234); Notice of GUC Liquidating Trustee's Forty-Fourth Omnibus Claims Objection Seeking to Reclassify Certain Claims and GUC Liquidating Trustee's Forty-Fourth Omnibus Claims Objection Seeking to Reclassify Certain Claims (Doc. 2243); Statement Opposing Drivetrain's Forty-Fourth Omnibus Claim Objection (Doc. 2253); Encore Energy Services, Inc.'s Opening Brief Supporting Administrative Claims (Doc. 2254); The Liquidating Trustee's Opening Brief in Support of its Forty-Fourth Omnibus Objection to Claims Seeking to Reclassify Certain Claims (Doc. 2255); Encore Energy Services, Inc.'s Reply Brief Supporting Administrative Claims (Doc. 2269); and The Liquidating Trustee's Reply Brief in Support of its Forty-Fourth Omnibus Objection to Claims Seeking to Reclassify Certain Claims (Doc. 2267). Various declarations and exhibits were also submitted to the court.  A hearing was held at which counsel for Encore Energy Services, Inc. and counsel for Drivetrain, as GUC Liquidating Trustee, appeared and presented witnesses and arguments.  Upon consideration of the record as a whole, the Court makes the following **FINDINGS OF FACT**:

Founded in 1941, Abengoa S.A. is a Spanish company with a collection of subsidiaries in over fifty countries providing solutions for customers in the energy and environmental sectors. Declaration of Sandra Porras Serrano, Chief Financial Officer, In Support of Chapter 11 Petitions and First Day Pleadings (hereinafter "Serrano Declaration"), Doc. 12 ¶ 6.  In February 2002,

Abengoa S.A. began its United States expansion. *Id*. ¶ 8. Abengoa's global operations are headquartered in Chesterfield, MO. *Id*. ¶ 17.

By 2013, after Abengoa S.A.'s restructuring, nearly all of Abengoa S.A.'s companies with operations in the United States became subsidiaries of Abengoa US, LLC, an intermediate holding company formed under Delaware law. Serrano Declaration, Doc. 12 ¶ 8. Abengoa Bioenergy US Holding, LLC (hereinafter "Abengoa Bioenergy") is the owner of the Abengoa entities in the United States, including Abengoa Bioenergy Company, LLC (hereinafter "ABC") and Abengoa Bioenergy of Nebraska, LLC (hereinafter "ABNE"). *Id*. ¶ 11.

ABC and ABNE make up part of the first generation of Abengoa Bioenergy plants. Serrano Declaration, Doc. 12 ¶ 11. The companies in the first generation convert food-based grains into ethanol. *Id*. ¶ 10. ABC is an Abengoa Bioenergy, first-generation company formed under Kansas law. *Id*. ABC operated three ethanol plants located in Portales, New Mexico; Colwich, Kansas; and York, Nebraska. *Id*. ¶ 11. ABNE is an Abengoa Bioenergy, first generation company formed under Nebraska law. *Id*. ABNE operated an ethanol plant located in Ravenna, Nebraska. *Id*.

### A. Encore Agreements[1]

ABC owned and/or had an interest in assets that included a bioenergy plant in York, Nebraska (hereinafter "York Plant") and a bioenergy plant in Colwich, Kansas (hereinafter "Colwich Plant"). Serrano Declaration, Doc. 12 ¶ 10. Encore Energy Services, Inc. (hereinafter "Encore" or "Encore Energy"), and ABC entered into a Base Agreement[2] with a series of Confirming Orders relating to the York Plant (hereinafter, collectively "ABC Prepetition Contracts"). The Liquidating Trustee's Opening Brief in Support of Its Forty-Fourth Omnibus Objection to Claims Seeking to Reclassify Certain Claims, Doc. 2255, at 3. The ABC Prepetition

---

[1] The following facts are taken from in The Liquidating Trustee's Opening Brief In Support of Its Forty-Fourth Omnibus Objection To Claims Seeking To Reclassify Certain Claims filed with this Court on August 30, 2021; Declaration of Sandra Porras Serrano, Chief Financial Officer In Support of Chapter 11 Petition, filed with this Court on February 24, 2016; and First Day Pleadings, filed on February 24, 2016.

[2] The Base Agreements between the parties are "subject to and incorporates the specific gas orders set forth in the Confirming Orders." Encore Base Agreement, Encore Energy's Ex. 3, at 2.

2

Contracts consisted of: (a) Confirming Order No. 2322 dated August 15, 2015 (hereinafter "Confirming Order No. 2322"), which incorporated the terms and conditions of a Base Agreement dated March 14, 2011 by and between Encore and ABC (hereinafter "York Base Agreement"); (b) Confirming Order No. 2335 dated August 21, 2015 (hereinafter "Confirming Order No. 2335"), which incorporated the terms and conditions of the York Base Agreement; (c) Confirming Order No. 2391 dated September 21, 2015 (hereinafter "Confirming Order No. 2391"), which incorporated the terms and conditions of the York Base Agreement; and (d) Confirming Order No. 2441 dated September 30, 2015 (hereinafter "Confirming Order No. 2411"), which incorporated the terms and conditions of the York Base Agreement.[3]  *Id.* at 3.

ABNE owned a bioenergy plant in Ravenna, Nebraska (hereinafter "Ravenna Plant"). Encore and ABNE entered into a Base Agreement[4] with a series of Confirming Orders relating to the Ravenna Plant (hereinafter, collectively "ABNE Prepetition Contracts")[5].  *Id.* at 4.  The ABNE Prepetition Contracts consisted of: (a) Confirming Order No. 2323 dated August 15, 2015 (hereinafter "Confirming Order No. 2323"), which incorporated the terms and conditions of a Base Agreement dated March 14, 2011 by and between Encore and ABNE (hereinafter "Ravenna Base Agreement"); (b) Confirming Order No. 2336 dated August 21, 2015 (hereinafter "Confirming Order No. 2336"), which incorporated the terms and conditions of the Ravenna Base Agreement; (c) Confirming Order No. 2390 dated September 21, 2015 (hereinafter "Confirming Order No. 2390"), which incorporated the terms and conditions of the Ravenna Base Agreement; and (d) Confirming Order No. 2442 dated September 30, 2015 (hereinafter "Confirming Order No. 2442"), which incorporated the terms and conditions of the Ravenna Base Agreement.[6]  *Id.*

---

[3] Confirming Order No. 2322, Confirming Order No. 2335, Confirming Order No. 2391, and Confirming Order No. 2441 are hereinafter, collectively "2016 York Confirming Orders."
[4] *See supra* text accompanying note 3. *See also* Encore Base Agreement, Encore Energy's Ex. 4, at 2.
[5] The ABC Prepetition Contracts and the ABNE Prepetition Contracts are hereinafter, collectively "Contracts."
[6] Confirming Order Doc. 2323, Confirming Order No. 2336, Confirming Order No. 2390, and Confirming Order No. 2442 are hereinafter, collectively "2016 Ravenna Confirming Orders."

Both the 2016 Ravenna Confirming Orders and 2016 York Confirming Orders provide for an automatic, month-to-month renewal provision under the Evergreen Pricing provision:

> Unless terminated by either party by giving 30 days written notice prior to the expiration of the initial term of this Confirming Order, the Confirming Order shall automatically renew and extend for successive month-to-month renewal terms at the default "Evergreen Price." Buyer or Seller may cancel at the end of a given renewal term by providing 30 days written notice prior to the expiration of the renewal term.

Confirming Orders, Encore Energy's Exs. 5–6.

### B. Abengoa's Decline

In early 2013, the Spanish economy was failing, causing the Spanish government to make budget cuts including those involving solar and wind power companies. Serrano Declaration, Doc. 12 ¶ 18. Spain's renewable energy sector was greatly affected including Abengoa S.A. *Id*. Abengoa S.A. began issuing debt via syndicated, bilateral, and other debt instruments to continue its operations. *Id*. On July 31, 2015, Abengoa S.A. lowered its guidance for corporate free cash flow causing a 27% decline in engineering and construction revenues for the third quarter of 2015 compared to the previous year, a deterioration in working capital of €659 million, and a reduction of available liquidity from €831 million to €346 million. *Id*. ¶ 19. On September 24, 2015, Abengoa S.A. announced a comprehensive action plan to improve its liquidity position. *Id*. ¶ 20. One component of the comprehensive action plan was securing an investment with Gonvarri Corporacion Financiera, S.L. (hereinafter "Gonvarri"), a steel industries group and one of the main Abengoa S.A. shareholders. *Id*. The Gonvarri transaction was terminated. Serrano Declaration, Doc. 12 ¶ 20. The failure of the Gonvarri transaction coupled with an increase in the company's liabilities decreased Abengoa S.A.'s creditworthiness. *Id*.; see Natural Gas Agreement, Encore Energy Ex. 9 ¶ 2. On November 25, 2015, Abengoa S.A. sought protection under Spanish insolvency law to negotiate with creditors. Serrano Declaration, Doc. 12 ¶ 21.

4

Abengoa S.A.'s decreased creditworthiness prompted a change in the Base Agreement terms with ABNE.  Natural Gas Agreement, Encore Energy Ex. 9 § 3.  Encore entered into a Natural Gas Agreement with ABNE on December 21, 2015.  *Id.* at pmbl.  The purpose of the Natural Gas Agreement was for Encore to continue supplying ABNE with natural gas for the Ravenna Plant under the terms of the Base Agreement and 2016 Ravenna Confirming Orders despite the company's low creditworthiness.  *Id.* § 1-2.  The Natural Gas Agreement changed the payment due date to the 15th calendar day of the month from the previous 180 days post-gas delivery arrangement.  *Id.* ¶ 2.  The Natural Gas Agreement allowed for Encore to temporarily share in the Ravenna Plant gross margins until Encore realized $411,471.33.  *Id.* ¶ 3.  Further, ABNE agreed to withhold taking profits from the Ravenna Plant until Encore was paid the full $411,471.33.  *Id.*  The Natural Gas Agreement also included language that "Encore is considered a critical supplier (as Encore's natural gas supply is a critical component in Abengoa-Ravenna's ethanol production)."  Natural Gas Agreement, Encore Energy Ex. 9 ¶ 3.

On December 24, 2015, Abengoa S.A. received a €106 million emergency loan to pay operations and wages.  Serrano Declaration, Doc. 12 ¶ 21.  On February 16, 2016, Abengoa S.A. publicly released its Industrial Viability Plan describing the financial restructuring of the company.  *Id.* ¶ 22.  The Industrial Viability Plan discussed the disposition of certain assets and activities along with the liquidation or restructuring of the first generation Abengoa Bioenergy entities inclusive of ABC and ABNE.  *Id.*

### C. Bankruptcy

On February 24, 2016, ABC, ABNE, and other Abengoa entities (hereinafter, collectively "Debtors") voluntarily filed Chapter 11 proceedings under the Bankruptcy Code in this Court (hereinafter "Voluntary Petition Date").  On the Voluntary Petition Date, Debtors filed several pleadings and first day motions[7] including Debtors' Motion for Interim and Final Orders (I)

---

[7] The pleadings and first day motions are as follows: Debtors' Motion for an Order Directing Joint Administration of Cass Pursuant to Fed. R. Bankr. P. 1015(b) (Doc. 3); Debtors' Motion for Entry of an

5

Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies and (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services (Doc. 9) (hereinafter "Utilities Motion"). A Utility Company List was attached as "Schedule 1" to the Utilities Motion listing Perennial Power, Westar Energy, Encore Energy, City of York, City of Colwich, City of Portales, and Dawson Public Power as the utility providers.

On March 4, 2016, this Court entered several orders granting the various first day motions on final and interim bases,[8] including the Utilities Motion which was granted on an interim basis

---

Order Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs (Doc. 4); Debtors' Motion for an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix For Each Debtor (Doc. 5); Debtors' Motion for an Order Pursuant to Section 107 of the Bankruptcy Code and Local Rules 1007-7 and 1009 (I) Authorizing the Debtors to File a Redacted Creditor Matrix and Redacted Amended Creditor Matrices and (II) Deeming The Procedures to Satisfy Local Rules 1007-7 and 1009 (Doc. 6); Debtors' Application for Entry of an Order Authorizing Employment and Retention of Prime Clerk LLC as Claims, Noticing and Solicitation Agent, *Nunc Pro Tunc* to the Petition Date (Doc. 7) along with an Engagement Agreement as Exhibit B (Doc. 11); Debtors' Motion for Interim and Final Orders Authorizing the Debtors to Pay Certain Pre-Petition Taxes and Related Obligations (Doc. 8); Motion of the Debtors For Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, and (B) Renew, Revise, Extend Supplement, Change or Enter Into New Insurance Policies, and (II) Granting Certain Related Relief (Doc. 10); Declaration of Sandra Porras Serrano, Chief Financial Officer, In Support of Chapter 11 Petitions and First Day Pleadings (Doc. 12); Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System and (II) Maintain Existing Bank Accounts and Business Forms; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority (Doc. 14); Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits (Doc. 15); and Motion of the Debtors For Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Super-Priority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief (Doc. 16).

[8] The Court entered the following orders on March 4, 2016: Order Directing Joint Administration of the Chapter 11 Cases (Doc. 84); Interim Order (I) Authorizing Debtors (A) To Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C.§ 363, (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) (Doc. 85); Interim Order (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, and (B) Renew, Revise, Extend Supplement, Change or Enter Into New Insurance Policies, and (II) Granting Certain Related Relief (Doc. 86); Order Extending The Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs (Doc. 87); Order Authorizing the Debtors to File A Consolidated List of Creditors In Lieu of Submitting A Separating Mailing Matrix For Each Debtor (Doc. 88); Order Pursuant to Bankruptcy Code Section 107 and Local Rules 1007-7 and 1009 (I) Authorizing Debtors to File a Redacted Creditor Matrix and Redacted Amended Creditor Matrices and (II) Deeming The Procedures to Satisfy Local Rules 1007-7 and 1009 (Doc. 89); Interim Order Authorizing the Debtors to Pay Certain Pre-Petition Taxes and Related Obligations (Doc. 90); Interim Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures For Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies

(hereinafter "Interim Utilities Order").  On April 12, 2016, this Court entered Final Order (I) Approving Debtors' Proposed Form of Adequate Assurance Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service (Doc. 233) (hereinafter "Final Utilities Order").  A Final Utility Company List was attached as "Schedule 1" to the Final Utilities Order that did not include Encore.  *See* Final Utilities Order, Doc. 233, Sched. 1.

### *Plan Confirmation*

On March 2, 2017, the Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code (hereinafter "Plan") was filed by Debtors and the Creditors' Committee (Doc. 1070).  On June 8, 2017, this Court entered Order Confirming Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Under Chapter 11 of the Bankruptcy Code (hereinafter "Confirmation Order").  *See* Order Confirming Third Amended Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code, Doc. 1443.  Drivetrain, LLC, (hereinafter "Drivetrain") is the GUC Liquidating Trustee of the Abengoa Liquidating Trust, as established by the GUC Liquidating Trust Agreement.  The GUC Liquidating Trust Agreement, filed on June 6, 2017, appointed Drivetrain, LLC, as the GUC Liquidating Trustee under the Plan, to administer specified assets and liabilities for the benefit of the creditors and to address and resolve creditors' claims.  GUC Liquidating Trust Agreement.  *See* Doc. 1439.

---

From Altering, Refusing or Discontinuing Service and (IV) Scheduling a Final Hearing (Doc. 91); Interim Order Authorizing Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits (Doc. 92); Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System and (II) Maintain Existing Bank Accounts and Business Forms; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority (Doc. 93).

### *The Rejection Matter*

Following the Voluntary Petition Date, ABC made the following payments to Encore for natural gas services to the York Plant: $4,953.53 on March 12, 2016; $151,394.24 on April 11, 2016; $207,828.91 on April 14, 2016; $58,348.52 on April 25, 2016; and $459,695.76 on April 28, 2016. The total amount paid post-petition to Encore on behalf of ABC was $882,220.96. Similarly, following the Voluntary Petition Date, ABNE made the following payments to Encore for natural gas services to the Ravenna Plant: $269,727.88 on April 11, 2016; $472,195.75 on April 14, 2016; and $565,437.10 on April 28, 2016. The total amount paid post-petition to Encore on behalf of ABNE was $1,307,360.73. Encore stopped supplying ABC and ABNE with natural gas to the York Plant and Ravenna Plant on May 31, 2016.

On April 1, 2016, Debtors filed Debtors' Motion for Entry of an Order Authorizing Rejection of Unexpired Contracts with Encore Energy Services, Inc. (Doc. 188) (hereinafter "Rejection Motion"). In the Rejection Motion, Debtors sought rejection pursuant to 11 U.S.C. § 365(a) of the ABC Prepetition Contracts, ABNE Prepetition Contracts, and Natural Gas Agreement (hereinafter collectively "Encore Agreements"). *See* Rejection Mot., Doc. 188 at pmbl. On April 20, 2016, Encore filed Encore Energy Services, Inc's Objection to the Debtors' Motion For Entry of an Order Authorizing Rejection of Unexpired Contracts with Encore Energy Services, Inc. (Doc. 249) (hereinafter "Objection to Rejection Motion"). In the Objection to the Rejection Motion, Encore argues against rejection stating that the Encore Agreements are not considered executory and, if so, rejection should be denied as it is not an exercise of Debtors' sound business judgment. *See* Obj. to Rejection Mot., Doc. 249.

A hearing was held on the Rejection Motion and Objection to the Rejection Motion on May 31, 2016. Following the hearing, this Court entered an Order overruling the Objection to the Rejection Motion and granting the Rejection Motion deeming the Encore Agreements rejected pursuant to 11 U.S.C. § 365(a) effective May 31, 2016 (hereinafter "Rejection Order"). Rejection Order, Doc. 351. This Court determined that the Encore Agreements were executory contracts

8

subject to assumption or rejection under Section 365(a). *Id*. at 2. Further, this Court determined that Debtors met the business judgment standard in the Eighth Circuit and thus would not interfere. *Id*. at 2-3.

### *The Administrative Claims Matter*

On June 12, 2016, Debtors moved to approve bid procedures for sale of its assets, including the York Plant and the Ravenna Plant. On September 23, 2016, ABC sold its interests in the York Plant for $37,375,000.00. On September 30, 2016, ABNE sold its interest in the Ravenna Plant for $115,000,000.00. Up and until the sale, both the York Plant and the Ravenna Plant were operating.

On June 29, 2016, Encore sent to ABC a Trueup invoice, dated May 2016, with a due date of July 8, 2016 (hereinafter "ABC Trueup Invoice"). The same day, Encore also sent to ABNE a Trueup invoice, dated May 2016, with a due date of July 8, 2016 (hereinafter "ABNE Trueup Invoice"). The ABC Trueup Invoice provided a total amount due of $129,660.75 for services in connection with the expiration, liquidation, and/or unwinding of certain NYMEX hedges for the period of May 1, 2016, to May 31, 2016. The ABNE Trueup Invoice provided a total amount due of $9,594.42 for services in connection with the expiration, liquidation, and/or unwinding of certain NYMEX hedges for the period of May 1, 2016, to May 31, 2016.

On September 19, 2016, Encore filed Claim No. 47-1 against ABC seeking recovery of an administrative priority claim in the amount of $229,317.71 (hereinafter "Claim No. 47"). Encore asserts a claim for damages resulting from ABC's failure to continue performing under the ABC Prepetition Contracts. The same day, Encore filed Claim No. 29-1 against ABNE seeking recovery of an administrative priority claim in the amount of $278,378.44 (hereinafter "Claim No. 29"). Encore asserts a claim for damages resulting for ABNE's failure to continue performing under the ABNE Prepetition Contracts. On March 17, 2017, Encore transferred Claim No. 47 and Claim No. 29 (hereinafter, "Claims" or "Claims At Issue") to Hain Capital Investors, LLC (hereinafter "Hain Capital").

9

On July 29, 2021, Encore filed Motion to Pay Claims, Alternatively, For Expedited Administrative Claims Discovery and Trial, and For Related Relief (Doc. 2234) (hereinafter "Motion to Pay Claims"). In the Motion to Pay Claims, Encore requests that Drivetrain, the GUC Liquidating Trustee, pay the Claims promptly or within a specified time ordered by the court. On August 2, 2021, Drivetrain filed Notice of GUC Liquidating Trustee's Forty-Fourth Omnibus Claims Objection Seeking to Reclassify Certain Claims and GUC Liquidating Trustee's Forty-Fourth Omnibus Claims Objection Seeking to Reclassify Certain Claims (Doc. 2243) (hereinafter "Objection to Reclassify Claims"). In the Objection to Reclassify Claims and pursuant to 11 U.S.C. §§ 502(a), 1141(a); Federal Rules of Bankruptcy Procedure Rule 3007; Local Rule 3007(c); and the Claims Objection Procedure Order, Drivetrain seeks to reclassify the Claims to general unsecured status because Encore asserts the Claims for damages resulting from the Rejection Order. On August 9, 2021, this Court entered Order Granting in Part and Continuing in Part Motion to Pay Claims, Alternatively, For Expedited Administrative Claims Discovery and Trial, and For Related Relief.

On August 23, 2021, Encore filed Statement Opposing Drivetrain's Forty-Fourth Omnibus Claim Objection (Doc. 2253) (hereinafter "Opposition to Objection to Reclassify Claims"). In the Opposition to Objection to Reclassify Claims, Encore argues that the Claims are administrative claims pursuant to 11 U.S.C. § 503(b)(1) and 11 U.S.C. § 503(b)(3)(D), because the natural gas provided by Encore to the York Plant and Ravenna Plant under the Encore Agreements preserved the estate and provided a substantial contribution to Debtors' bankruptcy estate. Encore states that the Eighth Circuit in U*.S. ex rel U.S. Postal Serv. v. Dewey Freight Sys. Inc.*, 31 F.3d 620 (8th Cir. 1994), ruled that a claimant whose executory contract was rejected post-petition, but never assumed, is not precluded from having administrative status. *Dewey Freight Sys.*, 31 F.3d at 625. On August 30, 2021, Encore filed Encore Energy Services, Inc.'s Opening Brief Supporting Administrative Claims (Doc. 2254); on September 16, 2021, Encore filed Encore Energy Services, Inc.'s Opening Brief Supporting Administrative Claims (Doc. 2266); and on

10

September 17, 2021, Encore filed corrected PDF Encore Energy Services, Inc.'s Reply Brief Supporting Administrative Claims (Doc. 2269) (hereinafter, collectively "Encore's Briefs"), restating its position from the Opposition to Objection to Reclassify Claims.  Encore affirms in Encore's Briefs that the amounts sought in the Claims are administrative and thus meritorious of priority status irrespective of them arising pre- or post-petition.

On August 30, 2021, Drivetrain filed The Liquidating Trustee's Opening Brief in Support of its Forty-Fourth Omnibus Objection to Claims Seeking to Reclassify Certain Claims (Doc. 2255) and on September 16, 2021, filed The Liquidating Trustee's Reply Brief in Support of its Forty-Fourth Omnibus Objection to Claims Seeking to Reclassify Certain Claims (Doc. 2267) (hereinafter, collectively "Drivetrain's Briefs").  In Drivetrain's Briefs, Drivetrain argues against a classification of the Claims as administrative, because the Claims were incorporated in the Rejection Order.  Thus, Drivetrain argues that because the Claims were subject to the Rejection Order, the claims should be reclassified as general unsecured claims pursuant to 11 U.S.C. § 365(g)(1) and 11 U.S.C. § 502(g)(2).

A hearing was held September 20, 2021, at which the parties appeared and presented witnesses and arguments.  At the conclusion of the hearing, the Court took the matter as submitted.

## JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding under 28 U.S.C. §§ 157 and 1334 (2016). This is a core proceeding under 28 U.S.C. § 157 (2016).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409(a) (2016).

## CONCLUSIONS OF LAW

The issue before the Court is whether the Claims are entitled to priority administrative status pursuant to 11 U.S.C. § 503(b)(1) and 11 U.S.C. § 503(b)(3)(D), or if the Claims were rejected under the Rejection Order and thus afforded general unsecured status pursuant to 11 U.S.C. § 365(g)(1) and 11 U.S.C. § 502(g)(2).

**I.        Administrative Priority**

The Bankruptcy Code provides a basis for the issuance of administrative status on claims. Encore argues that the Claims are administrative pursuant to 11 U.S.C. § 503(b)(1) and 11 U.S.C. § 503(b)(3)(D). The claimant seeking administrative status of a claim bears the burden of proving such by a preponderance of the evidence. *In re Old Carco LLC*, 424 B.R. 633, 642 (Bankr. S.D.N.Y. 2010). Under Section 503(b)(1), an administrative expense includes "the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C. § 503(b)(1)(A). Section 503(b)(3)(D) provides that administrative expenses also include expenses that provide a substantial contribution to the estate:

> [Administrative expenses include] the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title[.]

11 U.S.C. § 503(b)(3)(D).

Administrative expenses are given priority status over prepetition unsecured claims. *See* 11 U.S.C. § 507(a)(2); *Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835, 837-838 (6th Cir. 2010) (citing *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000) (citing 11 U.S.C. §§ 507(a)(1), 726(a)(1), 1129(a)(9)(A))). The purpose of allowing for this superior priority status is "to encourage third parties to contract with the bankruptcy estate for the benefit of the estate as a whole." *Sanchez v. Nw. Airlines, Inc.*, 659 F.3d 671, 678 (8th Cir. 2011) (quoting *Boeing N. Am., Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1026 (9th Cir. 2005)); *Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835, 838 (6th Cir. 2010) (quoting *In re United Trucking Serv., Inc.*, 851 F.2d 159, 161 (6th Cir. 1988) (Administrative expenses take priority status to "facilitate the rehabilitation of insolvent businesses by

12

encouraging third parties to provide those businesses with necessary goods and services.")); *see also In re Old Carco LLC*, 424 B.R. 633, 641 (Bankr. S.D.N.Y. 2010).

Drivetrain argues that Encore is trying to circumvent the Rejection Order through the filing of the Claims and seeking a higher priority status, i.e., administrative expense status. Drivetrain asserts that the Rejection Order, in rejecting the Encore Agreements, consequently classifies the Claims therein as general unsecured. Encore states that the Claims must be afforded administrative expense status because the Eighth Circuit does not prevent claimants from obtaining priority status under *U.S. ex rel. U.S. Postal Serv. v. Dewey Freight System, Inc*. Thus, the Court must address whether the Claims were subjected to the Rejection Order and thereby given general unsecured status.

## II. Rejection

Under Title 11, a Chapter 11 debtor is permitted to assume or reject an executory contract prior to confirmation subject to the court's approval. 11 U.S.C. § 365(a); *see* Fed. R. Bankr. P. 6006(a). Further, as noted, "Section 365(a) enables the debtor (or its trustee), upon entering bankruptcy, to decide whether the contract is a good deal for the estate going forward." *Mission Prod. Holdings v. Tempnology, LLC*, 587 U.S. 370, 373 139 S.Ct. 1652, 1658, 203 L.Ed.2d 876, 883 (2019). The debtor can decide to either assume the contract or reject it, "repudiating any further performance of its duties." *Id*. The purpose of rejection is to "release the debtor's estate from burdensome obligations that can impede a successful reorganization." *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528; *see* Rejection Order, Doc. 351, at 2. Further, "the authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization[.]" *Id*. Therefore, "[A] debtor seeking such approval must proceed by motion upon reasonable notice and opportunity for hearing." *Dewey Freight Sys.*, 31 F.3d at 624.

The business judgment standard is used in determining whether to reject or assume under 11 U.S.C. § 365. *Tempnology*, 139 S.Ct. at 1658; *see* Rejection Order, Doc. 351, at 2. Rejection requires a bankruptcy court to consider the Chapter 11 policy to rehabilitate the debtor and

balance the interests of all the parties involved.  See *Tempnology, LLC*, 139 S.Ct. at 1658 (noting that a rejected executory contract "giv[es] the counterparty a pre-petition claim" and "places that party in the same boat as the debtor's unsecured creditors"); *see also Bildisco*, 465 U.S. at 527 (emphasizing that "[t]he Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees.").

An executory contract that is rejected is considered a breach of contract.  11 U.S.C. § 365(g); *see Tempnology, LLC*, 139 S.Ct. at 1666 ("[W]e hold that under Section 365, a debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside bankruptcy."); *see also Bildisco*, 465 U.S. at 530, 545.  Damages resulting from rejection of an executory contract receive general unsecured status.   11 U.S.C. § 502(g); *Bildisco*, 465 U.S. at 531; *see also In re Old Carco LLC*, 424 B.R. at 640 (noting that rejected claims are afforded general unsecured status because "affording rejection claims administrative priority would effectively eliminate the purpose behind providing a debtor with the power to reject a contract"). However, if the debtor received benefits from the claimant of an executory contract during the pendency of a decision to reject, then the debtor must pay the reasonable value of the services provided under the contract.  *Bildisco*, 465 U.S. at 531 (citing *Philadelphia Co. v. Dipple*, 312 U.S. 168, 174 (1941) and *In re Public Ledger*, 161 F.2d 762, 770-771 (3d Cir. 1947)).  Even still, a claimant cannot submit an administrative priority claim on a rejected executory contract.  *In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 442 (5th Cir. 2019) ("[T]he Bankruptcy Code makes clear that a debtor-in-possession's rejection of a pre-petition contract does not give rise to an administrative priority claim.")

Prior to entry of the Rejection Order, none of the Encore Agreements were assumed by Debtors.  There is no dispute that Debtors continued to receive natural gas from Encore under the Encore Agreements from the Voluntary Petition Date up through and including the date of

14

rejection, May 31, 2016.  Debtors fully paid for all such post-petition/pre-rejection natural gas in accordance with the terms of the Encore Agreements.  With this stated, Encore interprets the Eighth Circuit's ruling in *Dewey Freight System, Inc.*, to mean that there is no limit on a claimant whose executory contract was rejected from obtaining an administrative expense status post-rejection.  *Dewey Freight Sys.,* 31 F.3d 620, 624 (8th Cir. 1994) (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984)).  This, however, is incorrect.

Dewey Freight System, Inc., (hereinafter "Dewey Freight") and the United States Postal Service (hereinafter "USPS") entered into a contract for mail delivery services.  *Dewey Freight Sys.*, 31 F.3d at 622.  Under the contractual terms, USPS paid an annual rate in thirteen four-week installments to Dewey Freight and in exchange Dewey Freight shipped mail from St. Louis to Kansas City, and then from Kansas City to Milwaukee (hereinafter "Original Contract").  *Id*.  In July 1991, Dewey filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  *Id*.  Dewey continued shipping mail and USPS continued making payments pursuant to the Original Contract's terms.  *Id*.  However, in September 1991, Dewey sought to assign its rights under the Original Contract to another trucking company but USPS refused.  *Id*.  Dewey informed USPS that it would stop performing under the Original Contract and USPS proceeded to solicit bids for the trucking routes in the Original Contract on an emergency basis (hereinafter, the "Emergency Contract").  *Id*.  A trucking company was awarded the trucking routes under the Emergency Contract.  *Id*.  Because of the emergency basis, USPS paid higher, short-term rates under the terms of the Emergency Contract than in the Original Contract.  *Id*.  USPS would have incurred approximately $27,000.00 from the cost of awarding the Emergency Contract to another trucking company and under the new rates of the Emergency Contract as well.  *Id*.  To prevent this, USPS filed a motion to lift the automatic stay to recuperate $18,959.32 from Dewey Freight's next installment payment under the Original Contract.  *Id*.

The bankruptcy court denied USPS's motion instructing USPS to pay the amounts due under the Original Contract and Emergency Contract and file an unsecured claim for Dewey Freight's failure to perform under the Original Contract. *Id*. The bankruptcy court opined –

> "(i) the trucking contracts were executory when Dewey petitioned for Chapter 11 protection and therefore governed by § 365; (ii) Dewey as debtor-in-possession rejected those contracts when it refused to perform; (iii) under § 365(g)(1) and § 502(g), a damage claim for rejection of an executory contract 'must be administered through bankruptcy and receive the priority provided general unsecured creditors[;'] and (iv) USPS may not invoke the equitable doctrine of recoupment because the money owed Debtor for post-petition shipments and USPS's damage claim for rejection of the contracts 'did not arise out of the same transaction.'"

*Id*. (internal citation omitted).

USPS appealed to the U.S. District Court, which affirmed the Bankruptcy Court. *Id*. USPS then appealed to the Eighth Circuit Court of Appeals. *Id*. The Eighth Circuit Court of Appeals affirmed the District Court decision and concluded that USPS's claim should be given general unsecured status. *Id*. at 625. The Court determined that because the claim arose prior to rejection, USPS's recoupment claim was entitled to an administrative status only upon USPS proving a benefit to Dewey Freight's estate. *Dewey Freight Sys*., 31 F.3d at 624. However, the Eighth Circuit Court of Appeals found that the recoupment claim was not administrative because the claim sought damages for Dewey Freight's failure to perform under the Original Contract. *Id*. The Eighth Circuit found that the Original Contract was still enforceable by Dewey Freight until it ceased performance— the Court's reasoning being that executory contracts which are not rejected remain in existence and thus are enforceable *by the debtor* – not *against* the debtor. *Id.* (citing *Bildisco*, 465 U.S. at 532). The Court noted that "[i]n other words, USPS had no claim at all for post-petition nonperformance until the contracts were rejected under § 365(a)." *Id*.

16

at 625.  Once rejected, the only "remedy for breach of the executory portions of the contract was governed by § 365(g)(1) and § 502(g)." *Id*.

Debtors were entitled to pursue rejection up until confirmation of their plan—which they did.  There were stringent requirements that Debtors bear the burden of proof to show rejection is warranted—again, Debtors successfully carried this burden.  The Rejection Order authorized the rejection of *all* of the Encore Agreements. *See* Rejection Order, Doc. 351.  Once the Encore Agreements were rejected, the Claims and damages therein were given general unsecured status.  Encore stopped furnishing ABC and ABNE with natural gas before the Rejection Order was entered. Debtors made their final service payments to Encore prior to the Rejection Order.  By April 28, 2016, Encore received a total of $882,220.96 from ABC and $1,307,360.73 from ABNE.

Encore attempts to circumvent the Rejection Order through the filing of the Claims under the guise of recovering administrative expenses pursuant to the ABC Trueup Invoice and ABNE Trueup Invoice.  The Bankruptcy Code and Eighth Circuit make clear in *Dewey Freight System, Inc.* that once a debtor has moved for rejection of a pre-petition executory contract and the court grants the rejection, the executory contract is given general unsecured status.[9]  *Dewey Freight Sys.*, 31 F.3d at 625 ("Where no benefits are received by the bankrupt estate or its representative under the contract, and the contract is not assumed, the creditor's claim is not entitled to priority[.]").  Even then, "a debtor-in-possession's rejection of a pre-petition contract does not give rise to an administrative priority claim."  *In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 442 (5th Cir. 2019).[10]  Thus, the amounts in the Claims are rejection damages and given general unsecured status.  Therefore,

---

[9] If the claim arose from a post-petition executory contract, the claim may be treated like an administrative expense.  *Dewey Freight Sys.*, 31 F.3d at 624; *see* 11 U.S.C. § 503(b)(1)(A); *Bildisco*, 465 U.S. at 531–32; *In re Jartran, Inc.*, 732 F.2d 584, 586-591 (7th Cir. 1984).

[10] Further, "a claimant is not entitled to an administrative claim because a debtor does not immediately reject an executory contract."  *In re IDL Dev., Inc.*, 2019 WL 5799325, at *3 (Bankr. Mass. Nov. 1, 2019) (citing *In re K Mart Corp.*, 290 B.R. 614, 621 (Bankr. N.D. Ill. 2003)); *see Dewey Freight Sys.*, 31 F.3d at 624 ("In other words, even if the debtor rejects long after commencement of the Chapter 11 proceeding, the Bankruptcy Code declares that the damage caused by the rejections is a pre-petition claim, so that it will not burden the reorganizing enterprise.").

17

**IT IS ORDERED THAT** Motion to Pay Claims, Alternatively, For Expedited Administrative Claims Discovery and Trial, and For Related Relief (Doc. 2234) is **DENIED**; and

**IT IS FURTHER ORDERED THAT** GUC Liquidating Trustee's Forty-Fourth Omnibus Claims Objection Seeking to Reclassify Certain Claims (Doc. 2243) is **SUSTAINED** and the Claims are allowed as unsecured claims.

*Kathy A. Surratt-States*
KATHY A. SURRATT-STATES
United States Bankruptcy Judge

DATED: September 3, 2025
St. Louis, Missouri

Copies to:

**Office of the United States Trustee**
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Suite 6.353
St. Louis, MO  63102

Thomas O. Ashby
Baird Holm LP
1700 Farnam St.-Ste. 1500
Omaha, NE 68102

Robert E. Eggman
Carmody MacDonald P.C.
120 South Central Ave., Ste. 1800
St. Louis, MO 63105

Mark V. Bossi
Thompson Coburn
One US Bank Plaza
St. Louis MO 63101

Ronald J. Silverman
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017

Thomas H. Riske
Carmody MacDonald P.C.
120 South Central Ave., Ste. 1800
St. Louis, MO 63105

David D. Farrell
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101

Erin N. Brady
Hogan Lovells US LLP
1999 Avenue pf the Stars. Ste 1400
Los Angeles, CA 90067